

# VOLUME 1 OF 3

STATE OF SOUTH CAROLINA

IN THE SUPREME COURT

---

Appeal from Richland County

William P. Keesley, Circuit Court Judge

---

JERIOD PRICE,

PETITIONER,

V.

STATE OF SOUTH CAROLINA,

RESPONDENT

---

## A P P E N D I X

---

ELIZABETH A. FRANKLIN-BEST
Appellate Defender

South Carolina Commission on Indigent
Defense
Division of Appellate Defense
PO Box 11589
Columbia, S. C. 29211-1589

ATTORNEY FOR PETITIONER

HENRY DARGAN MCMASTER
Attorney General

JOHN W. MCINTOSH
Chief Deputy Attorney General

SALLEY W. ELLIOTT
Assistant Deputy Attorney General

BRIAN PETRANO
Assistant Attorney General
P. O. Box 11549
Columbia, S. C. 29211

ATTORNEYS FOR RESPONDENT

i

## INDEX

INDEX ................................................................................................................. i

TRIAL TRANSCRIPT DATED DECEMBER 15-19, 2003 .............................................. 1

FINAL BRIEF OF APPELLANT ................................................................................ 971

FINAL BRIEF OF RESPONDENT ............................................................................ 983

STATE V. PRICE, 368 S.C. 494, 629 S.E.2d 363 (2006) ........................................... 1000

APPLICATION FOR POST-CONVICTION RELIEF ..................................................... 1005

AMENDED APPLICATION FOR POST-CONVICTION RELIEF ..................................... 1028

RETURN ............................................................................................................. 1043

POST-CONVICTION RELIEF HEARING TRANSCRIPT .............................................. 1049

ORDER OF DISMISSAL ........................................................................................ 1075

CLERK OF COURT RECORDS ............................................................................... 1089

1

ORIGINAL

State of South Carolina    )    In the Court of
                           )    General Sessions
County of Richland         )


State of South Carolina,    )
                            )    2003-GS-40-2295
        Plaintiff,          )
                            )
        vs.                 )      **TRIAL**
                            )
Jeroid J. Price,            )    PARTIAL TRANSCRIPT
                            )
        Defendant.          )
_____    )


December 15, 16, 2003
(Partial transcript of record)
Richland County, South Carolina

Before the Honorable Reginald I. Lloyd, Judge


A-P-P-E-A-R-A-N-C-E-S:

David M. Pascoe, Jr., Esq.
Donald N. Sorenson, Esq.
Bryan Jeffries, Esq.
For the State

Cameron B. Littlejohn, Jr., Esq.
Amye Rushing, Esq.
For the Defendant


Rema K. Gantt
Circuit Court Reporter

**2**

2

I-N-D-E-X

PAGE NO.

Monday, December 15, 2003

Pretrial motions                                    6

Jury qualification                                 25

Jury sworn                                         26

Opening Statements

    by the State                                  64

    by the Defense                                74

WITNESSES FOR THE STATE:

    Ryan Brooks

        Direct                                     82

        Cross                                     110

        Redirect                                  127

        Recross                                   130

    Marcus Jones

        Direct                                    133

        Cross                                     158

        Redirect                                  169

    Damien Martin

        Direct                                    172

        Cross                                     176

    Deputy David E. Lucas

        Direct                                    180

        Cross                                     189

**3**

3

I-N-D-E-X

PAGE NO.

Tuesday, December 16, 2003

WITNESSES FOR THE STATE:

Joe Jones

    Direct                      199

    Cross                      210

    Redirect              222

Deandre Eiland

    Direct                      225

    Cross                      235

    Redirect              240

Chemique Eillington

    Direct                      243

    Cross                      259

    Redirect              268

James D. Cattenhead

    Direct                      271

    Cross                      281

    Redirect              289

    Recross               290

Inv. James Richardson

    Direct                      296

    Cross                      299

Jason Wood

**4**

4

I-N-D-E-X

|                                       | PAGE NO. |
|---------------------------------------|----------|
| Jason Wood                            |          |
| Direct                                | 334      |
| Cross                                 | 352      |
| Redirect                              | 361      |
| Recross                               | 365      |
| Inv. Anna Elsey Clemmons              |          |
| Direct                                | 366      |
| Cross                                 | 389      |
| Redirect                              | 402      |
| Lt. Joe Powell                        |          |
| Direct                                | 405      |
| Cross                                 | 415      |
| Redirect                              | 420      |
| Anthony Patrick                       |          |
| Direct                                | 422      |
| Cross                                 | 447      |
| Redirect                              | 450      |
| Court Reporter's Certification        | 453      |

(Continuation of trial reported by Daphne Helms.)

**5**

5

E-X-H-I-B-I-T-S

(See attached exhibit list.)

6

## STATE V. JEROID PRICE

## EVIDENCE LIST

**ADMITTED**

| | |
|---|---|
| ☑ AC | 1. Diagram inside club |
| ☑ AC | 2. Diagram outside |
| ☐ Dr.S | 3. Diagram outside |
| ☑ Dr.S | 4. Body diagram |
| ☑ DgR | 5. Bullet from V's body |
| ☑ DgR | 6. Photo - Exterior front door |
| ☑ DgR | 7.    - Exterior w/patrol cars |
| ☑ AC | 8.    - View exit→stage |
| ☑ AC | 9.    - Interior |
| ☑ DgR | 10.    - Back towards exit |
| ☑ AC | 11.    - Similar to #10 |
| ☑ | 12.    - Bar – TV in corner |
| ☑ | 13.    - Bar other angle |
| ☑ | 14.    - Bar – Bud Light banner in center |
| ☑ | 15.    - Body – distance w/black chair |
| ☑ AC | 16.    - Body w/markers 1 → 3 |
| ☑ DgR | 17.    - Body w/markers 3 → 6 |
| ☑ AC | 18.    - Marker 1 |
| ☑ | 19.    - Marker 2 |
| ☑ | 20.    - Marker 3 |
| ☑ | 21.    - Marker 4 |
| ☑ | 22.    - Marker 5 |
| ☑ | 23.    - Marker 6 |
| ☑ | 24.    - Body in corner |
| ☑ | 25.    - Head on exit sign |
| ☑ | 26.    - Marker 7 distant |
| ☑ | 27.    - Marker 7 close-up |
| ☑ | 28.    - Marker 8 distant |
| ☑ | 29.    - Marker 8 close-up |
| ☑ | 30.    - Carpet cut distant |
| ☑ | 31.    - Marker 8 w/hole cut out |
| ☑ | 32.    - Floor under marker 8 |
| ☑ | 33.    - Wall markers 1 – 4 distant |
| ☑ | 34.    - Wall markers 1 – 4 up close |
| ☑ | 35. Photo – Wall markers 1 – 2 |
| ☑ | 36.    - Wall markers 2 – 3 |
| ☑ AC | 37.    - Wall markers 2 & 4 |
| ☐ | 38. Tape – Δ's voicemails — *never existed* |

*Jim Truitt  12-19-03*

**7**

☑ SS  39. Tape – V's 911 call
☑ AP  40. Photo line-up of defendant
☑ AS  41. Photo line-up of Ryan Brooks
☑ AC  42. .380 shell casing – marker 3
☑  43. .40 cal. Shell casing – marker 4
☑  44. .40 cal. Shell casing – marker 5
☑  45. Bullet on exit sign – marker 7
☑  46. Bullet fragments from marker 8
☑  47. Bullet fragment from marker 6
☑ AC  48. Bullet fragment from marker 1
☐  ~~49. Cell phone – marker 2~~  *does not exist*
☑ RB  50. Photo Ryan Brooks – afro
☑ RB  51. Photo Ryan Brooks – braids
☑ RB  52. Photo Ryan Brooks – red bandana
☐  ~~53. Black 40 cal. demonstrative~~  *does not exist*
☐  ~~54. Chrome 380 demonstrative~~  *does not exist*
☐  55. Diagram of differences between Brooks and A
☑ AP  56. Anthony Patrick's phone records
☑ SS  57. Jeroid Price's phone records
☑ JJ  58. Joe Jones affid. ID'ing Brooks (#1 or 8)
☑ RB  59. Brooks advice of rights
☐  60. Brooks statement 7 pp.
☑ SS  61. Photo of A + Jaylu
☑ SS  62. Bag of red clothing /hats
☑ SS  63. green bullet proof vest
☑ SS  64. blue bullet proof vest
☑ SS  65. camo flak jacket
☑ SS  66. red notebook
☑ SS  67. "Blood" bible
☑ JW  68. J. Wood 12/03 stmt.
☑ JW  69. J. Wood 1/03 stmt.
☑ J.Au  70. GSW left arm – V
☑ A.P.  71. BB pistol – A.P.
☑ SS  72. 32 cal. ammo
☐ ●  73. Ruger 9 mm gun box
☑ SS  74. 40 cal ammo box
☐  75. 9 mm ammo
☑  76. ~~Winchester~~ 357 ammo
☑ SS  77. clip (40 cal.?)
☑ SS  78. 380 box
☐  79. lg. clip  – ID → retained by the State
☑ SS  80. cell phone box
☑ SS  81. paperwork for Pieus 380
☑ SS  82. 6/14/02 CZ 40 paperwork
☑ SS  83. ~~~~ – Firearms application

8

☐  84  Polaroids from search △ apt
☐  85       "
☐  86       " .
☐  87       "
☐  88       "
☐  89       "
☑ss  90  Discount Guns receipt
☑ss  91  11/2/02 9mm paperwork
        92  ammo - 38

Court's exhibits
1) State's request to charge "
2) defense  "  "  "  "
3) jury question          "

**9**

## RECEIPT FOR EXHIBITS

Case No. _03-GS-40-2295_

Plaintiff: _State of S.C._

Defendant: _Jarsid Price_

Date Trial Started: _12/15/03_

Judge _R. Lloyd_

Pltf's Atty. _Pascoe, Sorenson, Jeffries_

Def's. Atty _Littlejohn, Rushing_

Date Trial Ended: _____

Received of _____, Court Reporter for the above case, these exhibits:

| Date | | Clerk of Court Use |
|------|------|------|
| 1 | Def. 1. Notes of Jor. Robinson ✱ | |
| 2 | 12/15/02    ID | |
| 3 | 2. photo   ID | ✓ |
| 4 | 3. photo | ✓ |
| 5 | 4. photo | ✓ |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | ✱ retained by defense attorney | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |

This _19_ day of _December_ ● _2003_        Page _____ of _____

By: _____

Richland County Clerk of Court

Clerk should retain <u>white</u> copy in Civil cases, <u>yellow</u> copy in Criminal cases.

Revised 3/96

10

Date: 12/15/03

County: Richland

## VOIR DIRE

Case No: 03-GS-40-2295

Pl./State: State

Defendant: Jerald Price

Court Reporter: _Laura Gantt_

Judge: R. Lloyd

State/Pl's. Atty: Pascoe, Swanson, Jeffican

Defense Atty: Littlejohn, Rushing

Page 1 of 2

| Juror No. | Name | Sex | Race | *Court | Strikes Plaintiff | Defense | Accept |
|---|---|---|---|---|---|---|---|
| 59 | Kenneth Elliott | M | B | | ✓ | X 1 | |
| 208 | Georgia Huntley | F | W | | ✓ | ✓ | 1 |
| 89 | Valerie Hayden | F | W | | ✓ | ✓ | 2 |
| 27 | Anthony Brown | M | B | | ✓ | ✓ | 3 |
| 210 | James Petrus | M | W | | ✓ | X 2 | |
| 136 | Donald Nelson | M | W | | ✓ | X 3 | |
| 124 | Anne Milliken | F | W | | ✓ | ✓ | 4 |
| 14 | Tonya Bittner | F | W | | ✓ | ✓ | 5 |
| 22 | Christina Brady | F | W | | ✓ | ✓ | 6 |
| 153 | Christopher Reese | M | B | | ✓ | ✓ | 7 |
| 214 | Richard Brown | M | W | | ✓ | X 4 | |
| 114 | Irma Lowman | F | B | | ✓ | ✓ | 8 |
| 110 | Gail King | F | B | | ✓ | ✓ | 9 |
| 88 | Rachel Hawkins | F | W | | ✓ | X 5 | |
| 211 | Mary Wagoner | F | W | | ✓ | X 6 | |
| 92 | Peter Hill | M | W (S) | | ✓ | ✓ | 10 |
| 149 | David Peters | M | W | | ✓ | X 7 | |
| 116 | Michael Manning | M | W | | ✓ | X 8 | |

r the court column, please indicate who made the motion to strike the jurors "for cause".
th a "C" for Court, "P" for Plaintiff

11

Date: _12/15/03_

County: _Richland_

VOIR DIRE

se No: _03-GS-40-2295_          Judge: _R. Lloyd_

:/State: _State_          State/Pl's. Atty: _Pascoe, Sorenson,_

_Jeffries,_

fendant: _Jerroid Price_          Defense Atty: _Littlejohn, Rushing_

urt Reporter: _Renee Scott_

_Page 2 of 2_

| ror No. | Name | Sex | Race | Court | Strikes Plaintiff | Defense | Accept |
|---------|------|-----|------|-------|-------------------|---------|--------|
| 180 | Wesley Jennings | M | W | | ✓ | ✓ | 11 |
| 26 | April Bromer | F | W | | ✓ | ✓ | 12 |
| Alts: | | | | | | | |
| 206 | Charles Wook | M | W | | ✓ | ✓ | 1 |
| 118 | Kimberly Massey | F | W | | ✓ | X 1 | |
| 179 | George Stone | M | W | | ✓ | X 2 | |
| 1 | James Adams | M | B | X 1 | | | |
| 182 | Jason Sutton | M | B | | ✓ | ✓ | 2 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

or the court column, please indicate who made the motion to strike the jurors "for cause".
ith a "C" for Court, "P" for Pla...

**12**

6

1    Monday, December 15, 2003

2            THE COURT:  Yes, sir, Mr. Littlejohn?

3            MR. LITTLEJOHN:  Your Honor, we've been

4    provided a witness list by the State this morning, just

5    a few moments ago.  We had been provided at least two

6    or three other lists as we were going through the

7    discovery process.  And I had talked with Mr. Pascoe on

8    a number of occasions about our concern that if the

9    State had subpoenaed witnesses that they not be

10   released until we had an opportunity to object or

11   otherwise work it out with the State as to their being

12   released because we may wish to call them as a witness.

13           As the Court knows, we're court-appointed,

14   and I just didn't want to have to go through a double

15   subpoenaing process.  And as I understand from my

16   discussions with Mr. Pascoe -- and he can correct me if

17   I'm wrong -- the witnesses that are on the list today

18   have either been subpoenaed or, if they're law

19   enforcement, otherwise contacted to be here and would

20   be available to both the State and the defense.

21           THE COURT:  Mr. Pascoe, does that represent

22   your understanding?

23           MR. PASCOE:  Not necessarily, Your Honor.  As

24   I told Mr. Littlejohn last week, sometimes I put them

25   on there because these names might come up, and I want

**13**

7

1   to make sure that the jurors don't know who some of

2   these people are.  Mr. Littlejohn and I went over last

3   week some people that he wanted me to subpoena, and

4   we've already discussed those.  And I told him who was

5   under subpoena and that I wouldn't release any certain

6   people from subpoena unless he wanted me to.

7          THE COURT:  Okay.  Is there anybody in

8   particular, Mr. Littlejohn, that you're interested in?

9          MR. LITTLEJOHN:  Your Honor, yes, sir.  If

10  the Court will allow me to go down the list, I'll be

11  glad to.

12          THE COURT:  Yes, sir.

13          MR. LITTLEJOHN:  There's a Tiffany Blanding.

14  I understand she is under subpoena.

15          MR. PASCOE:  Is that what I told you last

16  week?

17          MR. LITTLEJOHN:  Yes.

18          MR. PASCOE:  I'll have to go back and check.

19  Whatever I told you last week, I don't recall whether

20  she's actually under subpoena or not.  We can probably

21  get her here, though.

22          THE COURT:  Do you have a list of --

23          MR. LITTLEJOHN:  To refresh Mr. Pascoe's

24  memory, Your Honor --

25          THE COURT:  Yes, sir.

**14**

8

1          MR. LITTLEJOHN:  -- he did tell me she was

2    under subpoena.  I just wanted to make sure she was

3    available.

4          THE COURT:  Okay.

5          MR. PASCOE:  I'll double-check on that one,

6    Your Honor.

7          THE COURT:  Okay.  Thank you, sir.

8          MR. LITTLEJOHN:  Your Honor, the next one

9    would be Michael Boynton, and I understand he is under

10   the State's subpoena.

11         MR. PASCOE:  He is, Your Honor.

12         MR. LITTLEJOHN:  There was a Myron Jacobs,

13   which I see on the list.  Mr. Pascoe informed me that I

14   would need to subpoena him.  I don't know if the State

15   has already subpoenaed him.

16         MR. PASCOE:  I'll just have to check on that

17   one and see, Your Honor.

18         THE COURT:  Okay.  Thank you, sir.  I take it

19   the defense has not subpoenaed him?

20         MR. LITTLEJOHN:  No, Your Honor.  We have

21   issued a subpoena, but we have not served it, because

22   we didn't want to duplicate the effort.

23         THE COURT:  Got you.  Thank you.

24         MR. LITTLEJOHN:  Your Honor, then there's

25   Anthony Sherman Patrick.  He is on the State's list,

9

1    and I understand he is under subpoena.

2            MR. PASCOE:  Yes, sir.

3            MR. LITTLEJOHN:  Tameka Cole, I understand

4    she is under the State's subpoena.

5            MR. PASCOE:  Yes, sir.

6            MR. LITTLEJOHN:  Your Honor, there's an Andre

7    Davis.  I do not see him on the State's list, so

8    obviously we'll be responsible for him.  There's a

9    Jermaine Evans, which I understand from Mr. Pascoe that

10   he is under the State's subpoena.

11           MR. PASCOE:  Yes, sir.

12           MR. LITTLEJOHN:  Your Honor, Ronald Hamilton,

13   Rachiem Monroe, and Derrick Watson.

14           MR. PASCOE:  Yes, sir.

15           THE COURT:  Okay.  Thank you, Mr. Pascoe.

16           MR. LITTLEJOHN:  And I guess the last would

17   be C.J. Frye.

18           MR. PASCOE:  I'll have to check on him.  I

19   don't know if he's under subpoena or not.

20           THE COURT:  Okay.  Thank you.

21           MR. LITTLEJOHN:  Your Honor, last would be

22   Shameka Wright.

23           MR. PASCOE:  Yes, sir, she's under subpoena.

24           THE COURT:  Okay.  Thank you.

25           MR. LITTLEJOHN:  Thank you, Mr. Pascoe.

**16**

1          MR. LITTLEJOHN:  Your Honor, it's also my

2  understanding from discussions with Mr. Pascoe that

3  they would have a witness here to testify as to the

4  toxicology [sic] test that was run on the victim's

5  blood.

6          THE COURT:  Mr. Pascoe, is that -- I'm sorry?

7          MR. PASCOE:  We put him on the witness list.

8          THE COURT:  Okay.

9          MR. PASCOE:  Is he under subpoena?  I think

10  we touched base to make sure he's available, but we

11  didn't send a subpoena.

12          THE COURT:  And he was not one that you had

13  discussed putting up?  Okay.

14          MR. LITTLEJOHN:  Your Honor, also there was a

15  gunshot residue test that was done on the victim's hand

16  that came back positive, and I just want to make sure

17  there was an agent here from the State Law Enforcement

18  Division that could testify to those results.

19          THE COURT:  I'm not certain if he is one that

20  you all discussed --

21          MR. PASCOE:  Yes, sir.

22          THE COURT:  -- under subpoena.  Okay.

23          MR. PASCOE:  Down here, under the names.

24          MR. LITTLEJOHN:  Your Honor, one last lay

25  witness I want to ask you about is Christopher Wright.

11

1  He is on the State's list.

2         THE COURT:  Okay.  He's one that you all

3  talked about the State subpoenaing?

4         MR. PASCOE:  I don't think he's under

5  subpoena.

6         MR. LITTLEJOHN:  I don't think we talked

7  about him, Your Honor.

8         THE COURT:  Okay.

9         MR. PASCOE:  I don't think he's under

10  subpoena, Your Honor.

11         THE COURT:  Okay.  Thank you, sir.

12         MR. LITTLEJOHN:  Your Honor, while we're

13  talking about witnesses, it's my understanding from

14  talking to Mr. Pascoe that they have given us by way of

15  discovery an open file situation.  And Mr. Pascoe has

16  assured me that they would not call any witnesses whose

17  statements we had not received.  And I just want to

18  make sure we're still operating on that same

19  understanding.

20         Now, I understand with some of the expert

21  witnesses and some of the law enforcement there may not

22  be any formal statements.  But from the standpoint of

23  just lay or fact witnesses, I just want to confirm that

24  we are operating under that understanding.

25         MR. PASCOE:  I told Mr. Littlejohn he had all

**18**

12

1    of the statements that I have.

2              THE COURT:  Okay.

3              MR. PASCOE:  And, as Your Honor knows, I

4    think he is not even entitled to those statements, but

5    I gave them to him as part of my open file policy.

6              THE COURT:  Okay.  It's my understanding the

7    State's not taking the position that you're limited to

8    those witnesses in terms of fact in this.

9              MR. PASCOE:  Exactly.

10             THE COURT:  Is your understanding different,

11   Mr. Littlejohn?

12             MR. LITTLEJOHN:  Your Honor, if he's telling

13   me he's given me the statements beforehand, that's

14   fine.

15             THE COURT:  Okay.

16             MR. LITTLEJOHN:  I just didn't want to get in

17   a situation where under 5-82 he puts a witness up, who

18   then gives a statement, and we have to ask for a recess

19   or a continuance or whatever.  I just wanted to make

20   sure we were doing that in advance, which makes it a

21   whole lot easier for the Court and everybody.

22             THE COURT:  Yes, sir.

23             MR. PASCOE:  Yes, sir.  And we shouldn't have

24   that problem.

25             THE COURT:  Okay.  Thank you, sir.

13

1          MR. LITTLEJOHN:  Your Honor, still while

2     we're talking about discovery, Mr. Sorenson may be able

3     to put this on the record.  There were a number of

4     items that were seized at the crime scene that were

5     analyzed early, taken into custody by the Sheriff's

6     Department, later analyzed by SLED or other agencies.

7          Those items number one through 21, I believe,

8     Your Honor, but there was missing an item 13 and an

9     item 18.  We don't have any written information about

10    that.  But it's my understanding that item 13 are some

11    shoes that came from my client's apartment, which were

12    analyzed and there were no tests that were relevant to

13    this case.  And I'm not sure what item number 18 is.

14    And If we could just have the State put that on the

15    record, I would appreciate it.

16          THE COURT:  Okay, Mr. Sorenson.

17          MR. SORENSON:  It's my understanding, Your

18    Honor, item 13 is going to be blood.  I'm assuming

19    that's the victim's blood from the autopsy.  I'm not

20    100 percent sure if it's blood.  Item 18 is boots.

21          THE COURT:  Thank you, sir.

22          MR. LITTLEJOHN:  Your Honor, it's my

23    understanding from the reports that item 14 was the

24.   blood that came from the victim, and that was the

25    reason for my inquiry.  I couldn't determine what item

14

1    13 was.

2         MR. SORENSON:  And I'm not sure what this has

3    to do with pre-trial, but they've informed me that item

4    13 is blood.  It's obviously something he can take up

5    with the witnesses when they testify.

6         THE COURT:  I'm at a little bit of a loss,

7    too.  I don't know if there have been some discussions

8    between the State and defense counsel as to those

9    items.  I take it from the State's response that

10   there's been none regarding that particular matter.

11        MR. LITTLEJOHN:  Your Honor, I guess my

12   quandary is this.  I've got a SLED report that says

13   that item 14 is blood, and I don't have anything to

14   identify item 13.  And I'm just wondering what 13 is.

15   If it's something exculpatory, we certainly think we're

16   entitled to it.

17        THE COURT:  Certainly.

18        MR. LITTLEJOHN:  It may not be.  I'd just

19   like to know what it is.

20        THE COURT:  I will trust that the State will

21   respond --

22        MR. LITTLEJOHN:  Okay.

23        THE COURT:  -- that they've complied with

24   Brady and Rule 5.  And certainly, if they try to

25   introduce something contrary to that, we'll take it up

15

1    at that point.

2           MR. LITTLEJOHN:  Your Honor, there's mention

3    in the discovery of a telephone call that was

4    purportedly made by the victim in this case at 2:14 on

5    the night in question, a 911 call.  And I know there is

6    a tape of it.  The Solicitor's Office has played the

7    tape for me.

8           I would just like to make a motion in limine

9    at this time to resurrect the issue of admissibility of

10   the substance of that call at such time as the State --

11   if they seek to introduce it.

12          THE COURT:  Okay.  I don't know whether they

13   intend to introduce it or not.  But if you want to make

14   a motion in limine, I'll be glad to hear that -- I

15   don't know if you've got some other stuff -- if you

16   want me to hear that now.

17          MR. LITTLEJOHN:  Your Honor, we can take it

18   up when they get to it.  I don't think it would be a

19   lengthy hearing.  I just wanted to state from the

20   outset so we're aware of that as an issue.

21          THE COURT:  Thank you.

22          MR. LITTLEJOHN:  Your Honor, two last things.

23   There is a witness whose name was Marcus Martin, we

24   were informed.  I believe the State or Mr. Jeffries has

25   indicated his name is actually Marcus Jones.  Your

1    Honor, we would like to ask the Court for a hearing as

2    to any issue as to identification, if the State seeks

3    to elicit an in-court identification from this witness.

4    It's my understanding he was unable to pick out who he

5    thought was the shooter in a photographic lineup.

6            And if they're going to attempt to import

7    identification, we'd like to have that issue determined

8    by the Court prior to it going before the jury.  Your

9    Honor, I think the last thing we have, we would move

10   under Rule 6-15 for the witnesses to be excluded -- the

11   State's witnesses.

12           THE COURT:  Okay.  Does the State have any

13   objection to sequestering?

14           MR. SORENSON:  No, Your Honor, I don't think

15   so.  If I do, can I bring it back up --

16           THE COURT:  Yes, sir.

17           MR. SORENSON:  -- before we get into that?

18   As of this time, I've got no problems with sequestering

19   the witnesses.

20           THE COURT:  Okay.  Are there any particular

21   law enforcement that you --

22           MR. SORENSON:  Oh, I'd ask that the lead

23   investigators, like Stan Smith and Damon Robertson, be

24   allowed to stay in the courtroom, as well as really any

25   law enforcement.  There's no reason why they can't be

17

1    here, or the agents from SLED.

2            THE COURT:  Okay.  Any objection to that?

3            MR. LITTLEJOHN:  Your Honor, I don't have any

4    problem with him keeping his two investigators here,

5    the two case agents, as it were.  But the others, I

6    think the rule applies across the board to them.

7            THE COURT:  Is there any reason the law

8    enforcement, you suspect that they may mimic testimony

9    that they hear from the stand or would be influenced by

10   other testimony?

11           MR. LITTLEJOHN:  Your Honor, there's nothing

12   I can put my finger on.  But the rule is there for a

13   purpose, and we think that's one of the purposes.

14           THE COURT:  Okay -- because normally I don't

15   sequester.  But if neither side has an objection to it,

16   I'll certainly do that.  Otherwise, I would just let

17   them all -- unless somebody can articulate a specific

18   reason why certain witnesses may be likely to conform

19   their testimony from hearing other testimony , I won't

20   sequester.

21           MR. LITTLEJOHN:  Your Honor, if they're going

22   to keep the investigator, we'd like to keep Mr. Jones,

23   who's seated behind us.  He's our investigator.  I

24   don't anticipate him being a witness.

25           THE COURT:  Okay.  I take it the State has no

18

1   objection to that?

2          MR. SORENSON:  Yes, sir.

3          THE COURT:  All right.  All investigators can

4   stay in, and all other witnesses will be sequestered.

5   Anything further?

6          MR. LITTLEJOHN:  Your Honor, I believe that's

7   all we have at this time.

8          THE COURT:  As to the motion in limine as to

9   the 911 call, is there any response from the State?

10          MR. PASCOE:  We do intend -- I'll tell you,

11   we intend to introduce the 911 call that the victim

12   made to dispatch that night right before the shooting.

13   I think it's in line with all the case law as being

14   admissible.  I don't really think it's that much of a

15   problem.

16          THE COURT:  Mr. Littlejohn?

17          MR. LITTLEJOHN:  Your Honor, it's obviously

18   hearsay.  I don't see how it comes in under all the

19   case law.

20          MR. PASCOE:  Present sense impression, Your

21   Honor, State versus Shuler at Orangeburg; State versus

22   Garcia.  There are a bunch of cases.

23          THE COURT:  Your objection is just as to

24   hearsay?

25          MR. LITTLEJOHN:  Yes, Your Honor.  I think

19

1    he's offering it for the truth as a matter of

2    certainty.  The declarant is not available.

3            THE COURT:  I'll wait until they get ready to

4    offer that, and then we'll do a full hearing on that.

5    And I'll listen to it as well at that point.  Anything

6    further?

7            MR. LITTLEJOHN:  Your Honor, one thing that

8    was just brought to my attention, apparently the

9    Sheriff's Department has asked my client's family to

10   sit way up here in the gallery rather than behind us

11   here, and I just didn't know what the purpose of that

12   is.  Apparently, the victim's family is sitting behind

13   the Solicitor's table.

14           THE COURT:  I saw them move them from right

15   there where the jury goes.  If there are particular

16   family members that can fit on that first bench,

17   they're certainly welcome to sit there.  I remind you

18   all that this is not a long bench.  So we'll fit as

19   many of you on this bench right behind the defense

20   table as you can get.

21           THE COURT:  Okay.  Mr. Littlejohn, I also

22   understand you have requested voir dire?

23           MR. LITTLEJOHN:  Yes, Your Honor.

24           THE COURT:  Thank you, sir.

25           THE COURT:  Are there any objections from the

20

1    State?

2             MR. PASCOE:  We have no objections, Your

3    Honor, to those, as well as your normal jury charge.

4             THE COURT:  Okay.  We'll ask those, too, Mr.

5    Littlejohn.

6             MR. LITTLEJOHN:  Your Honor, one additional

7    thing, if I might, as we discussed briefly, at the

8    bench in the other courtroom.  Apparently, there was an

9    article in *The State* newspaper this morning that went

10   into some depth about the history of this case and some

11   earlier judicial proceedings.  The major concern is

12   this, Your Honor.  In that article -- and we'll be glad

13   to make it a part of the record -- the reporter gave an

14   account of pending charges against my client.

15            Those are charges that there has been no

16   disposition of.  They're fairly serious charges.  I

17   don't see how, being pending, there's any way in the

18   world they would come out during this trial.  But if

19   the jurors have read about those charges, it certainly

20   could influence them against the defendant.  And I have

21   a great deal of concern about that.  *The State*

22   newspaper obviously is the main newspaper in Richland

23   County and is probably the main newspaper which the

24   members of the jury panel would read.

25            And with that article, I'd be interested to

21

```
1    see what reaction we get.  And, Your Honor, I might
2    suggest perhaps individual voir dire by the Court might
3    be in order.
4              THE COURT:  We've certainly got enough jurors
5    here today, I think.  I don't know.  The whole panel
6    hasn't been released yet, have they, Ms. Scott?
7              MS. SCOTT:  No, Your Honor.
8              THE COURT:  Okay.  If we run into a problem
9    with that -- I had intended to inquire about that since
10   the article was in the paper this morning -- we'll
11   certainly see how many we can get from the panel we've
12   got.  We've got a lot of jurors, so I think we can
13   certainly deal with that.
14             MR. LITTLEJOHN:  Your Honor, would the Court
15   be inclined to ask the jurors individually about if
16   they've read the article?
17             THE COURT:  I'll certainly go through and ask
18   them if they've read the article and certainly instruct
19   them that they, number one, if they're selected on this
20   jury, should only consider that evidence presented in
21   this courtroom as well as my instructions on the law.
22             But I'll be glad to at any time, if anybody
23   has, in fact, read the newspaper article, see whether
24   or not they've formed any opinions about the defendant
25   based on that.
```

22

1            MR. LITTLEJOHN:  I guess maybe I'm being

2    overly cautious.  I was afraid that one juror might

3    respond and say, "Well, I read this in the paper," and

4    the rest of the jurors are sitting there and would hear

5    that inflammatory material.

6            THE COURT:  What I would probably do is call

7    them down and just bring them down here to the front

8    and see how much they did read and remember about it,

9    trying to see whether they've formed any opinions or

10   not.  Obviously, if they read it, I can't unring that

11   bell.  But they may have read it and not formed any

12   opinion about it, or they may have read Saddam and

13   never made it to the "Metro."

14           THE COURT:  Okay, anything further?  We'll

15   bring the jury up.

16           MR. LITTLEJOHN:  Nothing from the defense,

17   Your Honor.

18           MR. PASCOE:  I have two quick motions.

19           THE COURT:  Yes, sir.

20           MR. PASCOE:  We can do it now or later.  If

21   you want to bring the jurors up first, it's --

22           THE COURT:  Let me go ahead and deal with it.

23           MR. PASCOE:  The first motion was we did file

24   a reciprocal on this case.  I assume that there's going

25   to be no alibi, because we received no notice of alibi.

23

1          THE COURT:  Is that correct?

2          MR. LITTLEJOHN:  That's correct, Your Honor.

3          THE COURT:  Okay.  Thank you, sir.

4          MR. PASCOE:  Also, I make a motion barring

5    any evidence of third-party guilt as being

6    inadmissible.

7          THE COURT:  Okay.

8          MR. PASCOE:  If they're going to do that,

9    they just give us a heads-up.

10          THE COURT:  Okay.  Mr. Littlejohn?

11          MR. LITTLEJOHN:  Your Honor, from the

12    standpoint of our saying that Joe Jones did this and

13    not our client, no, sir, we don't have any evidence to

14    that effect.  There are some circumstances that will be

15    developed as the facts come out that there were a lot

16    of people there and a lot of circumstances that, quite

17    frankly, in my opinion don't add up.  But from the

18    standpoint of pointing a finger at some third party

19    definitively, no.

20          THE COURT:  Okay.  I'm not quite sure --

21          MR. LITTLEJOHN:  I'm sorry, I can't be any

22    more specific than that.

23          THE COURT:  Anything further as to that

24    point, Mr. Pascoe?

25          MR. PASCOE:  We might be able to take it up

24

1    later.

2              THE COURT:  Okay.

3              MR. PASCOE:  Thank you.

4              THE COURT:  Well, we'll address it again if

5    it becomes an issue.

6              THE COURT:  Any further witnesses, Mr.

7    Littlejohn, from the defense?

8              MR. LITTLEJOHN:  No, Your Honor.

9              THE COURT:  For voir dire purposes, everybody

10   that the defense may potentially call is on this list?

11             MR. LITTLEJOHN:  No, Your Honor.  If you'd

12   give me just a moment --

13             THE COURT:  Certainly.

14             MR. LITTLEJOHN:  -- there would not be many.

15   Your Honor, the only three we would add that we know of

16   at this time would be Chante Boyd --

17             THE COURT:  Boyd, B-O-Y-D?

18             MR. LITTLEJOHN:  -- B-O-Y-D, yes, sir; Kim

19   Miller; and Andre Davis.

20             THE COURT:  Okay.  Thank you, sir.

21             MR. LITTLEJOHN:  Thank you.

22             THE COURT:  Okay, we're ready for the jury.

23             MR. LITTLEJOHN:  Your Honor --

24.            THE COURT:  Yes, sir.

25             MR. LITTLEJOHN:  -- could we take just a

25

```
 1    moment?  My client didn't get to use the facilities on
 2    the way up.
 3              THE COURT:  All right, we'll take five
 4    minutes.
 5              MR. PASCOE:  Okay.
 6              THE COURT:  Thank you.  We'll be in recess.
 7                         (Break in proceedings.)
 8              THE COURT:  Okay, counsel, are you ready for
 9    the jury?
10              MR. LITTLEJOHN:  The defense is ready, Your
11    Honor.
12              MR. PASCOE:  Yes, sir.
13              THE COURT:  Okay.  Then we'll bring them up.
14              CLERK OF COURT:  Yes, Your Honor.
15                         (Jury panel in to be
16    qualified.)
17              THE COURT:  Ladies and gentlemen, we're ready
18    to begin the case of the State of South Carolina versus
19    Jeroid Price.  I'll explain to you all the charges in
20    this case in a little bit, but it's good to see you all
21    again.  I know we just saw each other about an hour
22    ago, I guess it was.
23              Again, for those of you who went through --
24    all of you did.  I know you all were asked questions
25    this morning during the qualification process, and I
```

26

1    have to ask you some more questions.  It will not be as

2    long as qualification, but I do need to go through

3    these questions with you before we begin the process of

4    selecting a jury for this particular trial.

5         I will have to ask you all to one more time

6    stand and raise your right hands and be sworn over.

7    Thank you.  If you all would, just stand and raise your

8    right hands.  Thank you.

9         CLERK OF COURT:  Ladies and gentlemen, please

10   answer "Yes, I do," after I give you this question.

11                    (The jury panel was sworn.)

12        CLERK OF COURT:  Thank you.

13        THE COURT:  Thank you.

14        THE COURT:  All right, ladies and gentlemen,

15   as I explained to you, this is the State of South

16   Carolina versus Jeroid Price.  I'd ask that Mr. Price

17   will stand and face the jury panel.  Mr. Price is the

18   young man in the gray suit standing with his attorneys.

19   And I would first ask if any member of jury panel is

20   related by blood, marriage, or otherwise has a close

21   personal relationship with Mr. Price.  If so, please

22   stand.  Okay, thank you, sir.

23        Ladies and gentlemen, Mr. Price is

24   represented by attorneys Cam Littlejohn and Amye

25   Rushing, and they've stood before and they're standing

27

1    next to Mr. Price. And I'd ask the same question -- if

2    any member of the jury panel is related by blood,

3    marriage, or otherwise has a close personal

4    relationship with Ms. Rushing or Mr. Littlejohn, or if

5    any member of the panel has ever been represented by

6    these attorneys. Okay, thank you.

7        Ladies and gentlemen, Mr. Price is charged in

8    the indictment with murder. The victim alleged in the

9    indictment is Mr. Carl Felder Smalls. And I would ask

10    if any member of the jury panel is related by blood,

11    marriage, or otherwise has a close personal

12    relationship or any friendship at all with Mr. Carl

13    Felder Smalls.

14        Ladies and gentlemen, the State is

15    represented by Assistant Solicitors David Pascoe, Don

16    Sorenson, and Bryan Jeffries, and they are standing in

17    front of you. And I would ask if any member of the

18    jury panel is related by blood, marriage, or otherwise

19    has a close personal relationship with either Mr.

20    Pascoe, Mr. Sorenson, or Mr. Jeffries. Thank you.

21        All right, ladies and gentlemen, I have a

22    long list of witnesses to read off to you. These are

23    potential witnesses in this trial. It may not mean

24    that all of them are called, but I do need to read the

25    entire list to you to again verify as to whether any

28

1    member of the panel is related to or has a friendship

2    with any of these individuals.  I will ask you all the

3    same question at the end of this list.

4         If, in fact, you do know somebody or are

5    related to somebody on this list, if you will just

6    stand as I call out this list, and I'll come back to

7    you at the very end.  I would also ask if any members

8    of this list as potential witnesses are in the

9    courtroom if you will stand as I read off your name.

10   The first name is Investigator Damon Robertson with the

11   Richland County Sheriff's Department; Steve Pearce with

12   the Richland County Sheriff's Department; Lt. Zane

13   Padgett with the Richland County Sheriff's Department;

14   Investigator Anna Elsey -- is that correct? --

15        MR. PASCOE:  Elsey, Your Honor.

16        MS. ELSEY:  Correct.

17        THE COURT:  -- Elsey with the Richland County

18   Sheriff's Department; Investigator Ray Livingston with

19   the Richland County Sheriff's Department; Dr. Ronald

20   Burns; Lt. Stan Smith with the Richland County

21   Sheriff's Department; Investigator David Goff with the

22   Richland County Sheriff's Department; Dave Lucas with

23   the Richland County Sheriff's Department; Chief David

24   Wilson with the Richland County Sheriff's Department;

25   Deputy Joe Davis with the Richland County Sheriff's

29

1    Department; Corporal Bill Allen with the Richland

2    County Sheriff's Department; Investigator Gene -- is it

3    Mincey? --

4            MR. MINCEY:  Yes, sir.

5            THE COURT:  -- Mincey with the Richland

6    County Sheriff's Department; Deputy David Collins of

7    the Richland County Sheriff's Department; Michael

8    Boynton; Kimathi Lewis; Maurice McDuffie; Lt. Joe

9    Powell of the State Law Enforcement Division; Special

10    Agent Cal Riley of the State Law Enforcement Division;

11    Special Agent Kimberly Black of the State Law

12    Enforcement Division; Ronald Hamilton; Jeffrey Lewis;

13    Damien Martin; Marcus Jones; David Sampson; Christopher

14    Wright; is it Rachiem? --

15            MR. PASCOE:  Rachiem, I think, Your Honor.

16            THE COURT:  -- Rachiem Monroe; Henry Foster

17    Phillips; Twanna Ivery; Kyle Green; Investigator James

18    Richardson of the Richland County Sheriff's Department;

19    Calvin Kizer; Myron Jacobs; Deandre Eiland; Mike

20    Hawthorne; Doron -- is it Guider?; Joe Jones; Tyron

21    Belton; Carlos Powell; Kimberly Jenkins; Shakir Lane;

22    Bernard Rambert; C.J. Frye.  I'm going to ask you to

23    help me again, Mr. Pascoe.

24            MR. PASCOE:  Chemiqua Ellington, Your Honor.

25            THE COURT:  Chemiqua Ellington; Tiffany

1    Blanding; Jermaine Evans; Crystal Frechette; Derrick

2    Cattenhead; Jamel Bryant; Ryan Brooks; Jason Wood;

3    Tameka Cole; Natalie Woods; Anthony Sherman Patrick;

4    Corey Lawrence; Chavee McGill; Derrick Watson; Jeremy

5    Coe; Lillie Smalls; Chante Boyd; Kim Miller; Andrea

6    Davis.

7         MR. LITTLEJOHN:  I believe that's Andre, I'm

8    sorry.

9         THE COURT:  I'm sorry -- Andre Davis.  Thank

10   you, sir.  Any member of the jury panel related by

11   blood, marriage, or otherwise either knows or has a

12   close personal relationship with any of those

13   individuals, if you'll just stand, please.  Yes, sir.

14        MR. PETRUS:  Brad Petrus.  I worked with

15   several of these football players and Carl Smalls when

16   he was a freshman here.

17        THE COURT:  Okay.  I'll ask you, sir -- and

18   when I ask you this question -- if you can be fair and

19   impartial in this case -- what I mean by that is, sir,

20   could you, despite your relationship with these

21   individuals or knowing them in whatever capacity -- you

22   said you worked with them?

23        MR. PETRUS:  Yes, sir.

24        THE COURT:  Could you fairly listen to the

25   evidence in this trial, take the charge as I give it at

31

1    the end of the case on the law, apply the law to the

2    facts fairly and impartially, and come to a fair

3    verdict for both the defendant and the State in this

4    case despite your relationship with those individuals?

5              MR. PETRUS:  Yes, sir.

6              THE COURT:  Okay.  Thank you, sir.

7              COURT REPORTER:  What was his number?

8              THE COURT:  Do you know your number, sir?

9              MR. PETRUS:  210.

10             THE COURT:  I'm sorry?

11             MR. PETRUS:  210.

12             THE COURT:  Okay.  Thank you, sir.

13             THE COURT:  Yes, ma'am.

14             MS. LOMAN:  I'm Erma Loman, Juror 114.

15             THE COURT:  Yes, ma'am.

16             MS. LOMAN:  It's Ron?

17             MR. SORENSON:  Yes.

18             THE COURT:  Yes.

19             MR. SORENSON:  Yes, sir.

20             MS. LOMAN:  I think he is my neighbor.

21             THE COURT:  Okay.  All right, ma'am, would

22   the fact that he was your neighbor in any way prevent

23   you -- the same question I asked the gentleman earlier

24   -- from being unable to be fair and impartial in this

25   case, hear the evidence, determine the evidence, and

32

1    take the charge on the law as I give it to you?

2              MS. LOMAN:  No, sir.

3              THE COURT:  Okay.

4              MS. LOMAN:  And Marcus Jones, I think may --

5    I have contacts with a Marcus Jones.

6              THE COURT:  Okay.  How do you know the Marcus

7    Jones?  Is he a close personal friend of yours?

8              MS. LOMAN:  My ex-husband's nephew.

9              THE COURT:  Okay.  Would the fact, ma'am,

10   that he was related to your ex-husband, again, in any

11   way prevent you from being fair and impartial to both

12   sides in this case?

13             MS. LOMAN:  No.

14             THE COURT:  Okay.  Thank you, ma'am.

15             THE COURT:  Yes, sir.

16             MR. THOMAS:  My name is Terry Thomas.  I go

17   to school with a lot of those people that you named.

18             THE COURT:  Okay.  Are they friends with you,

19   sir?

20             MR. THOMAS:  Yes, sir.

21             THE COURT:  Okay.  So let me ask you, based

22   on your relationship with any individuals on this list,

23   would it any way prevent you from being fair and

24   impartial, hearing the evidence as given, if you were

25   selected on this jury, from this witness stand and

33

1    introduced by this Court, and from taking the charge on

2    the law as I give it to you and being fair and

3    impartial to both the State and the defense, sir?

4              MR. THOMAS:  No, sir.

5              THE COURT:  Okay.  Thank you, sir.

6              THE COURT:  Okay, anyone else?  Is any member

7    of the jury panel related by blood, marriage, or a

8    friend of anyone who is employed in the Richland County

9    Solicitor's Office, the Richland County Sheriff's

10   Department, or the State Law Enforcement Division,

11   commonly known as SLED?  Yes, sir.

12             MR. CHAPMAN:  I teach at USC, Your Honor, and

13   I have taught some people from the State Law

14   Enforcement Division.

15             THE COURT:  Okay.  And your name, sir?

16             MR. CHAPMAN:  James Chapman.

17             THE COURT:  And do you remember your juror

18   number?

19             MR. CHAPMAN:  39.

20             THE COURT:  Okay.  Sir, would the fact that

21   you have taught some members of your classes who are

22   employed at SLED in any way cause you to not be able to

23   be fair and impartial to both the State and the

24   defendant in this case?

25             MR. CHAPMAN:  No, sir.

34

1          THE COURT:  Okay.  Thank you, sir.  Anyone

2     else?

3          THE COURT:  Okay, ladies and gentlemen, this

4     incident that is the subject of this trial occurred

5     back in 2002.  I would ask if any member of the jury

6     panel has either seen or heard news reports concerning

7     a shooting incident that took place at the Voodoo

8     Lounge on Garners Ferry Road in Richland County on

9     December 7, 2002.

10          The incident did result in the death of the

11     victim in this case, Carl Felder Smalls, who at one

12     time was a football player at the University of North

13     Carolina, as well as a year at the University of South

14     Carolina.  Has any member of the jury panel either seen

15     or heard news reports concerning this incident?  Let me

16     ask, if you all would, just stand.  Let me first ask,

17     has any member of the jury panel -- and I was going to

18     discuss with the entire jury panel, there was a news

19     article this morning in the "Metro" section of the

20     paper.

21          Let me find out first, did any member of the

22     jury panel see any news reports or see any newspaper

23     articles regarding this incident before the article

24     today?  If you would, just raise your hand -- before

25     today.

35

1            UNIDENTIFIED JUROR:  Today and before.

2            THE COURT:  Okay.

3            UNIDENTIFIED JUROR:  Did you just say just

4    news article or TV?

5            THE COURT:  Any news account at all -- okay.

6    If you all would, form a line over here at the end of

7    this front row, and I'll bring you down one at a time.

8            THE COURT:  All right, we still need quiet.

9            THE COURT:  Okay, yes, sir.

10            CLERK OF COURT:  Number 23, Your Honor,

11    Joseph Rutledge.

12            THE COURT:  Mr. Rutledge, I just need you to

13    come down here.

14            CLERK OF COURT:  Number 27, Anthony Brown.

15            CLERK OF COURT:  Number 182, Jason Sutton.

16            CLERK OF COURT:  Number 39, James Chapman.

17            CLERK OF COURT:  Number 146, Sheila

18    Pendarvis.

19            CLERK OF COURT:  Number 76, Willie Graham.

20            CLERK OF COURT:  Number 191, Michael Walls.

21            CLERK OF COURT:  Number 114, Erma Loman.

22            CLERK OF COURT:  Number 214, Richard Brown.

23            CLERK OF COURT:  Number 110, Gail King.

24            CLERK OF COURT:  Number 100, Wesley Jennings.

25            CLERK OF COURT:  Number 59, Kenneth Elliott.

```
1              CLERK OF COURT:   Number 179, George Stone.
2              CLERK OF COURT:   Number 149, David Peters.
3              CLERK OF COURT:   Number 210, James Petrus.
4              CLERK OF COURT:   Number 124, Ann Milliken.
5              CLERK OF COURT:   Number 11, Vanessa Bazemore.
6              CLERK OF COURT:   Number 184, Terry Thomas.
7              THE COURT:  Okay, thank you, ladies and
8     gentlemen.  Let me ask, has any member of the jury
9     panel been exposed in any way to what is commonly
10    called street gangs, such as Bloods or Crips, or has
11    any member of the jury panel formed any opinion about
12    street gangs such as those?
13             Is any member of the jury panel a member of
14    any group which advocates the enforcement of criminal
15    laws or advocates on behalf of the victims of criminal
16    violence, such as MADD, or CAV, or CADRE, or any such
17    groups as that?  Is anybody a member or contributor to
18    any such groups?
19             Is any member of the jury panel, whether I
20    had asked this specific question or not, aware of any
21    facts about this case that we've not already discussed
22    up here at the sidebar that would relate to what
23    happened on the incident in question, the day of the
24    incident in question, or relate to any of the potential
25    witnesses that may be called, or to the defendant, or
```

37

1    to the victim in any way?

2          Anybody aware of any personal facts or

3    knowledge of this incident?  Is any member of the jury

4    panel aware of any reason whatsoever, whether I've

5    asked you specifically in these questions or not, why

6    they could not sit in this case and be fair and

7    impartial to both the State and the defendant.  If so,

8    if you are aware of some reason, I'll be glad to bring

9    you down here and discuss that with you privately.

10          But is any member of the jury panel aware of

11   any reason whatsoever they do not believe they could

12   serve this week on this trial and be fair to both

13   sides?  Yes, sir.  Do you want to come down, sir?

14          THE COURT:  Yes, sir.  If you'd just state

15   your name.

16          MR. WISE:  Wendell Shane Wise.

17          THE COURT:  You need to speak up.

18          MR. WISE:  I'm mourning the loss of my wife

19   right now, and I don't think I can handle to go through

20   something like this serious.  Just mentally, I don't

21   think I can be fair or pay attention or anything like

22   that.

23          THE COURT:  Your wife just passed away when?

24          MR. WISE:  In July.

25          THE COURT:  I'm sorry to hear that, sir.  I

38

```
 1    appreciate your honesty based on your response that you

 2    don't believe you could sit here and listen to stuff

 3    like this that is unique to this trial.  Thank you,

 4    sir.

 5              MR. WISE:  Yes, sir.

 6              THE COURT:  I appreciate that.

 7              THE COURT:  Okay, thank you.

 8              THE COURT:  Counsel, anything further on voir

 9    dire for me at this time?

10              MR. LITTLEJOHN:  No, Your Honor.

11              MR. PASCOE:  No, Your Honor.

12              THE COURT:  Okay.  Thank you, counsel.  Are

13    both sides ready to do strikes?  We'll do ten and five,

14    then we'll do two alternates.  Thank you, ladies and

15    gentlemen.

16              MR. LITTLEJOHN:  Ten and five, Your Honor?

17              THE COURT:  Ten and five, yes, sir.

18              CLERK OF COURT:  Ladies and gentlemen of the

19    jury, if I should call out your name, please come

20    forward to this microphone stand here to my right,

21    state your name and occupation, and remain standing

22    there until I give you further instructions.  If you

23    have any personal items -- books, coats, umbrellas,

24    etc. -- bring those with you if I call out your name.

25    59, Kenneth Elliott -- number 59.
```

39

1          MR. ELLIOTT:  My name is Kenneth Elliott, and

2    I'm a student at USC.

3          CLERK OF COURT:  What says the State?

4          MR. PASCOE:  Please present Mr. Elliott.

5          CLERK OF COURT:  What says the defense?

6          MR. LITTLEJOHN:  Please excuse Mr. Elliott

7    from this case.

8          CLERK OF COURT:  Sir, if you would, please

9    return to the back of the courtroom there where you see

10   that deputy.

11         BAILIFF:  This way, please.

12         CLERK OF COURT:  208, George Huntley -- 208.

13         MS. HUNTLEY:  My name is Georgia Huntley.

14   I'm a student at USC and a server at Harper's

15   Restaurant.

16         CLERK OF COURT:  What says the State?

17         MR. PASCOE:  Please present Ms. Huntley.

18         CLERK OF COURT:  What says the defense?

19         MR. LITTLEJOHN:  Please seat Ms. Huntley.

20         CLERK OF COURT:  Please have a seat over here

21   in the jury box, as directed by the bailiff.

22         CLERK OF COURT:  89, Valerie Hayden -- number

23   89.

24         MS. HAYDEN:  Valerie Hayden, and I'm a nurse

25   at the Richland County Health Department.

40

1          CLERK OF COURT:  What says the State?

2          MR. PASCOE:  Please present Ms. Hayden.

3          CLERK OF COURT:  What says the defense?

4          MR. LITTLEJOHN:  Please seat Ms. Hayden.

5          CLERK OF COURT:  Please have a seat there in

6     the jury box, ma'am.

7          CLERK OF COURT:  27, Anthony Brown -- 27.

8          MR. BROWN:  My name is Anthony Brown.  I work

9     for the Office of the Budget and Control Board.

10          CLERK OF COURT:  What says the State?

11          MR. PASCOE:  Please present Mr. Brown.

12          CLERK OF COURT:  What says the defense?

13          MR. LITTLEJOHN:  Please seat Mr. Brown.

14          CLERK OF COURT:  Please have a seat in the

15     jury box, sir.

16          CLERK OF COURT:  210, James Petrus -- 210.

17          MR. PETRUS:  James Petrus, a college student

18     at USC.

19          CLERK OF COURT:  What says the State?

20          MR. PASCOE:  Please present Mr. Petrus.

21          CLERK OF COURT:  What says the defense?

22          MR. LITTLEJOHN:  Please excuse Mr. Petrus

23     from this trial.

24          CLERK OF COURT:  Sir, you may return to the

25     back there where you see the bailiff.

41

1          CLERK OF COURT:  136, Donald Nelson -- 136.

2          MR. NELSON:  My name is Donald Nelson.  I'm a

3    student at Midlands Tech.

4          CLERK OF COURT:  What says the State?

5          MR. PASCOE:  Please present Mr. Nelson.

6          CLERK OF COURT:  What says the defense?

7          MR. LITTLEJOHN:  Please excuse Mr. Nelson

8    from this trial.

9          CLERK OF COURT:  Yes, sir.  Please return to

10   the back of the courtroom where you see the bailiff.

11         CLERK OF COURT:  124, Ann Milliken -- 124.

12         MS. MILLIKEN:  Ann Milliken, and I'm a

13   housewife.

14         CLERK OF COURT:  What says the State?

15         MR. PASCOE:  Please present Ms. Milliken.

16         CLERK OF COURT:  What says the defense?

17         MR. LITTLEJOHN:  Please seat Ms. Milliken.

18         CLERK OF COURT:  Please have a seat here in

19   the jury box.

20         CLERK OF COURT:  14, Tonya Bentner -- 14.

21         MS. BENTNER:  My name is Tonya Bentner.  I'm

22   a nursing student at Midlands Tech.

23         CLERK OF COURT:  What says the State?

24         MR. PASCOE:  Please present Ms. Bentner.

25         CLERK OF COURT:  What says the defense?

42

```
 1              MR. LITTLEJOHN:  Please seat Ms. Bentner.
 2              CLERK OF COURT:  Please have a seat here in
 3    the jury box.
 4              CLERK OF COURT:  22, Christina Brady -- 22.
 5              MS. BRADY:  Christina Brady.  I'm a law
 6    student at the University of South Carolina.
 7              CLERK OF COURT:  What says the State?
 8              MR. PASCOE:  Please present Ms. Brady.
 9              CLERK OF COURT:  What says the defense?
10              MR. LITTLEJOHN:  Please seat Ms. Brady.
11              CLERK OF COURT:  Please have a seat there in
12    the jury box.
13              CLERK OF COURT:  153, Christopher Reese --
14    153.
15              MR. REESE:  My name is Christopher Reese.
16    I'm a truck driver for Carolina Wrecker.
17              CLERK OF COURT:  What says the State?
18              MR. PASCOE:  Please present Mr. Reese.
19              CLERK OF COURT:  What says the defense?
20              MR. LITTLEJOHN:  Please seat Mr. Reese.
21              CLERK OF COURT:  Please have a seat here in
22    the jury box.
23              CLERK OF COURT:  214, Richard Brown -- 214.
24              MR. BROWN:  My name is Richard Brown.  I'm in
25    sales with Hirschfield Steel Company.
```

43

```
1              CLERK OF COURT:  What says the State?

2              MR. PASCOE:  Please present Mr. Brown.

3              CLERK OF COURT:  What says the defense?

4              MR. LITTLEJOHN:  Please excuse Mr. Brown from

5      this case.

6              CLERK OF COURT:  Sir, you may return to the

7      back of the courtroom where you see the bailiff.

8              BAILIFF:  This way, please, sir.

9              CLERK OF COURT:  114, Erma Loman -- 114.

10             MS. LOMAN:  Erma Loman, teacher, Richland

11     District 2.

12             CLERK OF COURT:  What says the State?

13             MR. PASCOE:  Please present Ms. Loman.

14             CLERK OF COURT:  What says the defense?

15             MR. LITTLEJOHN:  Please seat Ms. Loman.

16             CLERK OF COURT:  Please have a seat here in

17     the jury box.

18             CLERK OF COURT:  110, Gail King -- 110.

19             MS. KING:  I'm Gail King, deputy director for

20     LRADAC grants through USC.

21             CLERK OF COURT:  What says the State?

22             MR. PASCOE:  Please present Ms. King.

23             CLERK OF COURT:  What says the defense?

24             MR. LITTLEJOHN:  Please seat Ms. King.

25             CLERK OF COURT:  Please have a seat here in
```

44

1   the jury box, ma'am.

2              CLERK OF COURT:  88, Rachel Hawkins -- 88.

3              MS. HAWKINS:  My name is Rachel Hawkins, and

4   I'm a student at USC.

5              CLERK OF COURT:  What says the State?

6              MR. PASCOE:  Please present Ms. Hawkins.

7              CLERK OF COURT:  What says the defense?

8              MR. LITTLEJOHN:  Please excuse Ms. Hawkins

9   from this case.

10             CLERK OF COURT:  Ma'am, please return to the

11  back of the courtroom there where you see the bailiff.

12             BAILIFF:  This way, please.  Thank you.

13             CLERK OF COURT:  211, Mary Wagener -- 211.

14             MS. WAGENER:  My name is Mary Ann Wagener,

15  and I work for South Carolina Community Bank.

16             CLERK OF COURT:  What says the State?

17             MR. PASCOE:  Please present Ms. Wagener.

18             CLERK OF COURT:  What says the defense?

19             MR. LITTLEJOHN:  Please excuse Ms. Wagener

20  from this case.

21             CLERK OF COURT:  Please return to the back of

22  the courtroom, ma'am, where you see the bailiff.

23             CLERK OF COURT:  92, Peter Hill -- 92.

24             MR. HILL:  My name is Peter Hill.  I'm a

25  student at Clemson University.

45

```
1              CLERK OF COURT:  What says the State?

2              MR. PASCOE:  Please present Mr. Hill.

3              CLERK OF COURT:  What says the defense?

4              MR. LITTLEJOHN:  Please seat Mr. Hill.

5              CLERK OF COURT:  Please have a seat here in

6      the jury box, sir.

7              CLERK OF COURT:  149, David Peters -- 149.

8              MR. PETERS:  My name is David Peters.  I'm a

9      lab assistant at Van De Grift Animal Clinic.

10             CLERK OF COURT:  What says the State?

11             MR. PASCOE:  Please present Mr. Peters.

12             CLERK OF COURT:  What says the defense?

13             MR. LITTLEJOHN:  Please excuse Mr. Peters.

14             CLERK OF COURT:  Sir, please return to the

15     back of the courtroom there where you see the bailiff

16     standing.

17             CLERK OF COURT:  116, Michael Manning -- 116.

18             MR. MANNING:  Michael Manning.  I'm a pilot

19     in the U.S. Air Force.

20             CLERK OF COURT:  What says the State?

21             MR. PASCOE:  Please present Mr. Manning.

22             CLERK OF COURT:  What says the defense?

23             MR. LITTLEJOHN:  Please excuse Mr. Manning

24     from this case.

25             CLERK OF COURT:  Sir, please return to the
```

46

1   back of the courtroom where you see the bailiff.

2              THE COURT:  The defense has two strikes left.

3              CLERK OF COURT:  100, Wesley Jennings -- 100.

4              MR. JENNINGS:  Wesley Jennings, graduate

5   teaching assistant at USC.

6              CLERK OF COURT:  What says the State?

7              MR. PASCOE:  Please present Mr. Jennings.

8              CLERK OF COURT:  What says the defense?

9              MR. LITTLEJOHN:  Please seat Mr. Jennings.

10             CLERK OF COURT:  Please have a seat here in

11  the jury box.

12             CLERK OF COURT:  26, April Brower -- 26.

13             MS. BROWER:  April Brower, employed by the

14  University of South Carolina Housing Office.

15             CLERK OF COURT:  What says the State?

16             MR. PASCOE:  Please present Ms. Brower.

17             CLERK OF COURT:  What says the defense?

18             MR. LITTLEJOHN:  Please seat Ms. Brower.

19             CLERK OF COURT:  Please have a seat here in

20  the jury box.

21             COURT REPORTER:  Just the 12 and two

22  alternates?

23             THE COURT:  There'll be two alternates.

24             CLERK OF COURT:  206, Charles Woods -- 206.

25             MR. WOODS:  Charles Woods, graduate student

47

1   at USC.

2               CLERK OF COURT:  What says the State?

3               MR. PASCOE:  Please present Mr. Woods.

4               CLERK OF COURT:  What says the defense?

5               MR. LITTLEJOHN:  Please seat Mr. Woods.

6               CLERK OF COURT:  Please have a seat here in

7    the jury box.

8               CLERK OF COURT:  118, Kimberly Massey -- 118.

9               MS. MASSEY:  My name is Kimberly Massey.  I'm

10   a graphics and web developer at USC.

11              CLERK OF COURT:  What says the State?

12              MR. PASCOE:  Please present Ms. Massey.

13              CLERK OF COURT:  What says the defense?

14              MR. LITTLEJOHN:  Please excuse Ms. Massey

15   from this case.

16              CLERK OF COURT:  Please return to the back of

17   the courtroom there where you see the bailiff.

18              CLERK OF COURT:  179, George Stone -- 179.

19              MR. STONE:  My name is George Stone.  I'm an

20   engineer with South Carolina Electric and Gas Company.

21              CLERK OF COURT:  What says the State?

22              MR. PASCOE:  Please present Mr. Stone.

23              CLERK OF COURT:  What says the defense?

24              MR. LITTLEJOHN:  Please excuse Mr. Stone.

25              CLERK OF COURT:  Please return to the back of

**54**

48

1    the courtroom there where you see the bailiff.

2                CLERK OF COURT:  1, James Adams -- number 1.

3                MR. ADAMS:  My name is James Adams.  I'm a

4    student at Benedict College.

5                CLERK OF COURT:  What says the State?

6                MR. PASCOE:  Please excuse Mr. Adams.

7                CLERK OF COURT:  Sir, please return to the

8    back of the courtroom there where you see the bailiff.

9                CLERK OF COURT:  182, Jason Sutton -- 182.

10               MR. SUTTON:  Jason Sutton.  I work at Target

11   in Lugoff.

12               CLERK OF COURT:  Does the State challenge for

13   cause?

14               MR. PASCOE:  Can we approach, Your Honor?

15               THE COURT:  Yes, sir.

16               THE COURT:  May I see you for a moment,

17   please?  If you would, come over here, please, sir.  Do

18   you know the defendant at all?

19               MR. SUTTON:  Not at all.

20               THE COURT:  Did you all speak to each other

21   about anything to each other before jury selection?

22               MR. SUTTON:  No, sir.  I don't know him.

23               THE COURT:  Did you have any exchange of

24   glances at each other or anything like that?

25               MR. SUTTON:  I kind of looked at him when I

49

```
1    came him, but that's about it.

2              THE COURT:  But you've never seen him before

3    today?

4              MR. SUTTON:  Never before.

5              THE COURT:  Okay.  Thank you, sir.  You can

6    step down there.

7              MR. PASCOE:  Counter from the State, Your

8    Honor.

9              THE COURT:  Counsel, will you all approach?

10             MR. PASCOE:  Do you want us to approach?

11             THE COURT:  Yes.  You all are okay?

12             MR. PASCOE:  Yes, sir.

13             THE COURT:  Both sides are okay?  All right.

14   I'm sorry, I missed that last part.  The State's not

15   counter?

16             MR. PASCOE:  No, sir.

17             THE COURT:  Okay.  And defense is not

18   counter?

19             MR. LITTLEJOHN:  Seat the juror.

20             THE COURT:  Okay.  Thank you, sir.

21             THE COURT:  You can have a seat, sir.

22             CLERK OF COURT:  Please have a seat in the

23   jury box.

24             THE COURT:  Counsel, anything related to jury

25   selection?
```

**56**

1          MR. PASCOE:  Yes, sir.  Beg the Court's

2     indulgence.

3          THE COURT:  Yes, sir.

4          MR. PASCOE:  Is it okay to approach, Your

5     Honor?

6          THE COURT:  Yes, sir.

7          THE COURT:  Okay, ladies and gentlemen who

8     have been seated on the jury, I'm going to ask if you

9     all will follow the bailiff to the jury room.  Do not

10    discuss anything about the case at all, whether it's

11    related to the allegation that I read to you in the

12    indictment, the witnesses, anything I've asked you

13    today during jury selection.

14          Just, please, if you will, just bear with us

15    shortly.  Just don't talk about anything about this

16    case or anything you've heard this morning.  You all

17    will wait in the jury room.  I'll bring you back out

18    shortly.  Thank you.

19                    (Jury out at 12:48 p.m.)

20          THE COURT:  All right, ladies and gentlemen

21    who were not picked on the jury, if you could, they

22    will show you next door to the courtroom next door.

23    I'm going to have you sit in that courtroom while I

24    take up some matters with the attorneys outside your

25    presence.

51

1        Again, much like the folks I just sent out, I

2    ask that you just not talk about the case or anything

3    that you've heard or seen this morning.  And we'll

4    bring you back shortly, okay?  Thank you.

5                            (Jury pool moved to a nearby

6    courtroom at 12:50 p.m.)

7            THE COURT:  Okay, Mr. Pascoe.

8            MR. PASCOE:  Thank you, Your Honor.  We want

9    to challenge some of the defense's strikes, Your Honor.

10   We noticed he used a total of ten strikes, nine of them

11   on whites.  In fact, he only seated one white male, and

12   I think that was an alternate, wasn't it?

13           Specifically, if we just go right down the

14   line, if we could hear what the reasonings are for

15   those strikes.

16           THE COURT:  Yes, sir.

17           MR. PASCOE:  Mr. Petrus, Juror 210.

18           MR. LITTLEJOHN:  Your Honor, if you could

19   give us just a minute.  I'm trying to put the

20   information together with the jurors.

21           THE COURT:  Okay.

22           MR. LITTLEJOHN:  And I'll be happy to address

23   those concerns.

24           THE COURT:  Yes, sir.  Do you need a moment

25   before he reads off the list, or do you want to hear

```
 1    the list?

 2                   MR. LITTLEJOHN:  If you could give me just a

 3    moment --

 4                   THE COURT:  Okay.

 5                   MR. LITTLEJOHN:  -- I'll be ready to respond

 6    to all of them.

 7                   THE COURT:  Yes, sir.

 8                   MR. PASCOE:  That's fine.

 9                   THE COURT:  Mr. Littlejohn, I don't mean to

10    rush you, but I would assume you all had reasons for

11    striking them at the time.

12                   MR. LITTLEJOHN:  We did, Your Honor.  It just

13    goes so fast, I was trying to put the faces with the

14    names --

15                   THE COURT:  Okay.

16                   MR. LITTLEJOHN:  -- and just make sure I'm

17    accurate before I address the Court.

18                   THE COURT:  Yes, sir.

19                   MR. LITTLEJOHN:  We're ready, Your Honor.

20                   THE COURT:  Okay.

21                   THE COURT:  Mr. Pascoe, I think we started

22    off with --

23                   MR. PASCOE:  We're not challenging all the

24    strikes, Your Honor --

25                   THE COURT:  Okay.
```

53

1          MR. PASCOE:  -- just certain factors.  Let me

2    just call out the ones.

3          THE COURT:  Okay.

4          MR. PASCOE:  Specifically, I think it was

5    Juror 136, Mr. Nelson, white male.

6          THE COURT:  I think you had originally said

7    210.

8          MR. PASCOE:  Well, I can list it out -- yes,

9    Mr. Petrus.

10          THE COURT:  Okay.

11          MR. LITTLEJOHN:  Your Honor, I think for

12    purposes of the record, we need to go through all of

13    them, if I'm not mistaken.  I don't think he can just

14    him.

15          MR. PASCOE:  We can go through all of them.

16    To speed it up, we're just making a challenge.

17          THE COURT:  Yes, okay.  Why don't you just

18    state the grounds for your challenge?

19          MR. LITTLEJOHN:  Your Honor, if 210 was

20    Petrus, he said he had met the victim before, and he

21    was acquainted with him.  And that reason alone, I

22    feel, is sufficient to strike him.

23          MR. PASCOE:  And that's why we're going to

24    concede that one.  That's why I went to Mr. Nelson.

25          THE COURT:  Okay, that's number 136.

1          MR. LITTLEJOHN:  Quite frankly, as to Mr.

2     Nelson, there was just something about his attitude

3     that my client didn't like, and it had nothing to do

4     with his race.  He just didn't feel like he was going

5     to be serious as to these proceedings.

6          MR. PASCOE:  That's not a reason, Your Honor.

7     How do you not like his attitude?  That's not a reason.

8          THE COURT:  Anything specific about what he

9     didn't like?

10          MR. LITTLEJOHN:  Your Honor, I think we have

11     to look at all of them to see what the ratio is, etc.

12     I think you just can't pull one out of all.

13          THE COURT:  And Mr. Pascoe is saying which

14     ones he is raising a challenge as to, and I'm just

15     trying to get the reason for the strike from the

16     defense first.  And there may be some overall argument

17     that you all have as to the whole group.  I don't know.

18     But as to 136, I'm just trying to write down what he

19     justified the strike on.

20          MR. LITTLEJOHN:  Your Honor, those were his

21     words to me, that he just appeared flippant and to not

22     be interested in the proceedings, and for that reason,

23     we did not feel he would be a good juror.

24          THE COURT:  Okay.

25          THE COURT:  All right, Mr. Pascoe.

55

1    MR. PASCOE: I'd like to know he appeared

2   flippant. I observed that juror as all the jurors, and

3   he never appeared flippant. I think they're making it

4   up. When he came up to the microphone, he was

5   professional. He said where he went to school. There

6   was nothing flippant about what he did. That's just

7   not a reason.

8    MR. LITTLEJOHN: Your Honor, first off, I

9   don't make up things that I present to the Court.

10   That's what we observed, and that was the reason that

11   my client did not want him on the jury.

12    THE COURT: Okay.

13    MR. PASCOE: But he didn't say that he

14   observed it originally. He was trying to say that his

15   client -- I just don't think that's a very -- that's a

16   real reason.

17    THE COURT: Well, let me hear the rest of

18   them --

19    MR. PASCOE: Okay.

20    THE COURT: -- and then I'll put it in the

21   context -- number 136. What's the next number?

22    MR. PASCOE: 214, Your Honor, Mr. Brown.

23    THE COURT: 214 -- your reasoning for

24   rejection as to that?

25    MR. LITTLEJOHN: Your Honor, this gentleman

56

1    came up and recounted he had read something about the

2    case.  He was interviewed by the Court individually,

3    and at that time, he made a statement to the effect

4    that he thought this was just another shooting.  And we

5    didn't think that was a serious enough attitude to be

6    involved in this particular jury.

7          THE COURT:  All right, sir.

8          THE COURT:  Mr. Pascoe.

9          MR. PASCOE:  If you only put African-

10   Americans on the jury, specifically an African-

11   American, you said that she heard that the victim came

12   from a good family, that approach that said that she

13   had knowledge about what happened?  And we were all

14   there.  What that juror was saying was that that's all

15   he had heard, so it wouldn't affect him being a fair

16   juror.

17         THE COURT:  That's the way I took his comment

18   at the sidebar --

19         MR. PASCOE:  Yes, sir.

20         THE COURT:  -- is that he was referring to "I

21   didn't dwell on it," not that he was being flippant

22   about the case.  That's certainly the reason for the

23   strike as to 214.  What's the next juror?

24         MR. PASCOE:  The one we were going to

25   challenge, Your Honor, is Wagener, 211.

57

1          THE COURT:  Okay, Mr. Littlejohn?

2          MR. LITTLEJOHN:  Your Honor, she's a white

3    female.  She works in the banking industry.  People in

4    the banking industry tend to be very conservative, and

5    for that reason, we felt like that was our non-gender,

6    non-racial decision.

7          MR. PASCOE:  Speaking of conservative, Your

8    Honor, to put a black male who works at the Budget and

9    Control Board -- someone who works at a bank is

10   conservative, but someone who works for the State

11   isn't, especially the Budget and Control Board?  But

12   the difference being she's a white female; he is an

13   African-American male.

14         THE COURT:  Anything further, Mr. Littlejohn,

15   as to that juror?

16         MR. LITTLEJOHN:  No, Your Honor.

17         THE COURT:  The next one, Mr. Pascoe.

18         MR. PASCOE:  The next one we're going to

19   challenge, Your Honor, is 116, Mr. Manning.

20         MR. LITTLEJOHN:  Your Honor, he's in the

21   United States Air Force and is obviously employed by

22   the government.  And that would be our reason, that he

23   works for the government.

24         MR. PASCOE:  Mr. Brown is an African-American

25   male, Your Honor --

58

1          THE COURT:  That's just what we went through.

2          MR. PASCOE:  -- who works for the government.

3          THE COURT:  You just left somebody on who

4     worked for the government.  Was it just the federal

5     government?

6          MR. LITTLEJOHN:  Yes, sir.  He's a pilot, and

7     they seem to be very strait-laced.

8          THE COURT:  All right, sir, the next one.

9          MR. PASCOE:  Our next challenge, Your Honor,

10    is going to be Ms. Massey.  I think it's Juror 118.

11    She was the first alternate they struck.

12         THE COURT:  Okay.  What's the reason for that

13    one?

14         MR. LITTLEJOHN:  Your Honor, this lady worked

15    at USC.  And certainly with the number of people that

16    were affiliated with USC, we had to use our strikes

17    where we thought they were appropriate.  But we felt

18    that she might be around some of these witnesses and

19    might have some contact with the football team.

20         MR. PASCOE:  Well, Your Honor, after hearing

21    that, I will concede.  I'll have to concede that he

22    even did strike an African-American male who I think

23    went to USC.  So I'd withdraw my motion on that one.

24.        THE COURT:  As to 118?

25         MR. PASCOE:  Yes, sir.  And, finally, a Mr.

59

1    Stone, an alternate, Juror 179.

2    MR. LITTLEJOHN:  Your Honor, that juror

3    indicated in the individual voir dire that he lives

4    close to the Voodoo Club and that's why it drew his

5    interest.  And we felt for that reason that might put

6    some pressure on him.  If you recall, he said the

7    incident happened down the street from his house.

8    THE COURT:  All right, Mr. Pascoe, anything

9    else on that one?

10    MR. PASCOE:  I don't have anything else on

11    Mr. Stone.

12    THE COURT:  Mr. Littlejohn, two of these in

13    particular bother me a little bit, given the totality

14    of the exercise of strikes, in particular Juror 136.

15    And certainly he's got a right to exercise strikes in a

16    constitutional manner, but I'm not hearing anything in

17    particular about that particular juror that made it

18    seem like he didn't take this case seriously.

19    What also bothers me is as to 116.  Your

20    initial justification was that he worked for the

21    government, and there was another government employee

22    allowed -- black government employee allowed -- to be

23    seated.  Can you explain those two?

24    MR. LITTLEJOHN:  Your Honor, it just seems to

25    me there's a great deal of difference between a white

60

```
 1    person who works for the State at the Budget and
 2    Control Board and someone who is -- he said he was a
 3    pilot, so I'm assuming he's an officer in the United
 4    States Air Force.  Being in the military, I would
 5    submit, is a lot different than being a regular person
 6    who is employed by the State.
 7            Your Honor, I also think the Court has to
 8    look at the overall composition of the jury as
 9    constituted at present.
10            THE COURT:  Okay.  Anything further from the
11    State?
12            MR. PASCOE:  No, Your Honor.
13            THE COURT:  All right.  Mr. Littlejohn, I'm
14    going to find that there is not a violation here, given
15    the overall composition of the jury and the reasons
16    you've offered.  I think you make a point that you
17    could exercise your strike if you thought that somebody
18    in the Air Force was more conservative because they
19    would be an officer in the military.
20            I understand that's your rationale for the
21    211 who you struck, who was in banking, and you believe
22    they tend to be more conservative.  So I find that your
23    overall exercise of strikes is not racially or gender
24    biased.  But I'll certainly note an exception if Mr.
25    Pascoe wishes to make one.
```

61

1          MR. PASCOE:  Thank you, Your Honor.  I don't

2    have anything.

3          THE COURT:  Okay.  Thank you, sir.

4          MR. PASCOE:  And, honestly, I agree with the

5    Court over one juror.  I was going to tell you I didn't

6    want to repick a jury if it came down to just that one

7    juror being a problem.

8          THE COURT:  Okay.

9          MR. PASCOE:  So I certainly agree with the

10   Court.

11         THE COURT:  Thank you, sir.  All right,

12   counsel, I'm going to bring the jury back in first and

13   get them situated for lunch, and then we'll break for

14   lunch.  And then we'll dismiss the rest of the panel.

15                         (Jury back in at 1:08 p.m.)

16         BAILIFF:  The jury is present, Your Honor.

17         THE COURT:  Okay, thank you, sir.

18         THE COURT:  Ladies and gentlemen of the jury,

19   we're going to break for lunch at this point.  We'll

20   take care of lunch for you all.  In just a little bit,

21   I'll send you back to the jury room, and they'll give

22   you some instructions regarding lunch there.  I ask

23   that while you're at lunch you not talk about the case

24   at all, you not talk about any of the facts or

25   questions that you've heard here this morning.

62

```
 1              I think you all can talk about Christmas

 2      shopping or the upcoming bowl season or anything like

 3      that, but I ask that you not talk at all about the

 4      case.  And when we come back -- we'll be back at 2:30 -

 5      - we'll swear you all in, and we'll get started on the

 6      case at that point.  So, in the meantime, I just ask

 7      that you all enjoy your lunch, get to know each other,

 8      and do not talk about the case at all.  Thank you.

 9              And let me also reiterate to you all, because

10      there was an article in the paper that did relate to

11      this case, that you all not look at the paper while

12      you're at lunch.  And we'll see you all at 2:30.  Thank

13      you.

14              BAILIFF:  You want them sent to the jury

15      room?

16              THE COURT:  Yes, why don't you send them back

17      to the jury room.

18                      (Jury sent to lunch at 1:15

19      p.m. to 2:30 p.m.)

20              THE COURT:  Okay, thank you, sir.

21              THE COURT:  All right, counsel, rather than

22      having you all sit here, if you all have no objection,

23      I'll just go next door to the courtroom next door and

24      send the rest of the panel downstairs, and they can get

25      their further instructions.  And we'll see you all at
```

63

1       2:30.  Thank you, counsel.

2                           (Break for lunch until 2:30

3       p.m.)

4              THE COURT:  Counsel, are we ready to go into

5       opening arguments?

6              MR. PASCOE:  Yes, sir, I'm ready, Your Honor.

7              MR. LITTLEJOHN:  The defense is ready, Your

8       Honor.

9              THE COURT:  Okay, thank you.  I think we're

10      ready for the jury.

11             BAILIFF:  The jury is present, Your Honor.

12                          (The jury returned to the

13      courtroom at 2:43 p.m., after which the following

14      proceedings were had:)

15             THE COURT:  Thank you, sir.

16             THE COURT:  Thank you, ladies and gentlemen.

17      I hope you all had a good lunch.  We're ready to start

18      the trial now.

19             The first thing I will ask you all to do is

20      actually stand one more time, raise your right hands,

21      and be sworn in as members of this jury.

22             CLERK OF COURT:  Thank you, Judge.  Please

23      answer "I do," or "I will," at the end of my statement.

24                          (Jury was sworn.)

25             CLERK OF COURT:  Thank you.  Please have a

64

1    seat.

2                    THE COURT:  Thank you, sir.

3                    CLERK OF COURT:  Yes, sir.

4                    THE COURT:  All right, ladies and gentlemen,

5    we will open with opening statements from both the

6    State and the defense counsel.  I always remind jurors

7    that opening statements and closing arguments are like

8    questions actually from the attorneys.  They're not

9    evidence.

10                   The only evidence that you all actually are

11   to consider -- and I will instruct you further on this

12   at the close of the case -- is testimony from the

13   witness stand, and exhibits, and evidence that I

14   actually introduce.  Having told you that, however,

15   opening statements are an opportunity for the attorneys

16   to go over with you what they believe the evidence in

17   this case will show, from both sides' perspective.

18                   So I ask that you pay close attention to

19   their opening statements.  And after that, we'll start

20   taking testimony.

21                   THE COURT:  Mr. Pascoe?

22                   MR. PASCOE:  May it please the Court?

23                   THE COURT:  Yes, sir.

24                        **OPENING STATEMENT**

25                        BY MR. PASCOE FOR THE STATE

1          During the early morning hours of

2   Saturday, December 7th, of last year, 22-year-old Carl

3   Smalls, Jr., was hunted, gunned down, and murdered by

4   that man, Jeroid Price, and his friend, Ryan Brooks --

5   hunted and murdered by the defendant and his friend.

6   Specifically, as the evidence will show you, the

7   defendant and his friend, Ryan Brooks, approached Carl

8   Smalls at a club called Club Voodoo's right after the

9   party had ended.

10          They pulled out guns, they shot him, and

11   they ran.  In the case of the defendant, he ran for

12   months.  And what did Lillie and Carl Smalls, Sr., lose

13   their son over?  Absolutely nothing -- gang signs,

14   trash talk.

15          Ladies and gentlemen, during the course

16   of this trial and at the end of it, you are going to

17   realize at least three things and get just one request

18   from me.  First, you are going to realize that the

19   defendant is guilty of murder; that the defendant and

20   Ryan Brooks shot Carl Smalls and left him there to die

21   on that nightclub floor.  Second, we have gangs in

22   Richland County.  We have rival gangs in Richland

23   County.

24          We have Crips and Crip want-to-be's who

25   wear blue and throw up signs.  We have Bloods, who wear

Opening by the State                                          66

1    red and do their thing.  Carl Smalls, unfortunately,
2    even though he had his whole life ahead of him,
3    affiliated himself with the Crips.  Jeroid Price, we
4    will prove, is a Blood.  And the importance of that
5    realization or the significance, the relevance of it,
6    is that you will see just how little it takes to get
7    killed in this world.
8                    Getting in someone's face, trash talk,
9    throwing up gang signs, wearing the wrong colors can
10   get you killed.  Is that reasonable?  Absolutely not.
11   It's absurd, but it's a fact.  Third, you will see
12   that, even though there were still hundreds of people -
13   - at least dozens -- at Club Voodoo's the night Carl
14   was murdered by the defendant, amazingly very few
15   people came forward.
16                   And even when the police went out and
17   found relevant witnesses, friends of the defendant,
18   you'll hear how they lied repeatedly.  And what's even
19   more amazing, something I've never had to tell a jury
20   in my 11 years as a prosecutor, some of the State's
21   witnesses that we call may still not tell the truth,
22   whether it's because they're afraid, whether they're
23   protecting their friend or themselves.
24                   But one thing I do know is that, while
25   you can run from the truth, you can't hide from it,

Opening by the State                                          67

1    which brings me to the only request I will have for you

2    at the end of this case, which is this -- do what you

3    just took an oath that you would do.  It's not up to

4    the State of South Carolina to render a truthful

5    verdict, or the witnesses, or the defense, or even

6    Judge Lloyd.  That rests solely upon you.

7                And I ask that you assess the

8    credibility of every single witness who gets on that

9    witness stand.  You deal with people every single day.

10   You know when somebody's lying, and you know why

11   they're lying.  You know when somebody's telling the

12   truth.  And I ask at the end of this case that you tell

13   the world what the truth is, that the truth matters, by

14   holding the defendant, Jeroid Price, responsible for

15   this cold-blooded murder.

16                Ladies and gentlemen, my name is David

17   Pascoe, and I, along with Don Sorenson and Bryan

18   Jeffries, will be prosecuting this case on behalf of

19   the State of South Carolina.  Also seated at the

20   State's table is Lt. Stan Smith.  He's the lead

21   investigator on this case from the Richland County

22   Sheriff's Department.

23                And seated behind the State's table are

24   Carl Smalls, Sr., his wife Lillie, and other family

25   members of Carl, Jr.  On behalf of both the Smalls

Opening by the State                                    68

1    family and the State of South Carolina, I want to thank

2    each and every one of you for being here today.  I know

3    you didn't volunteer for jury service.  But the fact of

4    the matter is that jury duty -- other than what our men

5    and women are doing for us overseas right now, jury

6    duty is the most important service you can perform for

7    your country, and I certainly concur with that.

8              Before I go further into what some more

9    of the facts are going to be in this case, I want to

10   very briefly talk to you a little bit about the law

11   with regards to murder.  And I promise to be brief,

12   because you're going to have a number of opportunities

13   to hear about the law, the most important time coming

14   when Judge Lloyd will charge you on the law before you

15   are asked to render your verdict.

16             Murder has probably the shortest and

17   simplest definition of any crime on our books.  Murder

18   is defined as the unlawful killing of another with

19   malice aforethought, either express or implied.  That's

20   it -- the unlawful killing of another with malice

21   aforethought.

22             Thus, to prove murder, all you have to

23   establish is malice.  And malice has a number of

24   definitions.  It's a person void of social

25   responsibility, reckless disregard for the welfare of

1    another.  It's an intentional act of violence.  Malice

2    has no time limit.  It can happen in the blink of an

3    eye and the snap of a finger.  And as I said, malice

4    can either be express or implied.

5            An example of express malice would be

6    saying you're going to hurt someone, or motioning that

7    you're going to hurt someone, and then doing it, lying

8    in wait for the victim or seeking the victim.  These

9    are all examples of express malice.  And while I submit

10   we will prove examples of express malice in this case,

11   the law recognizes you usually don't have express

12   malice.  So malice can also be implied.

13           And just one example of implied malice

14   would be the mere use of a deadly weapon, such as a

15   gun.  Shooting the victim one time is malice; two

16   times, more malice; three times, even more malice.

17   That's murder -- the unlawful killing of another with

18   malice aforethought, either express or implied.

19           And the standard of proof with which the

20   State must prove the defendant's guilt is proof beyond

21   a reasonable doubt.  This phrase means exactly the

22   same.  It's not proof beyond any doubt.  It's not proof

23   beyond any possible doubt.  It's proof beyond a

24   reasonable doubt.  The simple matter of the fact is we

25   have doubts about everything in this world.  Some may

1    doubt whether the earth revolves around the sun.

2              But you have to ask yourself, is it

3    reasonable?  And, in essence, what proof beyond a

4    reasonable doubt means is after you've looked at all

5    the evidence -- not just one piece of it, but after

6    you've looked at all the evidence -- if you are firmly

7    convinced, just firmly convinced, of the defendant's

8    guilt, you must find him guilty.  And I submit the

9    evidence will leave you much, much more than firmly

10   convinced.

11             The evidence will be that 22-year-old

12   Carl Smalls was a student at the University of North

13   Carolina.  He played football there.  He was on the

14   defensive line.  He came down here on December 6th,

15   that Friday of last year, to visit his girlfriend of

16   some four or five years, Joy Ellington.  He also wanted

17   to visit some of the South Carolina football players,

18   because he actually played his freshman year here at

19   South Carolina.

20             Carl learned later that day that a USC

21   fraternity was throwing a party.  I think it was the

22   Alpha fraternity at USC.  They were going to throw a

23   party at Club Voodoo's off of Garners Ferry Road.  Carl

24   and Joy both went together to the party that night.

25   You're going to hear that the place was packed and that

Opening by the State                                        71

1    security was an absolute joke.

2            Carl and Joy at one point in the night

3    got into a little argument over nothing, boyfriend-

4    girlfriend stuff.  They made up, but Joy wanted to

5    leave with a girlfriend.  She didn't want to go there

6    to begin with.  But before leaving, she asked Carl if

7    he was going to be okay, and he said he would, that

8    he'd catch a ride with a Carolina football player.

9            Unfortunately, for Carl Smalls -- and as

10   you're going to hear and see from the evidence -- even

11   though this was a college fraternity, the defendant and

12   his friends showed up -- because another thing you're

13   going to see is that there are gang want-to-be's and

14   then there are real gang members.

15           You have want-to-be's who maybe know the

16   colors, know the signs, know the walk.  And you have

17   the real thing, the gang members that tote guns, the

18   Jeroid Prices of the world.  The evidence will be that

19   about 2:00 that morning, or right before 2:00 that

20   morning, the defendant and his group of people got into

21   a verbal confrontation with Carl Smalls and some of

22   Carl's friends.

23           They got in each other's faces.  They

24   threw signs at one another.  It was finally broken up,

25   but not before Carl was actually told that night that

Opening by the State                                    72

1    he was going to fall.  Right at 2:00 in the morning,

2    the party ended.  People were supposed to exit the

3    building at 2:00 in the morning.  Carl briefly exited,

4    but for some reason -- which we will prove why Carl

5    came back into that building -- he came back in, I

6    submit because he knew he was in trouble, and he waited

7    by that door.

8            You're going to hear from a number of

9    witnesses who had different vantage points to this

10   murder, some from the outside and some from the inside.

11   And the facts will be -- the truth will be -- that Ryan

12   Brooks and the defendant, Jeroid Price, approached Carl

13   Smalls and that Carl Smalls struggled for his life.

14   Ryan Brooks pulled out a .380 semi-automatic pistol.

15           The defendant pulled out a larger .40-

16   caliber pistol.  And they pointed it at Carl as he

17   struggled, and they shot him three times, the last

18   shots being fired while the defendant was standing over

19   him.  He was shot in the hip, the waist, and right

20   through the chest.  Carl Smalls died on that floor, and

21   the defendants ran.  Ryan Brooks finally turned himself

22   in in January of this year.  The defendant finally

23   turned himself in in late March, three and a half

24   months after this incident.

25           Now, this is just some -- and I'll

Opening by the State                                    73

1    stress "some" -- of the evidence that you're going to

2    hear in this case, because you're also going to hear

3    about how Carl actually had gunshot residue all over

4    his left hand from struggling with those defendants

5    over those guns and from being shot at close range by

6    those defendants.

7                    A bullet actually grazed his arm.

8    You're going to hear that less than a week after this

9    murder, when the police searched the defendant's

10   apartment, of course, the defendant isn't there, but

11   they find gang material, and they find a gun box for a

12   .40-caliber pistol, the same type of gun that was used

13   to kill Carl Smalls.  And they found much, much more.

14                   You're also going to hear, ladies and

15   gentlemen, I submit, a voice from the grave.  You are

16   going to hear a call that Carl Smalls made minutes,

17   maybe seconds, before he was gunned down, a call to

18   911, a call for help.  This is just some -- and I want

19   to stress "some" -- of the evidence that you're going

20   to hear about in this case.

21                   You're also going to hear about how the

22   defendant, while he was on the run, had communication

23   with the police.  He would call them from a cell phone

24   and make inconsistent statements.  At first, he would

25   tell them, "Well, I wasn't even there.  I've got an

**80**

1    alibi."  And then when the police found that that

2    wasn't true, he would allude to self-defense and,

3    again, much, much more.

4              In closing, I want to thank you again

5    for your service.  And I want to throw one last thing

6    out at you, which is that, while there are no classes

7    on how to be a good juror, I submit each and every one

8    of you has been training for this job your whole life.

9    Some of you have been training as teachers, as parents,

10   as students, and it's this diversity of experience

11   you're asked to bring together, use your common sense,

12   and render a verdict.

13             "Verdict" is a Latin word.  It means

14   "veredicto."  Literally -- and this is going to

15   surprise you -- it means to speak the truth.  All I'm

16   asking you is that you tell us what the truth is about

17   December the 7th of last year.  And I submit if you do

18   that, the only truthful verdict you can render is that

19   the defendant is guilty.  Thank you.

20             THE COURT:  Thank you, Mr. Pascoe.

21             THE COURT:  Mr. Littlejohn?

22             MR. LITTLEJOHN:  May it please the Court?

23             THE COURT:  Yes, sir.

24             **OPENING STATEMENT BY MR. LITTLEJOHN**

25                       **FOR THE DEFENSE**

Opening by the Defense                                        75

1          Good afternoon, ladies and gentlemen.
2    I'm going to use some notes here.  I'm not as young Mr.
3    Pascoe, and my memory is not quite as good.  I can't
4    remember all this stuff, and this is too important a
5    case for me to forget something.  I want to thank you
6    for being here.
7          As the Judge said, and as Mr. Pascoe
8    said, this is a very important duty which you are about
9    to undertake, the duty of being a jury member.  Winston
10   Churchill once said that other than serving your
11   country during wartime, being on the jury is the most
12   important service that you can render to your country.
13   So I want to thank you for being here.
14         I want to thank you for having set aside
15   your jobs, and your family, and your Christmas
16   shopping, and everything that goes on at this time of
17   year to be the jury in this case.
18         Ladies and gentlemen, again, my name is
19   Cam Littlejohn.  I'm a sole practitioner here in
20   Columbia, and I, along with Amye Rushing, represent the
21   defendant, Jeroid Price.  Jeroid, would you stand up
22   for a second?  This is Jeroid Price.  This is the man
23   who is charged in the indictment.  Thank you.  I wanted
24   you to see Jeroid, and see how tall he is and how big
25   he is, because that's going to become important in this

Opening by the Defense                                    76

1    case.

2                    Now, I think you'll find that your

3    service here will be very interesting.  I noted during

4    the qualification earlier today that there weren't too

5    many people that had ever served on a jury before.  And

6    I'm assuming that many of you have never been on a jury

7    before, and I think you will find it interesting, and I

8    think you will find it enlightening to learn how our

9    system of jurisprudence, how our criminal justice

10   system, works in this country.

11                   And there are a number of rules that we

12   go by and a number of principles that are very

13   important to the way we handle criminal cases in this

14   country.  And I'll discuss that in a minute.

15                   But, first off, let me tell about the

16   two things that are for sure in this case.  And Mr.

17   Pascoe mentioned several things he thought were for

18   sure.  Number one, unfortunately, there is a man who is

19   dead.  Secondly, there is a man over here at this table

20   that is on trial for his life.  And this is a very

21   important case, as I mentioned.  It's important to

22   Jeroid Price for obvious reasons.  But how did we get

23   here?  Well, let me tell you how we got here.

24                   As Mr. Pascoe said, there was a shooting

25   at the Voodoo Lounge, which is out on Garners Ferry

1   Road, on December 7, 2002.  The Richland County

2   Sheriff's Department went out there and investigated,

3   and you're going to hear from various witnesses with

4   the Sheriff's Department how they investigated, and

5   what they found, and who they interviewed, who they

6   didn't interview.  So you'll be privy to that.  You'll

7   have the benefit of all that.

8                   But after the police investigated, they

9   went to the Magistrate and they got a warrant.  They

10  got a warrant charging Jeroid Price with murder.  When

11  they made application for that warrant, Jeroid Price

12  wasn't there.  I wasn't there.  Nobody was there

13  representing Jeroid Price.  They got a warrant for him.

14  Later, after Jeroid turned himself in, they went to the

15  Grand Jury, and the Grand Jury heard the Solicitor's

16  side of the case -- the State's side -- and they

17  returned a true bill, an indictment.  You'll hear that

18  term as we go along.

19                  An indictment is a formal charge.  So we

20  have to have an indictment in order to proceed.  But

21  the indictment is not evidence, and the fact that the

22  Magistrate issued a warrant is not evidence, and the

23  fact that the Grand Jury took some action is not

24  evidence.

25                  The defendant in this case, like in any

1   other case, is presumed to be not guilty as he sits

2   here right now.  And His Honor is going to explain that

3   to you at the conclusion of this case.  He has a

4   presumption of innocence that follows him the entire

5   way through this case -- not after one witness, not

6   after two, not after three, but through the entire

7   case.  And so I ask you to bear that in mind, to keep

8   your mind open, to listen to all the testimony before

9   you decide anything in this case.  And His Honor will

10  tell you, that's what you have to do as jurors.

11          And that's the beauty of our system,

12  ladies and gentlemen.  A man or a woman is presumed to

13  be innocent.  They have the right to a trial.  We don't

14  allow people in this country to be punished because

15  some dictator or some secret police says, "Hey, I think

16  he did something bad.  We're going to throw him in

17  jail."  It doesn't work like that.  Our system of law

18  and justice requires that the government prove somebody

19  -- prove that they're guilty beyond a reasonable doubt

20  by a jury of that person's peers, such as you, before

21  they can be found guilty.

22          That applies to everybody that's

23  excused.  It applies to you, and me, and everybody in

24  this city, everybody in this state, everybody in this

25  country -- and Jeroid Price.

Opening by the Defense                                          79

1              Mr. Pascoe told you -- and His Honor is
2       going to instruct you -- that the State has to prove
3       this case beyond a reasonable doubt.  They have to
4       prove that there was an unlawful killing of a person
5       with malice aforethought.  Those are individual
6       elements, individual words.  They have to prove that it
7       was unlawful, there was a killing, and that it was done
8       with malice aforethought.
9              Each one of those elements have to be
10      proven by the State.  Now, His Honor will instruct you
11      as to all these elements at the conclusion, and you'll
12      have the benefit of that information.  But I want to
13      emphasize that they must prove all these things.
14      They've got to prove that it was an intentional
15      killing.  They've got to prove that it wasn't a case of
16      mistaken identity.  They've got to prove it wasn't an
17      accident.
18              They've got to prove it wasn't self-
19      defense.  They have the burden, because that's the way
20      our system works.  The burden of proof is squarely on
21      them, because we don't allow dictators and secret
22      police to dictate who's convicted of crimes.  If you
23      aren't convinced, when all the evidence is in, of what
24      happened on December 7th, if you're not convinced that
25      they've proven those elements, you have to render a

**86**

Opening by the Defense                                    80

1    verdict of not guilty.  That's your duty.  That's how

2    the system works.

3               Now, what happened that night of

4    December 7, 2002?  I don't know.  I wasn't there.  Mr.

5    Pascoe wasn't there.  He doesn't know what happened.

6    Judge Lloyd wasn't there.  He doesn't know what

7    happened.  You weren't there.  You don't know what

8    happened.  And the way we determine these things is

9    through testimony, through physical evidence that may

10   be introduced, there may be some expert testimony.

11              But after all that information is

12   processed and given to you, then you go back and apply

13   your common sense to what you've heard, and you

14   determine what the truth is.  You determine whether

15   that burden of proof has been met.  But I submit to

16   you, ladies and gentlemen, that after you hear all the

17   evidence in this case, you still aren't going to know

18   what happened on December 7, 2002, at the Voodoo

19   Lounge.

20              And if you aren't convinced, you can't

21   find Jeroid Price guilty.  You're going to hear

22   conflicting statements, as Mr. Pascoe indicated.

23   You're going to hear witnesses that testimony doesn't

24   mesh, testimony that's at conflict with each other,

25   testimony that's at conflict with the physical

1    evidence.  That's going to happen.  That's one thing I

2    think you can be sure of.

3              There's going to be physical evidence

4    presented that won't add up, that won't mesh, that

5    won't be convincing.  And if it doesn't add up, if it

6    doesn't convince you, then you have to say not guilty.

7    That's how the system works.

8              Now, ladies and gentlemen, I could get

9    up here and go on and tell you what I think is going to

10   happen during the presentation of evidence in this

11   case, but I don't know.  So rather than me get up and

12   say, "Well, you're going to hear this, and you're going

13   to hear that," I'd rather just sit down and let the

14   witnesses start presenting their case, and we'll go

15   forward and get going with this trial.

16             So I'm going to ask you to do three

17   things.  I'm going to ask you three things that I know

18   you'll do.  And the first one is listen to the evidence

19   very closely.  The second one is listen to the law or

20   the legal instructions that Judge Lloyd gives you at

21   the end of the case.  And the third thing is I ask you

22   to keep your minds open and wait till you hear

23   everything before you try and make any kind of decision

24   in this case.

25             And after you've heard all that, I think

Opening by the Defense                                    82

1    you'll agree with me.  You still won't know what

2    happened at the Voodoo Lounge on December 7th.  Thank

3    you.

4              THE COURT:  Thank you, sir.

5              THE COURT:  Mr. Pascoe, are you ready to call

6    the first witness?

7              MR. PASCOE:  The State calls Ryan Brooks.

8              CLERK OF COURT:  Place your left hand on the

9    Bible and raise your right as best you can.

10                            (The witness was sworn.)

11             CLERK OF COURT:  Please have a seat up there,

12   speak into the microphone, and state your full name for

13   the record.

14             THE COURT:  State your full name for the

15   record.

16             MR. BROOKS:  Ryan Christopher Brooks.

17             THE COURT:  Mr. Pascoe.

18                       RYAN CHRISTOPHER BROOKS,

19   having first been duly sworn, testified as follows:

20                        **DIRECT EXAMINATION**

21   BY MR. PASCOE:

22        Q    Good afternoon, Mr. Brooks.

23        A    Good afternoon.

24        Q    Sir, you're charged for the death of Carl

25   Smalls, is that correct, sir?  Are you charged with

Ryan Brooks - Direct                                    83

1    murder?

2         A    Yes.

3         Q    You're charged along with a co-defendant, Mr.

4    Price?

5         A    Yes.

6         Q    Are you currently in the Richland County

7    Detention Center?

8         A    Yes.

9         Q    Do you have an attorney?

10        A    Yes.

11        Q    Josh Kendrick, who was in the courtroom

12   earlier -- you do have an attorney, sir?

13        A    Yes.

14        Q    Are you friends with the defendant, Jeroid

15   Price?

16        A    Yes, sir.

17        Q    How close of friends were you with the

18   defendant back in December of last year?

19        A    We was friends.

20        Q    How long had you known the defendant?  Speak

21   up, okay?

22        A    About four years.

23        Q    Four years?

24        A    Yes.

25        Q    How often would you go out with the defendant

Ryan Brooks - Direct                                    84

1    back in December or November of last year?

2         A    Occasionally.

3         Q    Had you ever been to his apartment on St.

4    Andrews Road?

5         A    Yes.

6         Q    How often had you been there?

7         A    Whenever I would stop by.  I can't recall how

8    many times.

9         Q    Let me ask you this, Mr. Brooks.  Are you a

10   Blood?

11        A    No, sir.

12        Q    Were you ever a Blood?

13        A    No.

14        Q    Were you a Blood in December of last year?

15        A    No.

16        Q    Do you know if the defendant, Jeroid Price,

17   is a Blood?

18        A    No, I do not.

19        Q    You do not know?  Sir, did you shoot the

20   victim, Carl Smalls, in the early morning hours of

21   December 7th?

22        A    Yes.

23        Q    Okay.  And how many times did you shoot Mr.

24   Smalls?

25        A    Once.

Ryan Brooks - Direct                                    85

1        Q    What type of weapon did you use when you shot
2    Carl Smalls?
3        A    A pistol.
4        Q    Do you know what kind of pistol it was?
5        A    A .380.
6        Q    A .380 semi-automatic?  What color was that
7    gun, do you know?  Do you remember?
8        A    It was silverish, chrome.
9        Q    Where did you get that gun from?
10        A    I bought it off the streets.
11        Q    Did you turn yourself in on January the 9th
12    of this year --
13        A    Yes.
14        Q    -- with an attorney?
15        A    Yes.
16        Q    You knew that the police had been looking for
17    you?  Did you give a statement to the police on January
18    the 9th?
19        A    Yes.
20        Q    A seven-page statement?
21        A    Yes.
22        Q    Did you tell them about the shooting?
23        A    Yes, I did.
24        Q    And before they took your statement, did the
25    police read anything to you?  Did they read you your

Ryan Brooks - Direct                                    86

1     rights?

2          A    Oh, yes.

3          Q    Let me show you what I've marked as State's

4     Exhibit 59 -- Madam Reporter, not for evidence, just

5     for ID for now.  Do you recognize that?

6          A    Yes.

7          Q    Is that the advice of rights that the police

8     read to you on January 9th?

9          A    Yes.

10         Q    The same condition it was in back then on

11    January the 9th?

12         A    Uh-huh.

13         Q    I'd ask that State's Exhibit 59 be admitted

14    into evidence, Your Honor.

15              THE COURT:  Any objection, Mr.

16    Littlejohn?

17              MR. LITTLEJOHN:  No, Your Honor.

18              THE COURT:  Okay.  Without objection,

19    it's admitted.  Is that 59?

20              MR. PASCOE:  It's 59, Your Honor.

21              THE COURT:  Thank you.

22                        (State's Exhibit 59 was

23    received in evidence.)

24         Q    I'll let you go ahead and keep that, okay?

25    And, very briefly, it told you you had the right to

Ryan Brooks - Direct                                    87

1    remain silent?

2         A    Yes.

3         Q    And you, with your attorney, still gave the

4    police a statement?

5         A    Yes.

6              MR. LITTLEJOHN:  Your Honor, I object to

7    the leading question.

8              MR. PASCOE:  I ask a little leeway in

9    some preliminary matters, Your Honor.

10             THE COURT:  I'll let you go into this

11   preliminary matter.

12             MR. PASCOE:  Thank you, Your Honor.

13        Q    And you testified you gave a seven-page

14   statement.  Just for the purpose of ID, do you

15   recognize State's Exhibit 60?

16        A    Yes.

17        Q    What do you recognize that to be?

18        A    Statement.

19        Q    Okay.  Is that the statement you gave to the

20   police?

21        A    Yes.

22        Q    I want you to use that if you need to refer

23   to it, okay?  Now, let me back up just a minute.  Where

24   did you go to school, Mr. Brooks?

25        A    Columbia High.

Ryan Brooks - Direct                                    88

1      Q    How long did you go there?

2      A    Three years, on and off.

3      Q    So you weren't going to college, Benedict or

4    Carolina, back in December of last year?

5      A    No.

6      Q    Okay.  And back in December of last year,

7    where were you living?

8      A    Crossroads Apartments --

9      Q    Did you ever --

10      A    -- no, Camden Station.

11      Q    I'm sorry, say that again?

12      A    Camden Station.

13      Q    Okay.  Where is that?

14      A    It's on Zimalcrest Drive.

15      Q    Did you have a roommate?

16      A    Yes.

17      Q    And who was that?

18      A    Jamel Bryant.

19      Q    Okay.  Now I want to take you to December the

20    6th of last year.  Where did you end up going that

21    night?

22      A    To a club.

23      Q    Which club is that?

24      A    Voodoo's.

25      Q    Okay.  Now, who did you go to Club Voodoo's

Ryan Brooks - Direct                                        89

1    with?

2         A    Me, Jason, and Anthony.

3         Q    Okay.  Who is Jason?

4         A    That's my friend.

5         Q    What's his last name?

6         A    Woods.

7         Q    And what is Anthony's last name?

8         A    Patrick.

9         Q    So Jason Woods and Anthony Patrick?

10        A    Yes.

11        Q    Whose vehicle did you drive to Club Voodoo's

12   then?

13        A    I rode in Anthony's truck.

14        Q    Okay.  What color is Anthony's truck?

15        A    Green.

16        Q    Do you remember what type it is?

17        A    It was a Rodeo.

18        Q    And before I forget, how tall are you?

19        A    About 6'1".

20        Q    Are you taller or shorter than the defendant,

21   Jeroid Price?

22        A    I believe taller.

23        Q    Okay.  What was your hairstyle like back on

24   the night of December the 6th?

25        A    I had braids to the back.

Ryan Brooks - Direct                                    90

1        Q    Okay.  What about the defendant's hairstyle?

2        A    I believe it was.

3        Q    Okay.  How much did you weigh back in

4   December last year?

5        A    200, 220 -- something like that.

6        Q    Were you a lot heavier than the defendant?

7        A    Yes, and about the same size I am now.

8        Q    Okay.  What time did you get to the party

9   that night with Anthony Patrick and Jason Woods?

10       A    I don't remember.

11       Q    Approximately.

12       A    I'd say maybe 1:00, 12:00.

13       Q    Was it pretty late in the evening or early

14   morning?

15       A    Yes.

16       Q    And did you have a cell phone back then?

17       A    Yes.

18       Q    What was your cell phone number?

19       A    417-5071.

20       Q    5071?

21       A    Yes.

22       Q    Okay.  Were you supposed to meet the

23   defendant that night at the party?

24       A    Yes.

25       Q    And, in fact, had you had conversations with

Ryan Brooks - Direct                              91

1    the defendant on his cell phone that night after

2    midnight?

3         A    I talked to him before I got there.

4         Q    Before getting to the party --

5         A    Yes.

6         Q    -- on the cell phone?

7         A    Yes.

8         Q    Did you end up meeting with the defendant

9    that night at the party?

10        A    Inside.

11        Q    Okay.  And what did you and the defendant end

12   up doing when you met inside the party?

13        A    We was just there on the dance floor.

14        Q    Did y'all just hang out together?

15        A    Yes.

16        Q    Did the defendant go to Benedict or USC, to

17   your knowledge?

18        A    Not to my knowledge.  I don't know.

19        Q    Did you and the defendant ever have a

20   confrontation with the victim, Carl Smalls, that night?

21        A    Yes.

22        Q    Okay.  Why did you have a confrontation with

23   Mr. Smalls that night, the victim?

24        A    He was acting like he wanted to fight --

25   loud.

Ryan Brooks - Direct                                    92

1          Q     Was anybody throwing up gang signs?

2          A     I recall he was, and some other guys he was

3     with.

4          Q     Were you throwing up gang signs?

5          A     No.

6          Q     Was Mr. Price throwing up gang signs?

7          A     I don't recall.

8          Q     You don't recall?

9          A     Yes.

10         Q     Would you even know how to throw a gang sign

11    up, since you're not a Blood?

12         A     No.

13         Q     Did you have a gun on you when you were

14    inside that club, sir?

15         A     No.

16         Q     Did the defendant have one on him when he was

17    in the club?

18         A     Not to my knowledge.

19         Q     Did you know anyone working security that

20    night?

21         A     No.

22         Q     Do you know anybody by the name of JayLu?

23         A     I know of him, but I don't know him

24    personally.

25         Q     Okay.  Describe JayLu for the jury.  What

Ryan Brooks - Direct                          93

1    does he look like?

2        A    He's a big guy, tall.

3        Q    And how did you know JayLu -- through who?

4        A    Jeroid.

5        Q    The defendant, Jeroid Price?

6        A    Yes.

7        Q    Let me ask you, is JayLu a Blood?

8        A    I believe so.

9        Q    Do you know what sect he would be involved

10   in, by any chance?

11       A    No.

12       Q    So tell the jury about this confrontation

13   that you and Mr. Price had with the victim, Carl

14   Smalls.  What happened?

15       A    He was talking loud, and he was throwing up

16   gang signs, and the guys he was with.  And I guess they

17   wanted to fight and what not.

18       Q    And what did you and Mr. Price do --

19   specifically, you and Mr. Price?

20       A    I did nothing.  They had words, but no action

21   was tooken [sic].

22       Q    Who is "they" had words?  Who is "they"?

23       A    Jeroid and the victim.

24       Q    When you say "Jeroid," of course, you mean

25   the defendant, Mr. Price?

Ryan Brooks - Direct                                    94

1          A    Yes.

2          Q    Do you remember what kind of words they had?

3          A    No, I wasn't right there on top of them.

4          Q    And the victim, Carl Smalls, was a lot bigger

5     than Mr. Price, correct?

6          A    Yes, he was bigger than me.

7          Q    Bigger than you.  And when the party ended at

8     2:00 in the morning, let me ask this, what did you do

9     then?

10         A    I went to the car, to go get my firearm.

11         Q    Okay.  Tell the jury why you went to the car

12    to get your firearm at 2:00 in the morning.

13         A    So I wouldn't get robbed in the parking lot,

14    because I had money in my pocket.

15         Q    Where did you end up going?

16         A    Back inside the club.

17         Q    Why did you go back inside the club?

18         A    I went to go check on Jeroid.

19         Q    Okay.  And tell the jury what you claim

20    happened when you went inside the club to check on

21    Jeroid Price.

22         A    I seen them talking again, closer.

23         Q    And who is "them"?

24         A    The victim and Jeroid.

25         Q    Okay.  And what happened?

Ryan Brooks - Direct                                    95

1       A    And as they was talking, the words was

2   getting heated up or whatever.  And then I seen Jeroid

3   do something with his waist, and I seen the victim rush

4   him.  That's when I noticed that they were struggling

5   for a pistol.  The pistol was pointed in my direction.

6       Q    Who was the only person that you saw that had

7   a pistol?

8       A    Both of them at the time.  They both had

9   hands on it.

10      Q    Whose pistol was it?

11      A    I'm not sure.

12      Q    Whose waist did it come from?

13      A    I believe it was Jeroid.

14      Q    Did the victim have a gun in his waist?

15      A    No, not that I know of.

16      Q    And tell the jury what you claim happened

17  after you saw them struggling over the gun.

18      A    After they was tussling with the gun, and

19  that's when the firearm came up towards my direction.

20  That's when I fired mine.

21      Q    So why did you feel the need to fire your

22  weapon?

23      A    Because I thought the other weapon was going

24  to get fired at me.

25      Q    So it was self-defense, right?

Ryan Brooks - Direct                                   96

1          A     Yes.

2          Q     Let me show you what's been marked State's

3     Exhibit 6.  I just want to warn the jury.  Do you

4     recognize that photo?

5          A     Yes.

6          Q     What do you recognize that to be?

7          A     The outside of the club.

8          Q     That adequately represents the outside of

9     Club Voodoo's?

10         A     Yes.

11         Q     And let me show you what's been marked as

12    State's Exhibit 17.  Do you recognize that area?

13         A     Yes.

14         Q     What do you recognize that area to be?

15         A     It's the hallway into the place.

16         Q     Okay.  Do you also recognize the person in

17    the photo?

18         A     Yes.

19         Q     Is that the victim, Carl Smalls?

20         A     Yes.

21         Q     I ask that State's Exhibits 6 and 17 be

22    admitted into evidence.

23              THE COURT:  Any objection, Mr.

24    Littlejohn?

25              MR. LITTLEJOHN:  May I see them, Your

Ryan Brooks - Direct                              97

1    Honor?

2                    THE COURT:  Yes, sir.

3                    MR. LITTLEJOHN:  I have no objection.

4                    THE COURT:  Okay.  Without objection,

5    they're both admitted.

6                            (State's Exhibits 6 and 17

7    were received in evidence.)

8         Q    The little numbers on here -- three, four,

9    five, six -- those were there obviously during the

10   murder, correct?  Those were put there by the Sheriff's

11   Department later, to your knowledge?

12        A    Yes.

13        Q    Okay.  State's Exhibit 6, that shows the

14   front entrance of Voodoo's, right?

15        A    Yes.

16        Q    And then there was an exit door.  Point where

17   the exit door is, because that's the entrance.  So

18   where's the exit door?

19        A    Right beside it.

20        Q    Up against that wall.  And what door did you

21   go through when you followed Jeroid Price into Club

22   Voodoo's?

23        A    The exit door.

24        Q    Okay.  And when you went in there, who were

25   the only people in this area in State's Exhibit 17 at

**104**

Ryan Brooks - Direct                                      98

1    the time?

2        A    Them two, to my eyesight.

3        Q    So it was just Jeroid Price, the defendant,

4    and then eventually yourself, of course, as you walked

5    through that exit door?

6        A    Yes.

7        Q    Okay.  And what did you say Jeroid was doing

8    with his waist?

9        A    He reached.

10        Q    And what do you claim the victim did at that

11    time?

12        A    That's when he rushed --

13        Q    Okay.

14        A    -- started tussling, wrestling.

15        Q    And what got pulled out?

16        A    A pistol.

17        Q    And you claim that you had to shoot in self-

18    defense?

19        A    Yes.

20        Q    And nobody else was in that area other than

21    the three of you?

22        A    Not to my knowledge.

23        Q    After you fired the gun, what did you do

24    then?

25        A    I ran.

Ryan Brooks - Direct                                    99

1      Q     Okay.  Where did you run to?

2      A     I ran to the Rodeo outside, the truck.

3      Q     What, if anything, did you hear or see as you

4   were running to the Rodeo, to the truck?

5      A     I heard gunshots when I was getting in the

6   truck.

7      Q     So how long after your first shot do you

8   think you heard more shots?

9      A     I'd say about 25 or 30 seconds.  I'm not

10  sure.

11     Q     How long did it take you to run to the car?

12     A     I'm not sure.

13     Q     Do you remember what the gun looked like that

14  appeared to come from the defendant's waist that they

15  struggled over?

16     A     I just know it was black -- I don't know.  I

17  couldn't describe it to you in detail.

18     Q     It was black.  And how did you leave the

19  scene?  Who did you leave with?

20     A     Anthony Patrick.

21     Q     Anybody else in the vehicle?

22     A     Jason Woods.

23     Q     And, again, that was in Mr. Patrick's green

24  Rodeo?

25     A     Yes.

Ryan Brooks - Direct                                    100

1        Q    And did you tell anyone in the vehicle that
2    night -- that morning -- what had happened?
3        A    No.
4        Q    So you had just shot someone, and you didn't
5    tell anybody what happened?
6        A    No.
7        Q    Okay.  Did you talk to the defendant on his
8    cell phone immediately after the shooting?
9        A    No.
10       Q    Sir, did you not receive a telephone call at
11   2:18 in the morning, right after the shooting?
12       A    My battery's dead for my cell phone.
13       Q    Yours were, but your friend's, Mr. Patrick's,
14   weren't.
15                 MR. LITTLEJOHN:  Your Honor, I object to
16   the leading questions.
17                 MR. PASCOE:  Well, now I'm asking to --
18                 THE COURT:  I understand.  I'll grant
19   you some leeway about that.
20                 MR. PASCOE:  Thank you, Your Honor.
21       Q    Didn't you and Anthony Patrick receive a call
22   at 2:18 and 41 seconds?
23       A    Anthony Patrick could have received a call.
24   I didn't receive a call.
25       Q    And you didn't talk to the defendant on Mr.

Ryan Brooks - Direct                           101

1    Patrick's phone?

2         A    No.

3         Q    Did you talk to him at 2:27 and 56 seconds?

4         A    Two who?

5         Q    2:27 in the morning and 56 seconds.

6         A    No.

7         Q    So it's your testimony you did not talk to

8    the defendant immediately after the shooting.  When was

9    the next time you talked to the defendant?

10        A    I remember talking early in the morning the

11   next day.

12        Q    Okay.  And what, if anything, did y'all talk

13   about with regards to the shooting?

14        A    We didn't.

15        Q    So you just shot somebody, know that he was

16   supposedly allegedly struggling over a gun with him,

17   and you heard more shots, and y'all didn't talk about

18   the shooting?

19        A    No.

20        Q    What was your home phone number back then,

21   before I forget it?

22        A    ▆▆▆▆▆▆, I believe.

23        Q    Now, where did Mr. Patrick and Mr. Woods take

24   you after the shooting, after you left Voodoo's?

25        A    To where I was staying at, Camden Station.

Ryan Brooks - Direct                                    102

1      Q    Okay.  What did you do with the gun?

2      A    I left it in the truck.

3      Q    Okay.  You testified earlier that you had a

4  roommate, Jamel Bryant.  Did you tell him what

5  happened?

6      A    No, I did not.

7      Q    Have you ever told him what happened?

8      A    No.

9      Q    Have you ever talked to the defendant, Jeroid

10  Price, about the shooting?

11      A    No.

12      Q    Sir, you took off and left the state of South

13  Carolina --

14      A    Yes.

15      Q    -- because of the charges of murder that were

16  being brought?

17      A    Yes.

18      Q    Where did you go?

19      A    I went to New Jersey, where my grandmother

20  stays.

21      Q    Do you know where the defendant went?

22      A    I believe Virginia or --

23           MR. LITTLEJOHN:  Your Honor, I'm object

24  to anything he believes if he doesn't know of his own

25  personal knowledge.

Ryan Brooks - Direct                                    103

1              THE COURT:  Okay.  Well, find out from

2    him --

3         Q    And do you know where the defendant is from?

4         A    He was born in New York.

5         Q    Did you have any contact with the defendant

6    while you were on the run, sir?

7         A    No.

8         Q    Now, Mr. Brooks, you are charged with the

9    murder of Carl Smalls, correct?

10        A    Yes.

11        Q    You know you're looking at 30 years to life,

12   right?

13        A    Yes.

14        Q    Have I given you any deals for your          .

15   testimony?

16        A    No.

17        Q    Okay.  In fact, even before we ever met, you

18   gave a statement to the police, correct?

19        A    Yes.

20        Q    Okay.  Now, let me ask you some questions

21   about your statement.  I asked you earlier if Jeroid

22   Price was a Blood, and you said you don't know.  You

23   remember that?

24        A    Yes.

25        Q    I want you to take a look at page two of your

Ryan Brooks - Direct                                    104

1    statement.  And I'll point it out for you, sir.
2    Remember when the police asked you why the victim would
3    confront Jeroid, and your answer was what?
4         A    It says right here because he was a Blood,
5    but I don't recall saying that.
6         Q    You don't recall telling the police that?
7         A    No.
8         Q    But State's Exhibit 60 is your sworn
9    statement that you signed, that's your signature,
10   correct?
11        A    Yes.
12        Q    And you even had a lawyer there when you gave
13   this statement, didn't you?
14        A    Yes, I did.
15        Q    Okay.  And also again on page six, do you
16   remember the police asking you -- I don't mean to put
17   my arm in your face -- "What can you tell me about
18   Jeroid's gang affiliation?"  Do you remember what your
19   answer was?  Did you tell the police, sir, "I know he's
20   a Blood, and he is probably GKB"?  You don't remember
21   that?
22        A    No.
23        Q    And do you remember when they asked you about
24   JayLu, what sect of Blood he was in?  Do you remember
25   what your response was?

Ryan Brooks - Direct                                    105

1      A      Yes.

2      Q      "I know that JayLu is a Nine Tre, which is a

3   Blood sect" -- do you remember that?

4      A      Yes.

5      Q      So you do remember saying that, but you don't

6   remember saying Jeroid Price is a Blood, right?

7      A      No.

8      Q      So, basically, when Carl Smalls was throwing

9   up these signs, you guys -- you and Jeroid Price --

10  really didn't know what the heck he was doing.  Neither

11  one of you are Bloods, right --

12     A      Yes.

13     Q      -- or you don't know that he's one, correct?

14  You're definitely not one, isn't that right?

15     A      Yes.

16     Q      And you were with Jeroid Price that night

17  during all of this stuff with Carl Smalls before the

18  shooting, correct?

19     A      Yes.

20     Q      You were there when Carl and Jeroid were in

21  each other's face?

22     A      Yes.

23     Q      You had to be thinking, "What in the heck is

24  this guy doing?  We're not Bloods," isn't that right?

25     A      Yes.

**112**

Ryan Brooks - Direct                                                106

1        Q    And before I forget, the person that you know

2    as Jeroid Price, do you see him in the courtroom today?

3        A    Yes.

4        Q    If you could, point him out for the jury.

5        A    Right there.

6        Q    The defendant, with his attorneys?

7        A    Yes.

8        Q    Is he the person that was struggling

9    allegedly over a gun with Carl Smalls?

10       A    Yes.

11       Q    Okay.  Of course, by not being a Blood,

12   neither one of you have a motive for killing Carl

13   Smalls, isn't that true?  You don't have a motive.

14            MR. LITTLEJOHN:  Your Honor, I object to

15   the leading question.

16            MR. PASCOE:  I ask for some leeway, Your

17   Honor, please.

18            THE COURT:  Okay.  Let me get you all to

19   approach.

20            BAILIFF:  Quiet, please.

21       Q    Let me show you what's been marked as State's

22   Exhibit 12.  You and Jeroid Price did not have a motive

23   to kill Carl Smalls, did you?

24       A    I didn't kill Carl Smalls.

25       Q    Well, you shot him.  Neither one of you had a

Ryan Brooks - Direct                                    107

1    motive to shoot Carl Smalls, correct?

2        A    Yes.

3        Q    Because you're not Bloods, right?  All right,

4    before I forget, let me show you what's been marked as

5    State's Exhibit 41.  Do you recognize the person in the

6    top picture?

7        A    That's me.

8        Q    That's you, correct?

9        A    Right.

10       Q    Just for ID.  Now, how was your hair back in

11   December of last year and prior to that?

12       A    What do you mean, prior?

13       Q    Did Jeroid Price and you ever have hair that

14   looked alike?

15       A    No.

16       Q    Do you ever look anything like Jeroid Price?

17       A    No.

18       Q    Just to point that out, let me show you

19   State's Exhibits 50 and 51.  Do you recognize those

20   photos?

21       A    Yes.

22       Q    Who are they?

23       A    Me.

24       Q    Do they accurately depict the way you looked

25   prior to December of last year, that you had a lot more

**114**

Ryan Brooks - Direct                                          108

1    hair than Jeroid Price?

2         A    Yes.

3         Q    I'd ask that State's Exhibits 50 and 51 be

4    admitted into evidence.

5                   THE COURT:  Okay.  Any objection?

6                   MR. LITTLEJOHN:  No objection.

7                   THE COURT:  Okay.  Without objection,

8    they're both admitted.

9                             (State's Exhibits 50 and 51

10   were received in evidence.)

11        Q    But you'd agree with me you're not a Blood,

12   but you do like the color red, don't you?

13        A    I had a shirt on.  That doesn't mean I like

14   the color red.  I just wear clothes.

15        Q    I'll ask you one more time, are you a Blood?

16        A    No.

17        Q    Let me show you what's been marked as State's

18   Exhibit 52.  Did you know I had that?

19        A    No.

20        Q    Who is in that picture?

21        A    Me.

22        Q    Does that accurately depict you in that

23   picture?  It's you.  I'd ask that State's Exhibit 52 be

24   admitted into evidence.

25                   THE COURT:  Any objection?  Yes, sir.

Ryan Brooks - Direct                          109

1                    MR. LITTLEJOHN:  Your Honor, technically
2       I don't know if he's laid a proper foundation, not
3       technically --
4                    MR. PASCOE:  He just said it's him.
5                    THE COURT:  He identified both of them.
6                    MR. PASCOE:  Thank you.  I'd ask that
7       State's Exhibit 52 be admitted into evidence.
8                    THE COURT:  It's admitted.
9                          (State's Exhibit 52 was
10      received in evidence.)
11          Q    Do you know where I got that, Mr. Brooks?
12          A    No, I don't.
13          Q    Would you be surprised if it came from your
14      buddy's apartment?  Would that shock you?
15          A    I don't know.
16          Q    Tell the jury what you're doing with your
17      left hand.  That's not a "B," is it?
18          A    No, it's not.
19          Q    No.  Tell the jury what you're doing with
20      your right hand.  That's not a red handkerchief, is it?
21          A    Yes, it is.
22          Q    You're not a Blood, are you, Mr. Brooks?
23          A    No.
24                   THE COURT:  You can pass that around.
25          Q    You didn't know I had that, did you?

Ryan Brooks - Direct                                    110

1          A    No.

2          Q    You did have a motive to kill Carl Smalls,

3    didn't you?

4          A    No.

5          Q    Beg the Court's indulgence.

6               THE COURT:  Yes, sir.

7          Q    And, once again, absolutely no deals for your

8    testimony, isn't that true, sir?

9          A    Yes.

10         Q    That's all I have, Your Honor.

11              THE COURT:  Thank you, Mr. Pascoe.

12              THE COURT:  Mr. Littlejohn.

13              MR. LITTLEJOHN:  Thank you, Your Honor.

14                      **CROSS-EXAMINATION**

15   BY MR. LITTLEJOHN:

16         Q    Mr. Brooks, my name is Cam Littlejohn.  I

17   represent Jeroid Price.  You turned yourself in in

18   January --

19         A    Yes.

20         Q    -- is that right?

21         A    Yes.

22         Q    You came in with Mr. Roberts, who was your

23   attorney at that time?

24         A    Yes.

25         Q    And at that time, you agreed to give a

Ryan Brooks - Cross                              111

1    statement --
2         A    Yes.
3         Q    -- is that correct?
4         A    Yes.
5         Q    Okay.  Now, I believe you indicated when Mr.
6    Pascoe was asking you questions that, between December
7    7th when the shooting incident took place and when you
8    turned yourself in, you hadn't talked with Jeroid Price
9    about what happened that night --
10        A    No.
11        Q    -- is that right?
12        A    Yes.
13        Q    You talked to him one time on the morning of
14   December 7th --
15        A    Yes.
16        Q    -- is that correct?
17        A    Yes.
18        Q    And that's the only time you talked to him
19   between the day of the shooting -- or the night of the
20   shooting -- and when you gave your statement?
21        A    Yes.
22        Q    Okay.  Now, Mr. Brooks, let's go into a
23   little detail about what happened on that particular
24   night.  You said you had gone to the club and gotten

Ryan Brooks - Cross                              112

1    there, I believe you indicated, it was about midnight

2    or 1:00 --

3         A    Yes.

4         Q    -- very late?

5         A    Yes.

6         Q    And you went there with Jason Woods and

7    Anthony Patrick?

8         A    Yes.

9         Q    Okay.  When you got there, was Jeroid already

10   there?

11        A    Yes.

12        Q    Okay.  Did you talk to Jeroid?

13        A    I don't recall.

14        Q    You don't recall?

15        A    You can't talk in a club, because the music's

16   loud.

17        Q    Too loud, okay.  Now, how long had you been

18   in the club when you saw Carl Smalls?

19        A    How long was I in there?

20        Q    Yes, sir.

21        A    I guess 30 minutes.  That's guessing.

22        Q    Thirty minutes?

23        A    Yes.

24        Q    Maybe 40 minutes?  I think that's what you

Ryan Brooks - Cross                                113

1    said in your statement.

2         A    Around that time.

3         Q    Okay.  Now, when you first saw Mr. Smalls,

4    what happened?  What did he do?

5         A    He was talking loud and moving.

6         Q    Did he come up and say anything to you and

7    Jeroid?

8         A    He said something, but I couldn't hear him

9    because of the music being loud.

10        Q    Okay.  Did he say something about knowing

11   your "punk ass"?

12        A    Yes, I think he did.

13        Q    Do you remember him making that statement?

14        A    Yes, I think he did say something like that.

15        Q    What did he say, as best you can recall?

16        A    "I know your bitch ass" -- something like

17   that.  It was something slick.

18        Q    Okay.  Who did Mr. Smalls say that to?

19        A    That's what I don't know.  He was over by me,

20   but I don't know if he was directing it to me, or

21   everybody that was around me, or whatever.

22        Q    Okay.  Now, did you recognize him at that

23   time?

24        A    What do you mean, recognize?

**120**

Ryan Brooks - Cross                                              114

1        Q    Had you seen him before, Carl Smalls?

2        A    I had seen him before in a club.

3        Q    Okay.  Did you know him?

4        A    No.

5        Q    Okay.  Do you know why he would come up and

6    speak to you or people that you were with like that?

7        A    No.

8        Q    Now, after he made this statement about "punk

9    ass," or "bitch ass," or whatever, did he make any

10    other statements at that time to you or Jeroid?

11        A    I don't recall at that time, no.

12        Q    Okay.  Now, as the night went on after that,

13    what did you observe Carl Smalls doing?

14        A    He was throwing up signs and doing some kind

15    of dance that they do.

16        Q    He was doing some kind of dance that they do.

17    Who is "they"?

18        A    I believe gang members.

19        Q    What kind of gang members?

20        A    Excuse me?

21        Q    What kind of gang members?

22        A    Crips.

23        Q    Crips?

24        A    Yes.

Ryan Brooks - Cross                              115

1       Q      Is there something called a Crip walk?  Are
2   you familiar with that?
3       A      I believe so.
4       Q      Was that what he was doing?
5       A      I believe so.
6       Q      You say he was throwing up signs.  Explain
7   that a little better.
8       A      I couldn't explain the signs.  It was just
9   hand motions.
10      Q      Okay.  Now, you indicated there was a guy
11  named JayLu there.
12      A      Yes.
13      Q      Do you know JayLu's full name?
14      A      No, I don't.
15      Q      After that, did Carl Smalls come up and
16  confront you again?
17      A      Huh-huh.
18      Q      Did he ever call you another name?
19      A      No.
20      Q      Do you recall him calling you a slob?
21      A      No.
22      Q      You don't remember that?
23      A      No.
24      Q      Do you remember putting that in your

Ryan Brooks - Cross                                    116

1    statement on January 9th?

2        A    No.

3        Q    Let me show you this document, and you see if

4    this refreshes your memory.  Does that appear to be a

5    page of your statement?  And I think you've got a copy

6    right in front of you.

7        A    Uh-huh.

8        Q    Do you see page two?  Have you got page two?

9        A    Yes.

10       Q    Flip to page two there.  Look at that last

11   full paragraph, about halfway down.  Do you recall now

12   whether he called you a slob or not?

13       A    I still don't recall him calling me that.

14       Q    Okay.  Do you remember putting that in your

15   statement?

16       A    It's here.

17       Q    Okay.  Do you remember trying to talk to Mr.

18   Smalls and explain to him that --

19       A    Yes.

20       Q    -- maybe you weren't such a bad guy after

21   all?

22       A    Yes.

23       Q    Did that do any good?

24       A    No.

Ryan Brooks - Cross                                    117

1        Q    How did he appear to you to be?  Did he

2    appear to be under the influence of anything?

3        A    I believe so, maybe drunk.

4        Q    Okay.  That's the way you observed him

5    acting?

6        A    Yes.

7        Q    Okay.  Now, Mr. Brooks, do you remember what

8    time the party let out -- what time it was over with?

9        A    I don't remember.

10       Q    Okay.  Could it have been around 2:00?  Does

11   that sound about right?

12       A    Yes.

13       Q    What stopped the party?  What ended the

14   party?

15       A    I think it was just time to go home --

16       Q    Okay.

17       A    -- time to close.

18       Q    Did the DJ say it's over with, or did the

19   security people say something, or do you know?

20       A    The DJ's the one that says it's over with,

21   but I don't recall him saying it.

22       Q    Okay.  Now, I believe you indicated to Mr.

23   Pascoe that you went outside --

24       A    Yes.

**124**

Ryan Brooks - Cross                    118

1      Q      -- when the party was over with or supposedly

2      over with, is that right?

3      A      Yes.

4      Q      You went out to the Rodeo that you were in?

5      A      Uh-huh.

6      Q      And I believe you said you got your gun at

7      that time?

8      A      Yes.

9      Q      Okay.  And you indicated that the reason you

10     got your gun was you were afraid you might get robbed?

11     A      Yes.

12     Q      What were you afraid of?

13     A      Getting robbed.

14     Q      Okay.  By whom?

15     A      Robbers.

16     Q      By robbers?

17     A      Yes.

18     Q      Okay.  You were concerned about that?

19     A      Yes.

20     Q      Had you had previous experience with

21     something like that?

22     A      No, I just heard of it.

23     Q      Okay.  Now, Mr. Brooks, after you got your

24     gun out of your car, did you go back toward the club?

Ryan Brooks - Cross                                    119

1       A    Yes.

2       Q    Okay.  And I believe you indicated to Mr.

3   Pascoe you went toward this exit door that's shown in

4   State's Exhibit 6, is that right?

5       A    Yes.

6       Q    Okay.  Now, were there people out here, out

7   in this area in front of the door?

8       A    And on the street.

9       Q    They were on the street?

10      A    Yes, cars.

11      Q    Okay.  And that was in front of, I guess,

12   both the entrance and the exit door, is that right?

13      A    I believe so, yes.

14      Q    Okay.  And for clarification, this picture

15   actually just shows the entrance door, isn't that

16   right?

17      A    Yes.

18      Q    Okay.  And there is an exit door that I

19   believe as you're looking at the picture would be on

20   the left over here --

21      A    Yes.

22      Q    -- opposite the trash can, is that right?

23      A    Yes.

24      Q    Okay.  Now, you told Mr. Pascoe after you got

Ryan Brooks - Cross                                    120

1    your gun, you went to the back to the club, you went to

2    the exit door, is that right?

3        A    Yes.

4        Q    Okay.  Was the exit door open or closed?

5        A    I believe open.

6        Q    You think it was open?

7        A    Yes, I remember open.

8        Q    Could it have been cracked open?  Do you

9    remember?

10       A    I think it was wide open.

11       Q    You think it was wide open?

12       A    Yes.

13       Q    Do you remember whether it was cracked open

14   or wide open?

15       A    I can't remember.  I know I didn't open it,

16   so it had to be either one.

17       Q    So you're sure it wasn't closed?

18       A    Yes.

19       Q    Okay.  Now, you indicated to Mr. Pascoe when

20   you got into that area, you saw Jeroid Price and Carl

21   Smalls, is that right?

22       A    Yes.

23       Q    Okay.  Now, Mr. Brooks, at the time, were

24   there words being exchanged between Jeroid Price and

127

Ryan Brooks - Cross                              121

1    Carl Smalls?

2         A    I believe so.

3         Q    Okay.  Do you remember hearing Carl Smalls

4    use the "F" word?

5         A    I think so.

6         Q    What did he say?

7         A    "Fuck" something -- "fuck this," or "fuck

8    that."  I can't remember.

9         Q    And who was he directing these words to?

10        A    I believe Jeroid.  He wasn't talking to me.

11        Q    Okay.  Then did you hear Jeroid reply to

12   that?

13        A    Not really.

14        Q    Did you hear Jeroid say, "Man?"

15        A    He might have.

16        Q    Okay.  Let me get you to refer to your

17   statement again, on page three, that first full

18   paragraph, the sixth line down.  Do you recall putting

19   in your statement that Jeroid said, "Man.  It was a

20   wrong ass, man," like "leave me alone?"

21        A    Yes.

22        Q    Do you remember saying that?  Isn't that what

23   happened?

24        A    I didn't say it.  I remember hearing it.

Ryan Brooks - Cross                                        122

1      Q    Okay.  But isn't that what happened?

2      A    Yes.

3      Q    Okay.  Now, isn't it true, Mr. Brooks, at

4   that point you saw Carl Smalls rush Jeroid Price?

5      A    Yes.

6      Q    Isn't that right -- he went after Jeroid

7   Price, and Jeroid's back was to the wall?

8      A    Yes.

9      Q    And as you're looking in that exit door,

10  Jeroid's to your left with his back to the wall, isn't

11  that right?

12     A    Yes.

13     Q    And Carl Smalls was coming from your right to

14  your left, isn't that right?

15     A    Say that again?

16     Q    I say as you're leaving through that exit

17  door, Carl Smalls was coming from your right to the

18  left going toward Jeroid Price.

19     A    Yes.

20     Q    Isn't that how it happened?

21     A    Yes.

22     Q    Okay.  And when Carl Smalls rushed Jeroid

23  Price, he grabbed him and pushed him up against the

24  wall, isn't that right?

Ryan Brooks - Cross                                    123

1          A    Yes.

2          Q    And, again, how big do you recall Carl Smalls

3     being?

4          A    Taller than me.

5          Q    Taller than you.  And you're what?

6          A    About 6'1" or 6'2".

7          Q    Was he taller than me?

8          A    I don't know -- might have been.  How tall

9     are you?

10         Q    I have to ask the questions, okay?

11         A    I don't know -- might be.  He was taller than

12    me.

13         Q    Okay.  And he was taller than you?

14         A    Yes.

15         Q    Heavier than you?

16         A    Yes.

17         Q    You'd say a lot heavier than you?

18         A    I wouldn't say a lot, but he was bigger than

19    me.

20         Q    He was a real big man, wasn't he?

21         A    Yes.

22         Q    Played defensive tackle.

23         A    I don't know about all that.

24         Q    Do you think he could have weighed 280

**130**

Ryan Brooks - Cross                                          124

1    pounds, probably --

2        A    Might could have weighed more.

3        Q    -- or might have weighed more?

4        A    Yes.

5        Q    Okay.  So he rushed Jeroid Price and had him

6    pinned up against a wall, right?

7        A    Yes.

8        Q    Okay.  And then, Mr. Brooks, he got into a

9    tussle with Jeroid Price over a gun, isn't that right?

10       A    Yes.

11       Q    You saw that tussle.  You saw Carl Smalls

12   going for the gun that Jeroid Price had, isn't that

13   right?

14       A    Yes.

15       Q    I need you to answer up, sir.

16       A    Yes.

17       Q    Okay.  They both had hands on that gun, isn't

18   that right?

19       A    Yes.

20       Q    And while they're going for that gun, Carl

21   Smalls, all 280 pounds of him, has got Jeroid Price up

22   against a wall, isn't that right?

23       A    Yes.

24       Q    Okay.  And you got scared because you thought