**266**

Chemiqua Ellington - Cross                                    260

```
 1        A    Yes.

 2        Q    Okay.  Now, Ms. Ellington, you indicated it

 3   was some time that evening that Carl Smalls showed up

 4   at your room?

 5        A    Yes.

 6        Q    And that was at Columbia College -- or USC?

 7   Where do you go to school?  I didn't even catch that.

 8        A    Columbia College.

 9        Q    Columbia College.  He showed up at your room?

10        A    Yes.

11        Q    Okay.  Then y'all decided to go to Club

12   Voodoo's?

13        A    Yes.

14        Q    Okay.  And so you, and he, and your friend

15   Shameka --

16        A    Yes.

17        Q    -- went to Voodoo's?

18        A    Yes.

19        Q    And you got there about 11:10, 11:15,

20   somewhere in that area?

21        A    Yes.

22        Q    Okay.  Now, up until that time, had Carl

23   Smalls been drinking at all?

24        A    He had a Bud Lite, but he wasn't intoxicated.

25        Q    Okay.  Well, what I'm asking you is what he
```

Chemiqua Ellington - Cross                    261

1    had to drink.

2         A    A Bud Lite, and that's it, as I can remember.

3         Q    Do you recall him having some kind of

4    liqueur?

5         A    Yes, I do.

6         Q    What was that?

7         A    I think some Courvoisier, I think.  I think

8    that's what it was.

9         Q    And when was that?

10        A    He had it in my room.

11        Q    Had it in your room before you went to the

12   party?

13        A    Yes.

14        Q    Okay.  What is that?  That's a liqueur --

15        A    Yes.

16        Q    -- or liquor, or what?

17        A    Yes, it is.

18        Q    Do you remember how much he had?

19        A    No.  He had it in my room, but I don't

20   remember him drinking that.  I remember him drinking

21   the Bud Lite.

22        Q    Okay.  But you have some recollection of him

23   having this liqueur?

24        A    Yes.

25        Q    Okay.  Now, when you got to Club Voodoo's,

Chemiqua Ellington - Cross                            262

1    you indicated that you saw an old friend of yours,

2    Bernard Rembert?

3        A    Yes.

4        Q    And Bernard Rembert is a football player at

5    Clemson?

6        A    Yes.

7        Q    Okay.  And you knew him because he was from

8    Charleston, is that right?

9        A    Yes.

10       Q    Okay.  And I believe you said that Mr.

11   Rembert came up and spoke to you?

12       A    Yes.

13       Q    And at that point, Carl Smalls came up and

14   had some words with Mr. Rembert?

15       A    He didn't come up to him immediately.

16       Q    Did he come up to him eventually?

17       A    Yes.

18       Q    Okay.  And he had some words with Bernard

19   Rembert?

20       A    Yes.

21       Q    Okay.  And you told us before that Carl

22   Smalls was not upset.  Isn't that what you told the

23   jury a few minutes ago?

24       A    Yes, he wasn't upset.  Naturally, I think he

25   would not be upset but ego trip, another man seeing

Chemiqua Ellington - Cross                              263

1    somebody else talking to his girlfriend in front of

2    millions of people there that night.  Naturally, you

3    would be upset.

4         Q    Okay.  So he was upset?

5         A    Not upset.  I think it was because all his

6    friends were there.  I think it was just because he saw

7    him talking to me more than one time.  He wasn't upset.

8         Q    Okay.  Now, you gave the Sheriff's Department

9    a statement that same morning, isn't that right?

10        A    Yes.

11        Q    Do you recall telling Investigator Smith that

12   Carl had been up in Bernard's face, and he bumped him?

13        A    Yes.

14        Q    You said that to them, didn't you?

15        A    Yes.

16        Q    Then you said they had words, but people were

17   holding them back to keep them from fighting.  Do you

18   recall making that statement?

19        A    Because he did that because Bernard said

20   something to him, and, naturally, you're going to say

21   something back.

22        Q    Okay.  But would you agree with me that Carl

23   Smalls was a little more than just upset?

24        A    No, I wouldn't.

25        Q    Even though he came up and got in this man's

Chemiqua Ellington - Cross                          264

1  face and bumped him?

2       A    Like I said before, I think it was an ego

3  trip.

4       Q    But you agree that he did go up and bump him?

5       A    Yes, he did.

6       Q    And he was having this ego trip because

7  another man was talking to his girlfriend --

8       A    Yes.

9       Q    -- which was you, right?

10      A    Yes.

11      Q    And he was upset about it, isn't that right?

12      A    Well, if that's how you want to put it, I

13  guess.

14      Q    Okay.  Now, Ms. Ellington, some time after

15  that you indicated that you decided to leave?

16      A    Yes.

17      Q    And you had gone there with Carl Smalls and

18  Shameka in your car?

19      A    Yes.

20      Q    Carl Smalls had your keys?

21      A    Yes.

22      Q    Okay.  And you said that you were walking out

23  to the parking lot, and you got separated from Carl

24  Smalls?

25      A    Yes.

Chemiqua Ellington - Cross                    265

1      Q    Okay.  And then later you got your keys from

2    him?

3      A    Yes -- I didn't per se.

4      Q    A police officer did?

5      A    Yes.

6      Q    Okay.  So you had to ask a police officer or

7    somebody else had to ask a police officer to get the

8    keys from Carl Smalls?

9      A    Carl was on the opposite side of the parking

10   lot from where I was.  I didn't see him.  And one of my

11   friends spotted him, and the cop was just there, not

12   hollering across the parking lot telling him to get the

13   keys.  She asked the cop to get the keys as just to

14   please ask him to give us the keys so we can go.

15     Q    Okay.  Now, was Carl Smalls agitated at you

16   at this point?

17     A    No, he wasn't.

18     Q    He wasn't upset with you?

19     A    No, he wasn't.

20     Q    You weren't upset with him?

21     A    No, I wasn't.

22     Q    Was there any reason you couldn't go up and

23   say, "Carl, let me have my car keys"?

24     A    I was in the car, and somebody sitting right

25   here, naturally, I'm not upset with him, just asked her

**272**

Chemiqua Ellington - Cross                              266

1    to get the keys -- or she asked him.  I didn't even see

2    him.

3         Q    Okay.  But y'all had to get a police officer

4    to get the keys?

5         A    He was there.  He was standing outside.  And

6    instead of us moving out of the car, getting out the

7    car, parking the car, and going across the parking lot

8    and possibly losing him again, she just asked the cop

9    to get the keys from him.  We were in the car -- in her

10   car -- getting ready to leave.

11        Q    Okay.  So the police officer just went and

12   fetched the keys for y'all?

13        A    Yes, that's all he did.

14        Q    He didn't do it because there was any

15   difficulty between y'all?

16        A    No, he didn't.

17        Q    Okay.  Do you remember when you gave your

18   statement to the Sheriff's Department making the

19   statement, "I wanted to go, but Carl wouldn't give me

20   my keys"?

21        A    I meant that he wouldn't give me my keys when

22   we were in the club.  Somebody was shooting outside.

23   That's why I didn't have my keys.  When we went

24   outside, we lost him.  He wouldn't give me my keys

25   because somebody was shooting outside, and he didn't

Chemiqua Ellington - Cross                    267

1    want me to get caught up in the crossfire, and my
2    friend Shameka.
3        Q    But you did make the statement Carl wouldn't
4    give you the keys?
5        A    Yes, I did.
6        Q    And you did have to get a police officer to
7    get the keys from Carl?
8        A    No, I didn't.  He was there, standing in
9    between the car and my friend, and he got the keys
10   because we didn't want to get out, move the car, park
11   the car, and come back and get the keys and possibly
12   lose him again.
13       Q    Ms. Ellington, isn't it a fact that Carl was
14   so upset at that point that you didn't want to approach
15   him to get the keys, that he was agitated, he was mad?
16       A    No, he wasn't.  Like I said before, we had a
17   discussion about it in the club.  That was that.  I
18   told Carl it was unnecessary.  He didn't have to act
19   like that over something so petty.  He could lose his
20   scholarship or something else.  And that was the end of
21   that.  He understood.  We even danced after that.
22       Q    Okay.  Did you see him getting in any
23   altercations with other people other than Bernard
24   Rembert?
25       A    No, I didn't.

Chemiqua Ellington - Cross                                        268

```
1        Q    You didn't see that?

2        A    No, I didn't.

3             MR. LITTLEJOHN:   If you'd indulge me

4   just a moment.

5             THE COURT:  Yes, sir.

6        Q    No further questions, Your Honor.

7             THE COURT:  Okay.  Thank you.

8             THE COURT:  Mr. Jeffries.

9             MR. JEFFRIES:  Briefly, Your Honor.

10            THE COURT:  Yes, sir.

11                  REDIRECT EXAMINATION

12   BY MR. JEFFRIES:

13       Q    Why did Carl have your keys in the first

14   place?

15       A    I didn't have any pockets on my pants.

16       Q    Okay.  Did you say earlier in your direct

17   testimony there was some type of shooting outside?

18       A    Yes.

19       Q    And you saw the police when you were outside?

20       A    Yes.

21       Q    And you also stated you and Carl left on good

22   terms?

23       A    Yes, we did.  The last thing he said to me

24   was that he loved me.

25       Q    Nothing further.
```

Chemiqua Ellington - Redirect                              269

1              THE COURT:  Thank you, sir.

2              MR. LITTLEJOHN:  Nothing further.

3              THE COURT:  Nothing further?

4              THE COURT:  Ma'am, you may step down.

5    Thank you.

6              THE COURT:  All right, ladies and

7    gentlemen of the jury, we're going to take a short

8    break.  You all return to the jury room.  Do not

9    discuss the evidence or the testimony you've heard or

10   seen thus far.  We'll bring you back out shortly.

11   Thank you.

12                         (Jury out at 11:01 a.m. for

13   break.)

14              THE COURT:  Thank you, sir.

15              THE COURT:  Anything before we take a

16   break, counsel?

17              MR. PASCOE:  Your Honor, one of our

18   witnesses has not shown up.  As we mentioned to you, if

19   we still can't locate him, can we get a bench warrant?

20              THE COURT:  Motion granted.

21              MR. PASCOE:  Thank you, Your Honor.

22              THE COURT:  Thank you.

23              THE COURT:  Counsel, we're going to take

24   a break.  Give me about five minutes.  And, Mr.

25   Kendrick, if you can join us back in chambers, I need

**276**

Chemiqua Ellington - Redirect                    270

1    to see all counsel.  Give me about five minutes,

2    though.  We'll be in recess for about ten minutes.

3    Thank you.

4                    (Break in proceedings.)

5                    THE COURT:  All right, counsel.  We've

6    had some discussions back in chambers, and I don't at

7    this point know that we need to go any further on that

8    topic matter.  But I'll talk to you all at the lunch

9    break about that.  Let me tell everybody, both sides,

10   that we're going to try this case.  We're going to do

11   it fairly.  We're going to do it in a civil manner.

12                    We're going to adhere to proper

13   courtroom etiquette and decorum with each other and

14   with the Court.  I think you all know I don't lose my

15   patience very often, but when I do, it's not good.  And

16   my level of patience with a couple of things is

17   diminishing quickly.  So we'll talk at the lunch break.

18   Are both sides ready to receive the jury?

19                    MR. PASCOE:  Yes, Your Honor.

20                    MR. LITTLEJOHN:  Yes, Your Honor.

21                    THE COURT:  We're ready for the jury.

22   Thank you, sir.

23                    (Jury back in at 11:47 a.m.)

24                    BAILIFF:  The jury is all present, Your

25   Honor.

Chemiqua Ellington - Redirect                        271

1              THE COURT:  Thank you, sir.

2              THE COURT:  Thank you, ladies and

3     gentlemen.  I'm sorry that took a little bit longer.  I

4     had to address some other matters unrelated to this

5     case and dealing with some stuff with the lawyers that

6     I needed to do outside your presence.  But we're ready

7     to continue, and the State may call their next witness.

8              MR. PASCOE:  Thank you, Your Honor.

9              THE COURT:  Thank you, sir.

10             MR. PASCOE:  The State calls Derrick

11    Cattenhead.

12             BAILIFF:  Sir, place your left hand on

13    the Bible, raise your right hand, and face the Clerk.

14                      (The witness was sworn.)

15             CLERK OF COURT:  Please have a seat,

16    sir, and state your full name for the record.

17             THE COURT:  Be sure you speak loud

18    enough for everybody to hear you.

19             MR. CATTENHEAD:  My name is James

20    Derrick Cattenhead.

21                      JAMES DERRICK CATTENHEAD,

22    having first been duly sworn, testified as follows:

23                   **DIRECT EXAMINATION**

24    BY MR. PASCOE:

25         Q    Good morning, Mr. Cattenhead.

James D. Cattenhead - Direct                             272

1        A    Good morning.

2        Q    How old are you, sir?

3        A    I'm 31.

4        Q    And are you currently getting a degree?

5        A    I am.

6        Q    What type of degree are you getting?

7        A    Master of Divinity.

8        Q    Okay.  Where did you get your undergraduate

9    degree?

10       A    University of South Carolina.

11       Q    When did you graduate from USC?

12       A    Officially, in May of this year.

13       Q    Okay.  And were you in any fraternity back

14   then?

15       A    Yes, Alpha Phi Fraternity, Incorporated.

16       Q    That's Alpha Phi Alpha?

17       A    Yes.

18       Q    And do you recall the late night hours of

19   Friday, December 6th, and the early morning hours of

20   Saturday, December 7th, of last year?

21       A    Yes, sir, I do.

22       Q    And where did you end up going, Mr.

23   Cattenhead?

24       A    It was Club Voodoo.  It was like the end of

25   the year party for my fraternity.

James D. Cattenhead - Direct                    273

1        Q    Approximately what time did you get to Club

2    Voodoo's?

3        A    It was between 12:30, 1:00, something like

4    that.

5        Q    And why did you go?

6        A    Well, actually, I was studying for a final

7    exam, and I was burned out, and I wanted to get out and

8    support the chapter.

9        Q    Okay.  Who sponsored the party?

10       A    My actual chapter.

11       Q    And did you hold any positions as an Alpha

12    back then?

13       A    I did.

14       Q    What was your position?

15       A    I was assistant state director.

16       Q    As the assistant state director of Alpha,

17    would you have anything to do with the party?

18       A    Not directly.

19       Q    Okay.  Why is that?

20       A    Because of my position, I was actually over

21    all of the collegiate chapters in South Carolina.  So,

22    for the most part, I was hands-off anything unless

23    there was a problem or something like that.  But I also

24    liked to support the chapters throughout the state.

25       Q    All right.  You testified you got to the

**280**

James D. Cattenhead - Direct                    274

1    party after midnight.  Did you have anything to drink

2    that night?

3         A    I didn't.

4         Q    Okay.  While you were at the party that

5    morning, did you observe anything that made you feel

6    uncomfortable?

7         A    I did.

8         Q    And where were you when you observed that?

9         A    It was near -- I guess near the bar, right

10   before you get onto the dance floor.

11        Q    You can just stay seated there.  I'll show

12   you State's Exhibit 1.  Point out where you were

13   standing.

14        A    I guess it was around about -- it had to be

15   around right here.  I actually didn't know the dance

16   floor was that big.  But it was somewhere over here,

17   because I remember it was near the corner -- because I

18   guess it was like a rail or a balcony or whatever, and

19   I was standing right about here, because it was near

20   the corner of the bar.

21        Q    And tell the jury what you observed that made

22   you feel uncomfortable.  What happened?

23        A    Well, I was actually, you know, standing up

24   talking to a couple of my brothers, and out of nowhere,

25   I mean, it was like two guys.  It wasn't so much an

281

James D. Cattenhead - Direct                    275

1    altercation or anything, but they were actually going

2    back and forth.  And, you know, the young man basically

3    told the other gentleman, "You're going to fall like

4    'The Matrix.'"  And I'm like, "Are you serious?"

5            This is like something from a movie, you

6    know.  But, you know, at that point, you know, a couple

7    of football players were with him, and I assume the

8    guy, Mr. Carl Smalls, was one of the guys, you know,

9    that the gentleman was directly into.  And I asked one

10   of the football players, you know, "Is everything

11   okay?" because at that point, you know, I didn't want

12   anything to happen at the party, because, you know, it

13   was a fund-raiser for the most part for the fraternity,

14   and we didn't need any altercations or something like

15   that.

16           So at that point, the football player and the

17   other football player basically said, "You know,

18   everything's okay, Derrick.  You know we're not going

19   to let anything happen in the party or nothing like

20   that.  So don't worry about that."  That was it.

21      Q    Let me ask you this.  Let me back you up for

22   a minute.  You testified about a confrontation that

23   started taking place on that area of the dance floor?

24      A    Right.

25      Q    How far were you from it?

**282**

James D. Cattenhead - Direct                                      276

1      A    Probably a good, I want to say, three feet.

2    That was like right there for the most part.

3      Q    It just came right up on you?

4      A    Right up on me.  I didn't go towards it.  It

5    was just like the guys like came up.

6      Q    How many people were involved in it?

7      A    I would say Carl Smalls, Rachiem -- which he

8    was actually standing to the side -- and maybe about

9    four or five others guys facing, you know, Carl Smalls.

10     Q    So it was Carl Smalls, and Rachiem is his

11   friend?

12     A    Right.

13     Q    And there were four or five guys facing those

14   two?

15     A    Right.

16     Q    Okay.  Could you tell whether it was gang-

17   related at all?

18     A    I assumed that it was.

19          MR. LITTLEJOHN:  Your Honor, I'm going

20   to have to object to his assumption.  If he saw

21   something --

22          THE COURT:  I'll let you rephrase that,

23   Mr. Pascoe.

24          MR. PASCOE:  Thank you.

25     Q    What, if anything, did you see that made you

James D. Cattenhead - Direct                    277

1    think it was gang-related?

2        A    Hand signals -- I mean, the colors.  I was a

3    youth counselor for an organization, and a lot of the

4    kids -- actually, I was like a dummy, I guess, you

5    know, to the fact of gang-related incidents until the

6    kids actually showed me certain things.  And it was

7    very familiar.

8        Q    And you recognized Rachiem and Carl Smalls

9    there on one side.  Did they go to college?

10       A    Yes.  I didn't know Carl, but I knew Rachiem.

11       Q    Okay.  Did you recognize any of those other

12   four fellows --

13       A    No.

14       Q    -- as going to college that you had ever

15   seen?

16       A    I never saw any of those guys.

17       Q    And was there any one person in particular

18   with those four people that was doing anything?

19       A    Yes, it was one guy.  It was almost like the

20   rest of the guys were behind him.  It was just one guy

21   in particular that was doing all the talking.

22       Q    And, if you could, what was that one guy

23   wearing that you recall?

24       A    Well, very vividly, the only thing that I can

25   remember is a hat.  He had on a hat which was red and

James D. Cattenhead - Direct                        278

1    white and black or blue.

2          Q    And what, if anything, did you see that

3    person -- how big was that person?

4          A    Maybe about 5'8", 5'9", medium size.  He

5    wasn't a very big guy -- a medium-sized guy.

6          Q    Certainly, a lot smaller than Carl Smalls?

7          A    Oh, definitely.

8          Q    What, if anything, did you see that person do

9    that made you feel uncomfortable?

10         A    Just, you know, when he said, "You're going

11   to fall like 'The Matrix'" and just basically fell back

12   like the trust for all the other guys like caught him.

13   And at that point, that's when I went over to Rachiem,

14   you know, and asked him was everything okay.

15         Q    And who was the person in that hat you

16   described, the small person, directing those words to?

17         A    It was definitely towards Carl, because

18   Rachiem was in the back of Carl.  You know, it was only

19   two guys on one side and then the other guys on the

20   other side.

21         Q    Tell the jury -- and I want you to actually

22   even show the jury.  If you need to stand up, with the

23   Court's permission, the Judge will let you.  I want you

24   to show the jury what the person in the black, red, and

25   white hat that was small -- what complexion was he?

James D. Cattenhead - Direct                    279

1        A    He was definitely dark-skinned.

2        Q    Okay.  Show the jury how he said it, the

3    "You're going to fall like 'The Matrix'" towards the

4    victim.

5        A    He basically just said, you know -- I guess

6    after the words were exchanged.  I didn't know

7    everything that was going on.  But he basically said,

8    "Before the night is over with, you're going to fall

9    like 'The Matrix.'"  And I was like, unbelievable.

10        Q    Did you ever see anything like that before?

11        A    Never, I mean, because at our parties, I

12    mean, you have people always -- you know, you have

13    beefs and stuff like that at the parties, but not a

14    direct threat that, you know, "I'm going to kill you."

15    You know, I've never seen that at any of our parties.

16            MR. LITTLEJOHN:  Your Honor, I object.

17    I don't believe that's his testimony.

18            THE COURT:  He can carry on.

19            MR. PASCOE:  Thank you.

20            THE COURT:  If you know something, sir,

21    or you perceived something, you can testify as to what

22    you perceived directly.  Just don't speculate on things

23    when you don't know, okay?

24            MR. CATTENHEAD:  Yes, sir.

25        Q    Is that how the person in that hat, small

James D. Cattenhead - Direct                    280

1    build with the dark-skinned complexion, was doing his

2    hands?

3        A    He was.

4        Q    And what did that look like to you that he

5    was doing with his hands?

6        A    A gun -- like gunshots.

7        Q    Now, you testified that after that, you were

8    concerned and went and talked to Rachiem Monroe?

9        A    I did.

10       Q    And the victim, Carl Smalls, was there, too?

11       A    Well, no, he wasn't in my presence when I was

12   talking to Rachiem.

13       Q    Did Carl Smalls appear to be mad?

14       A    No, he was calm.

15       Q    Was he acting violent at all?

16       A    Not when I saw him.

17       Q    What you saw that night about "falling like

18   'The Matrix,'" is that something that would normally

19   happen at an Alpha party you've been to?

20       A    No.

21       Q    Did you actually see the shooting, Mr.

22   Cattenhead?

23       A    I didn't.

24       Q    Okay.  Where were you when the shooting took

25   place?

James D. Cattenhead - Direct                           281

1        A    I was standing outside like on the sidewalk,

2    like right before you get to the actual pavement --

3    well, actually, in the parking lot.

4        Q    Tell the jury what, if anything, you did hear

5    and see.

6        A    It was just gunshots and people scattering,

7    and, of course, it was quite natural to be doing, also.

8        Q    Sure.  Where did you go after you heard the

9    gunshots?

10        A    I ducked between some cars and ran to my car,

11    and then I left.

12        Q    Can you describe how you heard the gunshots?

13        A    I guess I heard the first shot, and then I

14    heard another shot.  And after that, I don't remember

15    anything.  I mean, I was running, you know, trying to

16    get to my car.

17                 MR. PASCOE:  Beg the Court's indulgence.

18                 THE COURT:  Yes, sir.

19                 MR. PASCOE:  Thank you.

20        Q    Mr. Cattenhead, I want to thank you for

21    coming today.  Answer any questions that Mr. Littlejohn

22    has for you.

23                 THE COURT:  Thank you, sir.

24                 THE COURT:  Mr. Littlejohn.

25                 MR. LITTLEJOHN:  Thank you, Your Honor.

James D. Cattenhead - Cross                              282

1                          CROSS-EXAMINATION
2    BY MR. LITTLEJOHN:
3        Q    Mr. Cattenhead, my name is Cam Littlejohn.    I
4    represent Jeroid Price.
5        A    Yes, sir.
6        Q    He's the defendant in this case.    You told
7    the jury this was a fraternity party that was put on by
8    Alpha Phi Alpha?
9        A    Well, the fraternity is Alpha Phi, but it was
10   a chapter party, which the chapter is at USC?
11       Q    Okay.  And there were a number of other
12   fraternities and sororities that participated in
13   sponsoring this party, didn't they?
14       A    Like I said, I wasn't directly involved with
15   arranging the party.  You know, afterwards, they said
16   it was co-sponsored with our sister sorority, which is
17   Alpha Kappa Alpha, but I don't know.  I mean, I didn't
18   do the contracts, any paperwork, or anything like that.
19       Q    Okay.  So you weren't involved in putting the
20   party together?
21       A    No, I was not.
22       Q    I see.  Now, you indicated that you saw Carl
23   Smalls there that night?
24       A    I did.
25       Q    Okay.  He wasn't a member of your fraternity,

James D. Cattenhead - Cross                                      283

1    was he?

2         A    He was not.

3         Q    Okay.  So, to your knowledge, was he a member

4    of any fraternity or sorority that was putting on this

5    party?

6         A    No -- I mean, the only fraternity was Alpha

7    Phi Alpha.

8         Q    Okay.

9         A    I mean, we don't co-sponsor parties with any

10   other fraternity.  Now, we may, you know, periodically

11   do something with a sorority -- you know, Alpha Kappa

12   Alpha or whoever -- but we never co-sponsor a party

13   with another fraternity, not at USC.  That's not how we

14   do things.

15        Q    So he wasn't one of the fraternity brothers

16   of the fraternity?

17        A    He was not one of my fraternity brothers.

18        Q    Okay.  Now, you said there were a lot of

19   people there that night?

20        A    There was.

21        Q    How many people do you think were there?

22        A    I couldn't even guess.  I mean, it was a lot

23   -- more than usual, more than usual -- a lot, a lot.

24        Q    Very crowded?

25        A    Very crowded.

James D. Cattenhead - Cross                          284

1      Q    Okay.  And a lot of people were drinking?

2      A    I assume.  I mean, I can't say that they were

3   actually drinking.  You know, I wasn't partaking in

4   that.

5      Q    You weren't drinking at all?

6      A    I was not drinking at all.

7      Q    But other people were going up to the bar and

8   buying drinks?

9      A    Yes, of course.

10     Q    So it's a safe assumption they were drinking

11  those drinks they bought?

12     A    Yes, yes.

13     Q    Okay.  People were dancing?

14     A    They were.

15     Q    Okay.  And you said that at some point as

16  you're standing next to the bar that you notice Carl

17  Smalls get in this argument?

18     A    It wasn't really an argument, because, like I

19  said, it was like words exchanged, and then I saw a

20  young man, you know, make a motion.  But I won't

21  necessarily say it was an argument.

22     Q    Okay.  And you said that there was Carl

23  Smalls and Rachiem Monroe?

24     A    Yes.

25     Q    You knew both of them beforehand?

James D. Cattenhead - Cross                           285

1        A    I didn't know Carl.  Actually, when I came in

2    the club and someone pointed him out, that was the

3    first time that I ever saw.  I never saw him before.

4        Q    So that's the only way you knew him?

5        A    That's the only way I knew him.  But I knew

6    Rachiem, because I had some classes with him.

7        Q    Okay.  And you said that Carl Smalls,

8    Rachiem, four or five other guys exchanged some words?

9        A    Yes, pretty much.

10       Q    And then Rachiem --

11       A    Not Rachiem.  Rachiem was in the back.  The

12   other guys, they wasn't exchanging words, you know.  It

13   was just more so that one guy, you know, making a

14   statement to Carl.  That was pretty much, you know, the

15   gist of it.

16       Q    Okay.  But you indicated Carl didn't get

17   upset from that statement?

18       A    He didn't, I mean, because, like I said, it

19   was real brief.  Right after that, I went up to

20   Rachiem, and he said it's okay.  That was it, you know.

21       Q    So, according to you, this guy threatened

22   Carl Smalls with a gun, but he didn't get upset?

23       A    He didn't.  He didn't.  That's why, you know,

24   it was kind of weird.  You know, I was like, "This is

25   unbelievable."  But after talking to Rachiem, you know,

**292**

James D. Cattenhead - Cross                                    286

1    quite naturally, I was like, "Okay, it's okay.

2            It's nothing for us to be alarmed" -- because

3    at previous parties, if there's a beginning of an

4    altercation, you know, with security, with us having to

5    pay for security, we automatically get them out of the

6    club in order for the party to keep going on.  So at

7    that point, I didn't feel like it was any need, you

8    know, to address any other issue or anything.

9        Q    Okay.  So you didn't feel that Carl Smalls

10   was upset?

11       A    No, I did not.

12       Q    And you didn't know him at that point?

13       A    I didn't know him.

14       Q    And Rachiem Monroe told you everything was

15   okay?

16       A    He did.

17       Q    So you assumed everything was all right?

18       A    I did.

19       Q    Okay.  Did you see Carl Smalls any other time

20   that night?

21       A    No other time that night, because maybe after

22   that, maybe a couple of minutes later -- 30 minutes or

23   so -- I was getting ready to leave.  I was only there

24   probably about 30 minutes or so.

25       Q    Do you recall seeing Carl Smalls dancing,

James D. Cattenhead - Cross                    287

1    doing the Crip walk?

2         A    I did.

3         Q    You did see him do that?

4         A    I did.

5         Q    Okay.

6         A    I don't know if it was the Crip.  But from

7    what, you know, the kids in my youth group, you know,

8    did little walks and stuff like that, I think it was

9    pretty close.

10        Q    Okay.  And then at some point, you saw Carl

11   Smalls draw a line on the dance floor with his foot?

12        A    He did.

13        Q    Okay.

14        A    He did.

15        Q    And told Investigator Robertson that when he

16   interviewed you?

17        A    I did.

18        Q    Okay.  And, Mr. Cattenhead, you said you were

19   on the sidewalk when you heard the gunshot?

20        A    I was.

21        Q    And you said you heard one, then a second

22   shot -- you're not sure if there was a shot after that?

23        A    I'm not sure.  I was making my way over to my

24   car.

25        Q    And you took off?

James D. Cattenhead - Cross                              288

1          A     After the first --

2          Q     I mean, you got in your car and left?

3          A     After the first shot, I ran, ducked in

4    between some cars.  I heard another shot.  By that

5    time, I was making my way to my car.

6          Q     Okay.  So you didn't see anybody get shot or

7    anybody --

8          A     I didn't.

9          Q     -- shooting?

10         A     I didn't.

11         Q     Okay.

12               MR. LITTLEJOHN:  If you'd indulge me

13   just a moment, Your Honor.

14               THE COURT:  Yes, sir.

15         Q     Mr. Cattenhead, just one final question.  You

16   had mentioned something about a hat.  Did a lot of

17   people have hats on that night?

18         A     They did.  They did.

19         Q     There must have been more than a hundred

20   people in there, wouldn't that be safe to say?

21         A     Yes, sir.

22         Q     Maybe a hundred and fifty?

23         A     Yes, sir.

24         Q     A lot of them had hats on?

25         A     They did.

James D. Cattenhead - Cross                    289

1      Q    Okay, thank you.

2                  THE COURT:  Thank you, sir.

3                  THE COURT:  Mr. Pascoe?

4                  MR. PASCOE:  Just a couple of questions.

5                  THE COURT:  Yes, sir.

6                  MR. PASCOE:  Thank you.

7                  **RE-DIRECT EXAMINATION**

8      BY MR. PASCOE:

9      Q    Derrick, did Carl draw the line and do the

10     Crip walk before or after he was told that he was going

11     to fall like "The Matrix"?

12     A    It was before.

13     Q    Before.  Did you see him tell anybody that he

14     was going to kill them?

15     A    Who, Carl?

16     Q    Carl.

17     A    Definitely not.  He didn't say anything.  I

18     mean, he didn't say anything.  He did, you know, what I

19     presume to be the Crip mark, drew the line, and stepped

20     back.  That was it.  He never uttered a word.

21     Q    Do you know what "The Matrix" is?

22     A    Yes, I know what "The Matrix" is.

23     Q    What is it?

24     A    It's a movie.

25     Q    Okay.  That's all I have, Your Honor.

James D. Cattenhead - Redirect                          290

1                   THE COURT:  Thank you, sir.

2                   THE COURT:  Mr. Littlejohn.

3                   MR. LITTLEJOHN:  Just one follow-up,

4     Your Honor.

5                   **RE-CROSS EXAMINATION**

6     BY MR. LITTLEJOHN:

7          Q    Mr. Cattenhead, of course, you didn't follow

8     Carl Smalls around that evening?

9          A    I didn't follow him anyone around that

10    evening.

11         Q    Okay.  So you don't know if he got into other

12    confrontations with girls or other people or anything?

13         A    I have no idea.

14         Q    Okay.  Thank you, sir.

15                  THE COURT:  Thank you, sir.

16                  THE COURT:  Mr. Cattenhead, you may step

17    down, sir.  Thank you.

18                  THE COURT:  The State may call their

19    next witness.

20                  MR. PASCOE:  Thank you.  May it please

21    the Court, Your Honor.  The State calls Investigator

22    James Richardson.

23                  MR. PASCOE:  Is Mr. Cattenhead excused,

24    Your Honor?

25                  THE COURT:  Yes, sir.  There's no reason

James D. Cattenhead - Recross                    291

1    to keep him here.

2                    MR. LITTLEJOHN:  No objection.

3                    THE COURT:  Okay, you're free to come

4    and go as you please, sir.

5                    MR. CATTENHEAD:  Yes, sir.

6                    THE COURT:  Thank you.

7                    MR. PASCOE:  Thank you.

8                            (The witness was sworn.)

9                    CLERK OF COURT:  Please have a seat

10   there and state your full name for the record.

11                   MR. LITTLEJOHN:  Your Honor, may we

12   approach the bench for a moment?

13                   THE COURT:  Yes, sir.

14                   THE COURT:  Ladies and gentlemen, I need

15   to take up something with the lawyers outside your

16   presence.  I promise you this will take about five

17   minutes or so.  We won't leave the courtroom, so we'll

18   bring you right back out.  If you'll just return to the

19   jury room.  Do not discuss the evidence or testimony

20   you've heard or seen so far.  Thank you.

21                            (Jury out at 12:10 p.m.)

22                   THE COURT:  Thank you, sir.

23                   THE COURT:  Investigator, you may step

24   down while we do this.  I think you've already been

25   sworn, sir, and we'll bring you back shortly, possibly.

292

1    THE COURT: Mr. Littlejohn.

2    MR. LITTLEJOHN: Your Honor, it's my

3    understanding the next witness, Detective Richardson,

4    is a supposed expert in or has investigated gang

5    activity, and the Solicitor's Office intends to put him

6    up to testify, not as to what happened on December the

7    7th at the Voodoo Club but as to generalities as to

8    what gangs do, and what their tendencies might be, and

9    their colors, etc.

10    Your Honor, I would object to that

11    testimony. I don't see where that general line of

12    testimony has anything to do specifically with the

13    incident that occurred on December 7th at the Voodoo

14    Club. There's been some evidence as to animosity

15    between Bloods and Crips, and I think that's a given.

16    The jury understands that. I don't see that they need

17    a full-blown explanation of gang activity.

18    This is not a civic group or a school

19    class that needs to be educated about any groups. I

20    think that would be highly prejudicial in this case.

21    THE COURT: Thank you, sir. You still

22    have an opportunity to voir dire the witness as to his

23    qualifications. But your objection right now is just

24    as to the relevance of his testimony and the

25    prejudicial effect --

293

1          MR. LITTLEJOHN: Yes, Your Honor.

2          THE COURT:  -- of that testimony?  Okay.

3     Thank you, sir.

4          THE COURT:  Mr. Sorenson.

5          MR. SORENSON:  May it please the Court,

6     Your Honor.

7          THE COURT:  Yes, sir.

8          MR. SORENSON:  The State's position is

9     that, especially in light of the testimony that this

10    jury has heard over the last day and a half, it would

11    be very relevant, and it would aid the jury in

12    understanding a lot of the testimony that has come

13    before them as far as what flashing signs, Crips,

14    names, stuff of that nature is, along with also stuff

15    that we're going to tie in ultimately with a later

16    witness that was found in this defendant's apartment.

17              As Your Honor understands, the motive

18    that we're putting forward for this crime is that it

19    was a gang-related homicide.  And, therefore, I think

20    it would go towards helping explain that motive, in

21    light of other evidence that's going to come in later

22    in the trial, additionally.

23              THE COURT:  Anything further, Mr.

24    Littlejohn?

25              MR. LITTLEJOHN:  No, Your Honor.

**300**

1          THE COURT:  Okay, thank you.

2          THE COURT:  I do think it's relevant in

3    light of the testimony regarding the flashing of signs

4    and all of that and helping this jury understand sort

5    of some of the signs and what all that means.  I had to

6    ask my law clerk what the Crip walk is, even.  I'm not

7    from the MTV/BET generation.  So I think it would aid

8    them in understanding this testimony.

9          And I think we did introduce some photos

10   yesterday of Mr. Brooks purportedly flashing a gang

11   sign and all of that.  They need to understand what

12   this is or not.  So I'll allow his testimony.

13   Certainly, Mr. Littlejohn, you still have the right to

14   voir dire him as to his qualifications if you choose

15   to.  But we'll let him testify.

16          He actually did not need to leave the

17   room, but I guess he thought he was still sequestered.

18   If you'll tell Investigator Richardson he can come back

19   in.

20          THE COURT:  Investigator Richardson,

21   you've been previously sworn.  So we'll continue, Mr.

22   Sorenson.

23          THE COURT:  If you'll bring the jury

24   back out.

25          MR. SORENSON:  Your Honor, I guess

295

```
 1    before they come in --
 2                    THE COURT:  Yes, sir.
 3                    MR. SORENSON:  -- there were several
 4    items that were recovered during the search of the
 5    defendant's apartment.  Obviously, we haven't gotten to
 6    putting that witness up.  I plan on marking them for ID
 7    and showing them to this officer during his testimony,
 8    with the understanding that we will lay, hopefully, a
 9    proper foundation for their admissibility with a future
10    witness who is sworn.
11                    THE COURT:  You're not introducing them
12    or referring to them as coming --
13                    MR. SORENSON:  We can mark them for ID
14    if you want.
15                    THE COURT:  -- from the defendant at
16    this point?
17                    MR. SORENSON:  That they wouldn't be
18    referred to where they came from at all at this point
19    in time.
20                    THE COURT:  Okay.
21                    MR. LITTLEJOHN:  Your Honor, given that
22    setup, I don't know that I have an objection.  But I
23    was going to object to them coming in, just by virtue
24    of the fact that they're just red clothing.
25                    THE COURT:  And we'll deal with it,
```

296

1    certainly at the time that they get ready to introduce

2    them.  But I'll let this witness as an expert witness

3    testify as to his opinions or conclusions regarding

4    whatever it is they've got for showing, just as long as

5    there's no reference to at this point coming from the

6    defendant.  At the point that they put a witness on to

7    introduce it into evidence, I'll certainly hear your

8    objection.

9                    MR. LITTLEJOHN:  All right.

10                   THE COURT:  Okay, we're ready for the

11   jury.

12                   (The jury returned to the

13   courtroom at 12:15 p.m., after which the following

14   proceedings were had:)

15                   BAILIFF:  The jury is all present, Your

16   Honor.

17                   THE COURT:  Thank you, sir.

18                   THE COURT:  Ladies and gentlemen, we're

19   ready to continue.  Thank you for your patience.

20                   THE COURT:  Mr. Sorenson.

21                   MR. SORENSON:  Thank you, Your Honor.

22   May it please the Court.

23                   JAMES RICHARDSON, having first

24   been duly sworn, testified as follows:

25                   **DIRECT EXAMINATION**

James Richardson - Direct                          297

1    BY MR. SORENSON:

2        Q    Good afternoon, Investigator Richardson.

3        A    Good afternoon, sir.

4        Q    Will you please tell us where you're

5    employed?

6        A    I'm employed with Richland County Sheriff's

7    Department.

8        Q    And what are your current duties with the

9    Sheriff's Department?

10       A    I'm a full-time gang investigator with the

11   County.

12       Q    Okay.  And how long have you been in law

13   enforcement, sir?

14       A    Altogether, about 16 years, sir.

15       Q    Okay.  And how long of that have you been in

16   your current capacity as a gang investigator?

17       A    Two years, sir.

18       Q    Two years.  And if would go through for the

19   jury and kind of tell us a little bit about your

20   specialized training you've had in that regard.

21       A    Yes, sir.  I've been trained in Florida

22   through the Florida Gang Investigators Association, the

23   North Carolina Gang Investigators Association.  I'm

24   currently the Midlands president for the South Carolina

25   Gang Investigators Association.  I've done numerous

James Richardson - Direct                                298

1    speeches, talks, educational type environment to law

2    enforcement, civilians all across the Southeast and

3    here in South Carolina.

4         Q    Okay.  About how many different lectures do

5    you think you've given over the last two years on gang

6    activity here in the state of South Carolina?

7         A    Probably pretty close to 600.

8         Q    And you indicated that you're a gang

9    investigator.  You've done that for two years.  Tell

10   the jury, what does that entail as far as your day-to-

11   day activities?

12        A    It mainly entails gathering intelligence and

13   disseminating it through our department and updating

14   our gang intelligence talks as far as for the education

15   of parents.  It also entails us interviewing gang

16   members and basically keeping track of where they are,

17   what they're doing, and that type of stuff.

18        Q    Okay.  And as part of your day-to-day

19   training, you indicated that you interview gang

20   members.  You also keep up with reading material and

21   stuff of that nature?

22        A    Absolutely, sir.  Just about every book that

23   I can get my hands on in reference to gangs, I read.

24        Q    Okay.  And what associations do you then

25   belong to as a result of your activities as a gang

James Richardson - Direct                                    299

1    investigator?

2         A    The North Carolina Gang Investigators

3    Association, the Florida Gang Investigators

4    Association, and the South Carolina Gang Investigators

5    Association.

6         Q    And so would it be safe to say that over the

7    last years in law enforcement that you have pretty much

8    dealt exclusively with issues relating to gang activity

9    here in, I guess, specifically the Midlands?

10        A    Yes, sir.

11        Q    Your Honor, at this time, we'd offer

12   Investigator Richardson as an expert in the field of

13   gangs and gang activity.

14             THE COURT:  Any objection or request of

15   voir dire, Mr. Littlejohn?

16             MR. LITTLEJOHN:  Your Honor, I want to

17   cross-examine, please.

18             THE COURT:  Yes, sir.

19             **CROSS-EXAMINATION** VOIR DIRE

20   BY MR. LITTLEJOHN:

21        Q    Investigator Richardson, you indicated that

22   you had gone to training in Florida and North Carolina?

23        A    Yes, sir.

24        Q    And that's put on by -- what did you say --

25   the Gang Investigators Association?

James Richardson - Cross                                    300

1         A    Yes, sir.

2         Q    Those are police officers, aren't they?

3         A    Yes, sir.

4         Q    All police officers?

5         A    Not necessarily -- Solicitor's Office, groups

6    like that, yes, sir.

7         Q    Okay.  So police officers and prosecutors?

8         A    Yes, sir.

9         Q    Okay.  They aren't psychologists, or

10   sociologists, or newspaper reporters?

11        A    As far as I know, sir.  I don't know their

12   background as far as who makes up their board.

13        Q    Okay.  But they're all interested in law

14   enforcement as it relates to gangs?

15        A    I believe so, yes, sir.

16        Q    And that's what you're interested in?

17        A    Yes, sir.

18        Q    And you work with the Sheriff's Department

19   that investigated this case?

20        A    Yes, sir.

21        Q    Okay.  And you said you had been doing this

22   for two years?

23        A    Yes, sir -- full-time for two years.

24        Q    Have you received any formal education in

25   this field?

James Richardson - Cross                           301

1        A    Formal education, as in?

2        Q    Other than going to these police

3    associations?

4        A    No, sir.  It's basically self-taught, a lot

5    of it, because it's a continuing entity.  It's an ever-

6    flowing entity.  Pretty much, you've got to keep track

7    with it on a day-to-day basis.

8        Q    Okay.  Have you ever written any articles or

9    any treatises on the subject?

10       A    I've never written any articles.  I've had

11   several that were published through interviews and

12   stuff like that.

13       Q    Okay.  But you've never written any?

14       A    No, sir.

15       Q    You've never been published on the subject?

16       A    No, sir.

17       Q    And most of your activities and day-to-day

18   things are dealing with police officers, is that right?

19       A    No, sir -- dealing with gang members, in most

20   cases.

21       Q    Okay.  As a police officer?

22       A    Yes, sir.

23            MR. LITTLEJOHN:  Your Honor, --

24   qualifications.

25            THE COURT:  Okay.  I do find that under

James Richardson - Cross                                    302

1    702, I think he's got the requisite experience and

2    training to be qualified under 702.  So I'm going to

3    qualify him as an expert.  I note your exception to

4    that.

5              MR. LITTLEJOHN:  Yes, Your Honor.  That

6    would be an exception --

7              THE COURT:  Thank you, sir.

8              MR. LITTLEJOHN:  -- for the record.

9              THE COURT:  Yes, sir.

10             MR. SORENSON:  Thank you, Your Honor.

11                  DIRECT CONTINUED

12        Q    If you would, Investigator Richardson, please

13   give the jury a little bit of background about the

14   origins of gangs.

15        A    Gangs have been around basically since the

16   beginning of time.  Where they really started affecting

17   is during immigration to the United States into New

18   York City.  Gangs were formed in the neighborhoods as a

19   way to protect their heritage and their culture,

20   because the different heritages were so different, and

21   they were formed as a way to protect those

22   neighborhoods.

23             The current gangs we're seeing today

24   basically came out of two different places, one out of

25   Chicago and one out of L.A.  In Chicago, the main hit

James Richardson - Direct                    303

1    of the gangs started in the late '60s, '70s, and then

2    in L.A., there are gangs dating back to the mid '20s

3    and '30s.

4         Q    Okay.  And how about types of gangs.  What

5    kind are there?

6         A    The types of gangs that we're seeing today

7    are two basic types.  We have traditionals and non-

8    traditionals.  A traditional gang is one that has a

9    history, like out of Chicago or L.A.  Non-traditional

10   is like a neighborhood set or something like that.  The

11   types of gangs we're seeing are like Crips, Bloods,

12   Pyru, Latin Kings, Gangster Disciples, groups like

13   that.

14        Q    Okay.  Those names that you just said to the

15   jury, are some of them kind of related to each other,

16   or are they all separate kind of entities?

17        A    They're related as in their beliefs in some

18   cases.  The Bloods believe under People Nation, which

19   is they believe in like the right side of the body or

20   the left side of the body, and they have certain

21   numbers and stuff that they go by to show their

22   affiliations, so the other gang members, they know who

23   they are.

24                  MR. LITTLEJOHN:  My objection is

25   continuing throughout, Your Honor.

James Richardson - Direct                                          304

```
 1              THE COURT:  Yes, sir.  I'm sure it's
 2    continuing.
 3         A    And the other side is the Folk Nation, which
 4    are like Gangster Disciples of the Folk Gang, and
 5    Hoovers, and groups like that, and Crips.
 6         Q    Crips fall under that?
 7         A    Yes, sir.
 8         Q    Okay.  How about specifically here in the
 9    Midlands and in Columbia?  Do we have gangs --
10         A    Yes, sir, we do.
11         Q    -- in this area?
12         A    Yes, sir, we do.
13         Q    What gangs are located here in Columbia?
14         A    We have Folk Nation, Gangster Disciples,
15    Crips, Bloods, Pyru, Hispanic gangs, MS-13 Gangs,
16    groups like that, from other places.
17         Q    Okay.  I'm going to ask you specifically.  I
18    believe this came out yesterday in a witness'
19    testimony.  You indicated they're Bloods --
20         A    Yes, sir.
21         Q    -- Crips?
22         A    Yes, sir.
23         Q    I want to ask you specifically about
24    something called GKB.
25         A    Yes, sir.
```

James Richardson - Direct                              305

1        Q    What is that?

2        A    The GKB stands for Gangster Killer Bloods.

3   They are a sub-group of another group out of New York

4   called the UBN, or United Blood Nation.

5        Q    Is that all kind of affiliated under the

6   Blood sect?

7        A    Yes, sir, it is.

8        Q    Okay.  How about Nine Tre, or TRE?

9        A    Nine Tre is also a Bloods gang, a derivative

10  of a Blood gang out of New York.

11       Q    Both found here in the Midlands?

12       A    Yes, sir.

13       Q    If you would, Investigator Richardson, tell

14  us, how do gangs go about distinguishing themselves or

15  differentiating themselves from other gangs?

16       A    Most of the time, the way that they

17  differentiate is through clothing, or bandannas, or

18  hand signs and stuff like that.  They're kind of

19  getting away from wearing bandannas, because everybody

20  knows what they're looking for.  So now it's different

21  symbols -- the clothing, the hand signs, the talk, the

22  way that they talk, the way that they disrespect each

23  other, and things like that.

24       Q    Okay.  As far as clothing goes, are there

25  certain like sports jerseys that are associated with

James Richardson - Direct                                306

1    different gangs --

2          A     Yes, sir.

3          Q     -- such as the Crips and the Bloods?

4          A     Yes, sir.

5          Q     If you would, give us some examples of that.

6          A     For instance, like for the Crips, it would be

7    like a Cowboys jersey, and it disrespects the -- the

8    Bloods would disrespect the Crips by wearing a five-

9    pointed star, and it would be blue.  And the Cowboys is

10   an acronym that means "Crips only win by offing young

11   slobs."

12         Q     And you had indicated signs.  Can you tell us

13   a little more about what you mean by hand signs?

14         A     The hand signs are like sign language that

15   they make up, and it could be like showing their

16   affiliation by using different hand signs.  Also, it

17   can be a disrespect by using a hand sign.  And they can

18   also communicate different messages like how to set up

19   to do an attack on somebody, or what have you.

20         Q     And is there almost like kind of code that

21   comes out of that, also --

22         A     Absolutely, yes, sir.

23         Q     -- as far as there are terms meaning

24   different terms and stuff of that nature?

25         A     They really have their own dictionary in some

James Richardson - Direct                          307

1    cases, called a Book of Knowledge.  And within this
2    Book of Knowledge, it has different number codes,
3    different secret passwords, the handshakes, the signs,
4    the symbols, everything that they would need to know to
5    be a gang member.
6         Q    Okay.  And how does a person come about
7    becoming a gang member?
8         A    First, through the affiliation, and then they
9    have to go through an initiation process.  And it
10   varies from gang to gang as to how it's done.  But most
11   of the time, they have to get jumped in or beat in to
12   get into the gang.  They get beat up for a certain
13   period of time.
14        Q    And that's by other gang members?
15        A    Yes, sir, by other gang members.
16        Q    And within the certain gangs, such as the
17   Bloods or the Crips, is there any kind of a hierarchy
18   within those groups?
19        A    Yes, sir, there is.  They do have a chain of
20   command.  We have several high-ranking officials here
21   in Columbia, from what we understand.
22        Q    You had indicated there being a kind of a
23   Book of Knowledge, I believe is the term you used?
24        A    Yes, sir.
25        Q    Is there also sort of a code of conduct or

314

James Richardson - Direct                              308

1   behavior that gang members are supposed to follow once

2   they become a member?

3       A    Absolutely, yes, sir.

4       Q    And does that differ from different gang to

5   different gang as far as what that code of behavior or

6   code of conduct is?

7       A    Yes, sir, in some cases, it does.

8       Q    And, specifically, I want to ask you about a

9   couple of things.  Are gang members allowed to give

10  other non-gang members information about their

11  particular group?

12      A    Like secret handshakes and stuff like that,

13  they wouldn't do, as far as the different passwords --

14  not to non-gang members, they wouldn't give it, no,

15  sir.

16      Q    And are they allowed to even admit to other

17  non-gang members such as law enforcement that they

18  actually belong to a gang?

19      A    It depends on the gang.

20      Q    Okay.  What do you mean by that?

21      A    Well, like the Crips out of L.A., they always

22  claim, they always say who they're affiliated with, no

23  matter what the circumstances.  But being as under with

24  the UBN or GKB, the Gangster Killer Bloods, I've read

25  over several Books of Knowledge where one of their

James Richardson - Direct                          309

1    rules stipulates that they will never admit their
2    affiliation with Bloods.
3        Q    So they might admit to a crime, even to
4    shooting somebody, before they would admit to being a
5    Blood?
6        A    I've seen that before, yes, sir.
7        Q    If you would, tell us a little bit about how
8    gang members interact with other rival gangs.
9        A    In most cases, they don't interact.  It's
10   pretty much an uneasiness.  The gang members know what
11   part of town they can go to and what part of town they
12   can't go to.  They know what they can or can't wear in
13   different areas of town or different places, like
14   shopping areas and things like that.
15       Q    Okay.  And when they do interact --
16   specifically, this jury has heard testimony about
17   people flashing signs at each other.
18       A    Yes, sir.
19       Q    Describe for the jury what that means or what
20   that is.
21       A    Flashing signs would be like throwing their
22   bandanna up or throwing a hand sign up or something
23   like that, or saying a disrespecting word, something to
24   basically show that they're proud of who they are and
25   that they're against the other group.

James Richardson - Direct                                    310

1       Q    Okay.  And if you would, talk about how are
2   ways that a gang can disrespect another rival gang.
3       A    There are actually several ways they can
4   disrespect.  For instance, a Blood gang member would be
5   called a slob by a Crip gang member, and it's showing
6   their disrespect.  The Crip gang member would be called
7   a crab.  A Folk Nation would be called a doughnut.
8            A hand sign, they could take their hand signs
9   that they do, that they claim.  For instance, the hand
10  sign that I'm holding up right now is a Folk Nation
11  hand sign.  If I wanted to disrespect the Folk Nation,
12  I would turn the hand sign upside-down, and that would
13  show disrespect, or if I wanted to -- let's say I was a
14  Crip, and I wore a red T-shirt.  I would wear a Band-
15  aid over that T-shirt, showing that I'm disrespecting
16  them.
17      Q    Okay.  What are the signs for a Blood?
18      A    The left hand sign, a B.
19      Q    Kind of like a B?
20      A    Yes, sir.
21      Q    And if you disrespect a Blood, what would you
22  do, then?
23      A    Throw it upside-down, yes, sir.
24      Q    How about a Crip, then?
25      A    A Crip would be a C, and the same thing --

James Richardson - Direct                    311

1    you throw it upside-down.

2        Q    I've heard a lot about like gang graffiti --

3        A    Yes, sir.

4        Q    -- being written on overpasses, and

5    buildings, and stuff of that nature.

6        A    Yes, sir.

7        Q    Are there ways to disrespect rival gangs

8    through graffiti?

9        A    Yes, sir.  They can either spray-paint it

10   upside-down, or they would cross certain letters out.

11   Like, for instance, a Blood would cross out a C,

12   showing that he disrespects them, with a line, or they

13   would turn it upside-down, and vice versa.  A Crip

14   would disrespect a Blood by turning their B's backwards

15   or something like that.

16            They would also not say the words.  For

17   instance, they would write the letters CK, which stands

18   for Crip Killer, on a wall, and then, of course, they

19   would cross out the C.

20       Q    Now, you had spoken earlier, sir, about gangs

21   distinguishing themselves from other gangs by the

22   clothing they wear and the signs that they use, the

23   terms that they use.  Is there certain music also

24   that's associated with different gangs?

25       A    Well, we've seen where some of the rappers,

James Richardson - Direct                                    312

1    one gang will listen to one certain kind of rap or one

2    rap artist, but they won't listen to another, I guess

3    because of the affiliation that they feel that they

4    have -- that the rappers have.  And in some of the

5    music, the rappers openly tell you who they're

6    representing.

7          Q    And you've heard of something called the Crip

8    walk before?

9          A    Yes, sir.

10         Q    Tell the jury what that is.

11         A    The C walk, the Crip walk, is a disrespect to

12   the Bloods.  It actually originated in L.A. where they

13   do a dance on the ground, and it's supposed to spell

14   out the word.  And then, as they go across it, they're

15   crossing it out.  So they're disrespecting the rival

16   gang.

17         Q    In your experience, Investigator Richardson,

18   can flashing signs at a rival gang member, or wearing

19   colors, or doing something like the Crip walk, can that

20   also lead to violence between rival gang members?

21              MR. LITTLEJOHN:  Your Honor, I'm going

22   to object.  May we approach the bench?

23              THE COURT:  Yes, sir.

24         Q    Investigator, let me repeat the question for

25   you.  In your experience and your training, sir, can

James Richardson - Direct                        313

1    gang members flashing signs, wearing colors, doing
2    things such as the Crip walk, can that lead to violence
3    breaking out between rival gang members?
4         A    Absolutely, yes, sir.
5         Q    As part of your duties and your training, I
6    believe you indicated that a part of what you try to do
7    is kind of keep tabs on gang members here in Columbia?
8         A    Yes, sir.
9         Q    Now, through your training, have you become
10   familiar with the defendant, Jeroid Price?
11        A    I became familiar with his name on the
12   street, yes, sir.
13        Q    Are you aware of whether he's affiliated with
14   a gang?
15        A    Yes, sir.
16             MR. LITTLEJOHN:  Your Honor, I'm going
17   to object to this.  This is beyond the purview of what
18   he's been qualified to do, and we're going into
19   hearsay.
20             THE COURT:  Yes, sir.  Why don't you all
21   approach?
22             THE COURT:  Okay, I'm going to overrule
23   the objection.  And, Mr. Sorenson, you can continue.
24             MR. SORENSON:  Thank you.
25        Q    Once again, I believe you indicated that you

James Richardson - Direct                              314

1    are familiar with the defendant, Jeroid Price?

2         A    Yes, sir.  His name has been mentioned

3    several times during interviews.

4         Q    Are you aware of whether he's affiliated with

5    a gang?

6         A    I am, sir.

7         Q    What gang is that?

8         A    The GKB, or Gangster Killer Bloods.

9         Q    Are you aware of what his position is within

10   that gang?

11        A    The word that we received is that he is known

12   as a supreme, which is a higher elevation.  He's like

13   an officer within the gang.

14        Q    I want to return you specifically back to

15   talking now specifically about Bloods or GKB's.  What

16   colors are associated with that organization?

17        A    Red, sir.

18        Q    And are you familiar with the hand signs that

19   are associated with that group?

20        A    I am, sir.

21        Q    And if I could, I want to show you a couple

22   of photographs that are in evidence, State's Exhibit

23   #52.  Have you had an opportunity to see that

24   photograph, sir?

25        A    Yes, sir.

James Richardson - Direct                              315

1      Q     And State's Exhibit #61?

2      A     Yes, sir.

3      Q     Okay.  And if you would -- can I get him to

4   step down just briefly, Your Honor?

5                  THE COURT:  Yes, sir.

6      Q     In front of the jury, just kind of show, if

7   you would, Investigator Richardson, what the

8   significance of these photographs are as far as from a

9   gang standpoint.

10     A     In this particular photograph, I see two

11  individuals who are flashing gang hand signs, the first

12  of which being this gentleman right here to the bottom

13  right.  He's throwing up a Crip killer sign, which is

14  CK, and with his left hand, he's throwing up a B, which

15  stands for Blood.  The other gentleman next to him is

16  throwing up a hand sign over his arm, which is a Pyru

17  hand sign they use to show their affiliation.

18     Q     What is Pyru?

19     A     Pyru is a sub-group of the UBN, or a sub-

20  group of the Bloods up in California.

21     Q     And how about as far as especially the guy on

22  I guess it would be the jury's left, the clothing that

23  he's wearing?

24     A     He's wearing all red, and he's wearing what

25  looks like a 76ers jersey, which is showing affiliation

**322**

James Richardson - Direct                                316

1    with the five-pointed star.

2         Q    And the individual with the Pyru sign, are

3    you aware of who that individual is?

4         A    I'm not aware of who that is, sir.

5         Q    Okay.  So the defendant, Jeroid Price, you

6    don't know him personally --

7         A    I do not know him personally.

8         Q    -- as far as knowing his face?

9         A    No, sir.

10        Q    All right.  Now I'm showing you State's

11   Exhibit #52, that photograph.  Is there anything

12   significant in that photograph?

13        A    The red bandanna that one gentleman is

14   holding up, and it looks like he's getting ready to

15   throw up a Blood sign.  The gentleman sitting right

16   behind him looks like he's smoking a cigar or something

17   like that.  He's throwing up a Blood hand sign showing

18   his affiliation.  And I notice the red that they're

19   wearing and the bandannas.

20        Q    Okay.  Investigator Richardson, I'd like to

21   show you State's Exhibits #66 and #67.

22        A    Yes, sir.

23        Q    It's marked for ID at this point in time.

24   Have you had an opportunity to see those items before?

25        A    I did, sir.

James Richardson - Direct                                    317

1        Q    And specifically State's Exhibit #66, what is
2    that item?
3        A    This item here?
4        Q    Whichever one is 66, and I believe that's --
5    has it got a sticker on it?
6        A    Okay, yes.  Yes, sir.
7        Q    Okay.  Have you had an opportunity to go
8    through that notebook?
9        A    I did, sir.
10       Q    Have you been able to find anything within
11   that notebook or the pages of that notebook that is
12   relevant with regards to gang activity?
13       A     It seems like the book is like a
14   conglomeration of rap music, where he's writing music.
15   In one of the --
16                 MR. SORENSON:  Can I have him step down,
17   Your Honor, once again for just a moment?
18                 THE COURT:  Yes, sir.
19       Q     If you would, show the jury what you're
20   talking about as you're going through there.
21       A     It looks like there's several pages where he
22   started writing rap music, is what it sounds like.  One
23   thing that stood out is back here where he started
24   writing one of them.  It says, "Yea, about a million to
25   one chance, dog; hush" --

James Richardson - Direct                                    318

1              MR. LITTLEJOHN:  Your Honor, excuse me,
2    I would have to object.  This is only for
3    identification purposes.
4              THE COURT:  Yes.
5              MR. LITTLEJOHN:  If he wants to examine
6    it and talk about it in general terms, I have no
7    problem.
8              THE COURT:  Yes, I certainly don't mind
9    him just showing what it is he's talking about.  But if
10   he's going to go through the whole thing, it is ID
11   right now.  But there was another matter.  Let me see
12   counsel for just a moment.
13             THE COURT:  Thank you, both.
14        Q    You may continue, Investigator.
15        A    One of the last, where he started out in this
16   paragraph, it says, "GKB, I got this," referring to the
17   GKB Gangster Killing Bloods, in this notebook.
18        Q    Okay.  What is State's Exhibit #67?
19        A    Excuse me?
20        Q    What is State's Exhibit #67?
21        A    This is a book of different codes they would
22   use like a dictionary.  It gives a definition as to
23   what different things mean, different words, what they
24   would symbolize in the street and what they actually
25   mean in layman's terms.  And I noticed quite a bit of

James Richardson - Direct                    319

1    referring to the Bloods as far as Blood stoning and

2    stuff like that.  Also in the book, they're crossing

3    out the C's, which would be a disrespect to the Crips.

4         Q    Is that done pretty much throughout that

5    entire --

6         A    Yes, sir.

7         Q    -- 115-page folder?

8         A    Throughout the whole book.

9         Q    Okay.  And does that book or those pages kind

10   of go through and lay out a lot of that terminology,

11   and those codes, and those signs that you talked about

12   earlier?

13        A    Yes, sir.

14        Q    I believe you had indicated, sir, that part

15   of that would be associated, is that correct?

16        A    Yes, sir.

17        Q    I'm going to show you at this time what is

18   marked as State's Exhibit #62.  Have you had an

19   opportunity to look through this bag of clothing, and

20   hats, and stuff of that nature?

21        A    I have, sir.

22        Q    Are there any items in this bag that in

23   looking at them -- well, first of all, what color is

24   all this clothing that's in the bag?

25        A    All of it's red or some affiliation of red.

James Richardson - Direct

1    Q    Are there any other items in here that, as

2    far as your experience and your training as a gang

3    investigator, have any significance with regards to a

4    Blood gang or affiliation of a Blood?

5    A    Yes, sir, the red and white.  There's a --

6    Q    If you'll tell me, I'll just hold it and get

7    stuff out.

8    A    All right.  The New York Yankees hat, of

9    course, their colors are not red and white, but yet he

10   has a red-and-white New York Yankees hat.  I believe

11   there's an Atlanta Braves hat in there, also.  It's all

12   red.

13   Q    Does that have any --

14   A    AB, All Bloods.

15   Q    That's the Atlanta Braves hat?

16   A    Yes, sir -- and the bandanna, of course.  The

17   bandanna was highly starched, and it was perfectly

18   folded five times, which the number five shows

19   affiliation with the Bloods.

20   Q    The rest of this is pretty much just red

21   clothing --

22   A    Yes.

23   Q    -- shirts and stuff of that nature?

24   A    The rest of it is just pretty much red

25   clothes, sir.

James Richardson - Direct                    321

1      Q    And, lastly, sir, I want to show you State's
2  Exhibits #63, #64, and #65.  Were you given an
3  opportunity to review these items?
4      A    I did, sir.
5      Q    Okay.  First of all, what are they?
6      A    They appear to be bullet-proof vests, sir.
7      Q    Okay.  What significance would they hold with
8  regards to gang members?  Is it common to find a
9  bullet-proof vest on a gang member or when searching a
10  gang member's apartment, or house, or car?
11      A    Most of the guys we deal with as far as this
12  would not have this type of stuff.  The lower-echelon
13  gang members would not be -- probably wouldn't have
14  this in their presence.  But the higher-ranking gang
15  members, we know for a fact that out of New York they
16  actively seek body armor as a way to protect
17  themselves.  They've even had clothing made out of it,
18  suit jackets or a leather jacket, and it'll have lining
19  made out of Kevlar.
20      Q    You're looking at State's Exhibit #67.  Do
21  you recall something very similar to kind of like a
22  pledge of allegiance in here?
23      A    Yes, sir.
24      Q    Okay.  And if you would, what is that?
25      A    It's a pledge to the UBN, or to the United

James Richardson - Direct                                322

1      Blood Nation, where he's pledging his allegiance to
2      that group.
3          Q    Okay.  What is that pledge that's in there?
4      If you would, just read that pledge for the jury.
5          A    "I pledge allegiance to the almighty red flag
6      of the UBN, United Blood Nation, and for that bloodbath
7      for which we stand, one set, under blood, for blood,
8      and for all my blood bank or blood."  And it goes on to
9      say, the next paragraph, "What that red be like, five
10     popping, six dropping, CKT to my casket, drops five
11     alive, six must die, rest in peace to OG tie."
12         Q    What does that CKT indicate?
13         A    Crip Killing Thug.
14         Q    And the reference to the five and the six?
15         A    The five shows their affiliations to the
16     Bloods, and the six is the affiliation to the Crips.
17     In other words, with those two numbers, they show who
18     they represent by wearing those numbers.
19         Q    And, lastly, would you expect to find, in
20     searching a gang member's home or car, weapons?  Is
21     that something that's common?
22         A    Yes, sir, it's become.
23         Q    Ammunition for those weapons, stuff of that
24     nature?
25         A    Yes, sir.

James Richardson - Direct                    323

1              MR. SORENSON:  Beg the Court's

2    indulgence.

3              THE COURT:  Yes, sir.

4        Q    That would be all I have, Your Honor.  Please

5    answer any questions Mr. Littlejohn has.

6              THE COURT:  Thank you, sir.

7              THE COURT:  Mr. Littlejohn.

8                    **CROSS-EXAMINATION**

9    BY MR. LITTLEJOHN:

10       Q    Investigator, the writings that you read to

11   the jury a little while ago --

12       A    Yes, sir.

13       Q    -- and let me be specific, they've been

14   marked for identification as State's Exhibits #67 and

15   #66.  You don't know who wrote these, do you?

16       A    I do not know, sir.

17       Q    You don't have any idea?

18       A    No, I do not, sir.

19       Q    You didn't do any sort of handwriting

20   analysis or anything?

21       A    No, sir.

22       Q    You don't know whose writing it is?

23       A    No, sir, I do not.

24       Q    Okay.  Bullet-proof vests, those are not

25   illegal?

James Richardson - Direct

324

```
 1        A    No, sir, they are not.

 2        Q    You can buy them at a gun show, or at a pawn

 3   shop, or virtually anywhere?

 4        A    Yes and no.  I mean, they're not illegal to

 5   have, and they're not illegal to sell.

 6        Q    Right.

 7        A    Yes, sir.

 8        Q    You can go buy one?

 9        A    Yes, sir.

10        Q    I can go buy one?

11        A    Yes, sir.

12        Q    Anybody on the jury can go buy one?

13        A    Sure, yes, sir.

14        Q    Okay.  Nothing illegal?

15        A    No, sir.

16        Q    Okay.  The items here in Exhibit 62 that you

17   examined, red clothing --

18        A    Yes, sir.

19        Q    -- you don't know where this came from?

20        A    No, sir, I do not.

21        Q    You don't know whether this red clothing was

22   intermixed with green clothing, or blue clothing, or

23   yellow clothing, or any other clothing?

24        A    No, sir, I do not.

25        Q    You don't know if these items fit anybody in
```

James Richardson - Direct                                    325

1    particular?

2         A    No, sir, I do not.

3         Q    You don't know Jeroid Price, do you?

4         A    No, sir, I do not.

5         Q    You've never met him?

6         A    No, sir.

7         Q    And some of the things you told us about

8    Jeroid Price today, that's based on stuff you've heard

9    from informants --

10        A    Yes, sir.

11        Q    -- from people who come in and trade

12   information to the Sheriff's Department?

13        A    No, sir.  These people were not paid

14   informants.  They were just people on the street who,

15   upon making contact with them, started giving up names.

16        Q    And it's all hearsay, isn't it?

17        A    Pretty much, yes, sir.

18        Q    Because you don't know that of your own

19   personal knowledge?

20        A    No, sir.

21        Q    You're just basing it on what somebody told

22   you?

23        A    Yes, sir.

24        Q    Investigator Richardson, Mr. Sorenson showed

25   you some photographs here, and particularly he showed

James Richardson - Direct                                    326

1    you State's Exhibit 61.

2        A    Yes, sir.

3        Q    Do you remember seeing that photograph?

4        A    Yes, sir, I do.

5        Q    And that appears to be a group of six

6    individuals?

7        A    Yes, sir.

8        Q    Okay.  How many of them had on red clothing?

9        A    Only one, sir.

10       Q    Just the one?

11       A    Yes, sir.

12       Q    There's nothing illegal about wearing red

13   clothing, is there?

14       A    No, sir, there's not.

15       Q    And out of six people, chances are somebody's

16   going to have on something red, isn't it?

17       A    Probably so, yes, sir.

18       Q    Let me ask you about this sign right here --

19       A    Yes, sir.

20       Q    -- on the individual kneeling down.  It looks

21   like the defendant, Jeroid Price?

22       A    Yes, sir.

23       Q    Okay.  You said that was a symbol for what?

24       A    The Pyrus use that symbol.

25       Q    The Pyrus?

James Richardson - Direct                    327

1        A    Yes, sir.

2        Q    And that's a gang?

3        A    Yes, sir.  That's a Blood affiliation, yes,

4   sir.

5        Q    But it's a separate gang from the Bloods?

6        A    No, sir.  It's called Pyru Bloods.

7        Q    And they're based in L.A., I think you said?

8        A    Yes, sir, on Pyru Street in L.A.

9        Q    Okay.  So those guys are from L.A.  They're

10  not from South Carolina?

11       A    That's correct, sir.

12       Q    Okay.  Are you familiar with the NBA?  Do you

13  ever watch basketball on TV?

14       A    Yes, sir.

15       Q    Do you know who Doug Christie is?

16       A    I have no idea, sir.

17       Q    He plays for the Sacramento Kings.

18       A    Okay.  I don't know, sir.

19       Q    Have you ever seen him use that sign --

20       A    Have not, sir.

21       Q    -- when he shoots a foul shot?

22       A    Have not, sir.

23       Q    You haven't?

24       A    I don't watch basketball.

25       Q    Okay.  But you're not familiar with anybody

James Richardson - Direct                                328

1    else using that sign?

2        A    As far as I know, it's used in sign language.

3    Other than that, no.

4        Q    Some people use that sign to say, "I love

5    you"?

6        A    That's correct, sir.

7        Q    That's right?

8        A    Yes, sir.

9        Q    Other people use it for that?

10       A    Yes, sir.

11       Q    Matter of fact, on *Forrest Gump,* they use

12   that sign.  Did you watch that movie?

13       A    I'm not familiar with that sign in that

14   movie.

15       Q    Okay.  State's Exhibit 52 --

16       A    Yes, sir.

17       Q    -- you saw this photograph?

18       A    Yes, sir.

19       Q    You don't know any of these people?

20       A    Do not.

21       Q    Okay.  And it shows a number of people at

22   what appears to be a barbecue or something?

23       A    That's what it appears to be, sir.

24       Q    Okay.  And you've got one person with a red

25   hat, and one person with a red bandanna --

333

James Richardson - Direct                         329

1      A     Yes, sir.

2      Q     -- and one person sitting on a red cooler?

3      A     Yes, sir.

4      Q     That doesn't mean he's a Blood or anything,

5  does it --

6      A     That does not mean that.

7      Q     -- just because he's sitting on a red cooler?

8      A     No, sir.

9      Q     Okay.  Investigator Richardson, based on your

10  experience as an investigator in this area -- Your

11  Honor, reserving my objection --

12                THE COURT:  Yes, sir.

13     Q     -- isn't it common for gang members to have

14  either burns or tattoos --

15     A     In most cases, yes, sir.

16     Q     -- indicating a gang affiliation?

17     A     Yes, sir.

18     Q     Do you know if Jeroid Price has any burns or

19  tattoos such as that?

20     A     I have not had a chance to examine him, sir.

21     Q     Would it surprise you if I told you he

22  didn't?

23     A     No, sir, it wouldn't, actually.

24                MR. LITTLEJOHN:  If you'd indulge me

25  just a second, Your Honor.

James Richardson - Direct                                    330

1                    THE COURT:  Certainly.

2          Q    Investigator Richardson, just a couple of

3    final things.  Pyrus and GKB, those are two separate

4    things?

5          A    Yes, sir, they are.

6          Q    Okay.  What is an OG?

7          A    Original gangster.

8          Q    Original gangsters affiliated with what?

9          A    Both sides, sir.

10         Q    Would it be affiliated with the Crips?

11         A    It can be affiliated with both.

12         Q    An original gangster would be somebody in the

13   hierarchy of the Crips if it was used in that context?

14         A    It basically means just like an elder in the

15   gang.

16         Q    Okay.  So an OG could be an elder in the

17   Crips gang?

18         A    Yes, sir.

19         Q    That's all I have.

20                    THE COURT:  Thank you, sir.

21                    THE COURT:  Mr. Sorenson?

22                    MR. SORENSON:  Nothing further, Your

23   Honor.

24                    THE COURT:  Okay.  Thank you, sir.

25                    THE COURT:  Investigator Richardson, you

James Richardson - Direct                    331

1    may step down.  Thank you, sir.

2                    INVESTIGATOR RICHARDSON:   Thank you,

3    sir.

4                    MR. SORENSON:  Thank you, sir.

5                    THE COURT:  Okay.  Ladies and gentlemen,

6    it's probably a good time to take a break for lunch.  I

7    ask that you all return to the jury room and that you

8    not discuss the case, or testimony, or evidence you've

9    heard or seen thus far.  We'll break till 2:30.  Thank

10   you.

11                    (Jury out from 12:55 to 2:30

12   for lunch.)

13                    THE COURT:  Okay, everybody, you need to

14   be seated until the jury is out.

15                    THE COURT:  Thank you, sir.

16                    THE COURT:  Anything further we need to

17   take up?  Mr. Littlejohn --

18                    MR. LITTLEJOHN:  Yes, Your Honor.

19                    THE COURT:  -- let me just put on the

20   record, during the course of Investigator Richardson's

21   testimony, you had an objection that I treated as a

22   continuing objection to, I'm assuming, the whole line

23   of his direct.  And I just wanted to make sure you got

24   on the record your exception to that, as well as the

25   hearsay objection.

332

1          MR. LITTLEJOHN:  Yes, Your Honor.

2     Particularly, I objected -- I want to add for the

3     record that I objected to his testimony as to any

4     tendency toward violence that might be anticipated with

5     the showing signs, etc.  He was testifying as to what

6     reaction those sort of things might provoke, and I

7     object to that supposition.

8          Secondly, Your Honor, I object to his

9     description as to Jeroid Price as being high up in the

10    Bloods gang, based on the fact that that was obviously

11    hearsay and things he's heard on the street.  And our

12    position would be that would be inadmissible.

13         THE COURT:  Okay.  And we did have a

14    sidebar about that.  I just wanted to make sure --

15         MR. LITTLEJOHN:  Yes, sir.

16         THE COURT:  -- that the record reflected

17    that I treated your objection as timely and continuing

18    as to that.  I just wanted to make sure you got

19    everything on the record you needed to.

20         MR. LITTLEJOHN:  Thank you, Your Honor.

21         THE COURT:  Mr. Sorenson, as to that,

22    does the State need to add anything to the record?

23         MR. SORENSON:  No, sir.

24         THE COURT:  Okay.  Thank you, gentlemen.

25    All right, we'll be in recess until 2:30.  I don't know

333

1    if we needed to address any further the conversation we

2    had back in chambers.

3                    MR. PASCOE:  Not unless you think it's

4    necessary.

5                    THE COURT:  I didn't, but I'll be glad

6    if either side needs to address that further.  If

7    something else arises with that, we'll address it then.

8    Thank you, counsel.

9                    MR. PASCOE:  Thank you, Your Honor.

10                   THE COURT:  Thank you, both.  We'll see

11   you all at 2:30, then.

12                   MR. PASCOE:  Thank you, Judge.

13                           (Break in proceedings.)

14                   THE COURT:  Are both sides ready to

15   receive the jury?  Do we need to give Ms. Rushing and

16   Mr. Jeffries a moment?

17                   MR. LITTLEJOHN:  She went to feed her

18   meter.

19                   THE COURT:  If you want to wait on her,

20   I'll do that.

21                   THE COURT:  Okay.  Are counsel for both

22   sides ready?

23                   MR. PASCOE:  Yes, sir.

24                   THE COURT:  Thank you.

25                   THE COURT:  All right.  We're ready for

```
 1    the jury.

 2                        (The jury returned to the

 3    courtroom at 1:34 p.m., after which the following

 4    proceedings were had:)

 5                    BAILIFF:  Your Honor, the jury is

 6    present.

 7                    THE COURT:  Okay.  Thank you, sir.

 8                    THE COURT:  Thank you, ladies and

 9    gentlemen.  I hope you all had a good lunch.  We're

10    ready to continue.

11                    THE COURT:  The State may call the next

12    witness.

13                    MR. PASCOE:  Jason Woods, Your Honor.

14                    BAILIFF:  Step up here, please.  Stand

15    right there, left hand on the Bible, raise your right,

16    and face him.

17                        (The witness was sworn.)

18                    CLERK OF COURT:  Please have a seat up

19    here, sir, and state your full name for the record.

20                    MR. WOOD:  My name is Jason Dexter Wood.

21                        JASON DEXTER WOOD, having

22    first been duly sworn, testified as follows:

23                        DIRECT EXAMINATION

24    BY MR. PASCOE:

25         Q    Good afternoon, Mr. Woods.  Do you live here
```

Jason Wood - Direct                                      335

1    in Columbia, sir?

2         A    Uh-huh.

3         Q    Where did you go to school?

4         A    Columbia High School.

5         Q    And how old are you?

6         A    Twenty-two.

7         Q    And are you friends with both the defendant,

8    Jeroid Price, and the co-defendant, Ryan Brooks?

9         A    Yes, I am.

10        Q    Okay.  How long have you known Mr. Brooks?

11        A    Since high school.

12        Q    Okay.  Did he have a nickname?

13        A    B.D.

14        Q    B.D.  And how long have you known Jeroid

15   Price?

16        A    High school.

17        Q    And does he have a nickname?

18        A    I don't know.

19        Q    Have you ever heard of a J.P.?

20        A    A Justin Peters.

21        Q    Not Jeroid Price?

22        A    Huh-uh.

23        Q    What about a J-Blades?

24        A    No.

25        Q    And all three of you -- Mr. Brooks and the

Jason Wood - Direct                                    336

1    defendant -- are close friends, is that correct?

2         A    I guess you could say that.

3         Q    Okay.  Would you ever hang out with them?

4         A    Yes.

5         Q    And what sorts of things do y'all do when you

6    hang out together?

7         A    Play basketball, parties, things like that.

8         Q    And you still kept in contact with both these

9    defendants, even after they have been arrested, isn't

10   that true?

11        A    Well, no, not really.  I didn't contact

12   nobody.

13        Q    Did any of them contact you?

14        A    Yes, maybe one.

15        Q    Who?

16        A    Jeroid.

17        Q    Contacted you?

18        A    Yes.

19        Q    Okay.  Let me ask you this.  There's nothing

20   wrong with this, but even during the course of these

21   proceedings, you've talked to the defendant's family?

22        A    No.

23        Q    You didn't talk to them today outside during

24   the lunch break?

25        A    Not really.  I mean, I might have -- I don't

Jason Wood - Direct                              337

1    know what I said to them.  Maybe I did, and maybe I

2    didn't.  I don't know.

3        Q    A simple question -- were you hanging out and

4    talking with the defendant's family during lunch today?

5        A    I mean, I know a lot of people there, some of

6    his family.  I don't know who is family and who isn't.

7        Q    The fact of the matter is the only reason

8    you're here today is because I subpoenaed you, isn't

9    that true?

10       A    Well, no.  I would have came anyways if you

11   wouldn't have subpoenaed me.

12       Q    Well, let me ask you, why would you come?

13       A    Because I'm friends with them.

14       Q    With Mr. Price?

15       A    Uh-huh.

16       Q    Okay.  Let me take you back to Friday,

17   December the 6th, of last year, okay, the night of the

18   party.  What did you do that day?

19       A    I went to work.

20       Q    What time did you get home?

21       A    Around 11:30.

22       Q    P.M.?

23       A    Yes.

24       Q    Where did you end up going?

25       A    To the party at the Voodoo's, where the

Jason Wood - Direct                                      338

1    shooting was.

2          Q    Okay.  Who did you go with?

3          A    Anthony Patrick and Ryan Brooks.

4          Q    Who picked you up?

5          A    Anthony Patrick.

6          Q    In whose vehicle?

7          A    His.

8          Q    Okay.  What kind of vehicle did he have?

9          A    A Rodeo.

10         Q    Do you remember what color it was?

11         A    Teal.

12         Q    Could it also be called green -- teal or

13   green?

14         A    Yes, I guess so.

15         Q    Approximately what time did you get to Club

16   Voodoo's with Anthony Patrick and Ryan Brooks that

17   night?

18         A    Around 12:30.

19         Q    So it was definitely after midnight?

20         A    Well, I wouldn't say definitely, but maybe

21   somewhere in that ballpark.

22         Q    Okay.  And do you recall what Mr. Brooks was

23   wearing that night?

24         A    No.

25         Q    What was his hair like that night?

Jason Wood - Direct                           339

1        A    I don't remember.

2        Q    Did you have an opportunity to see the

3    defendant, Jeroid Price, at the party that night?

4        A    Yes, I seen him.

5        Q    Okay.  And who was he hanging out with?

6        A    I don't know.

7        Q    Who did you end up hanging out with at the

8    party?

9        A    Anthony Patrick.

10       Q    Who did Ryan Brooks end up hanging out with

11   at the party?

12       A    I don't know.  I mean -- I don't know.

13       Q    Did you ever see Ryan Brooks and the

14   defendant hanging out together at the party?

15       A    Maybe so.  I don't really remember that well.

16       Q    Do you remember any confrontations that Mr.

17   Brooks or Mr. Price had with the victim, named Carl

18   Smalls, that night?

19       A    Yes.

20       Q    What do you remember about that?

21       A    A lot of arguing, you know, back and forth,

22   but nothing too major, just, you know, arguing.

23       Q    Okay.  And was any of that gang-related?

24       A    I don't know.

25       Q    Are you a Blood?

Jason Wood - Direct                                340

1       A    No.

2       Q    Do you know if Jeroid Price is a Blood?

3       A    No.

4       Q    Mr. Brooks -- is that a "no"?

5       A    No.

6       Q    None of you are in gangs?

7       A    I'm not in a gang.

8       Q    What did you do when the party ended?

9       A    Went and got in the truck.

10      Q    Okay.  Who is "we"?

11      A    I said I went and got in the truck.

12      Q    Mr. Patrick's truck?

13      A    Yes.

14      Q    Did anyone else get in with you?

15      A    Patrick.

16      Q    Tell the jury what happened as you and Mr.

17   Patrick got in the truck.

18      A    We was just sitting in the truck, playing

19   with girls in the parking lot.

20      Q    Did anything unusual happen?

21      A    You want me to tell --

22      Q    Did you hear anything unusual?  Did anything

23   unusual happen?

24      A    Gunshots.

25      Q    Okay.  And where were the gunshots coming

Jason Wood - Direct                                    341

1    from, could you tell?

2         A    No, I just heard the gunshots.

3         Q    Tell the jury what you saw and heard as the

4    gunshots went out.

5         A    I heard a gunshot, I guess -- I heard a

6    gunshot. Brooks came out of the club, got in the truck

7    with us, and was like, "Go," and we left.

8         Q    Did you see anything in Mr. Brooks' hand as

9    he got in the truck?

10        A    Yes, he had a gun.

11        Q    Do you remember what kind of gun it was?

12        A    A chrome gun.

13        Q    You don't remember the type gun? Was it big

14   or small?

15        A    It was a gun.

16        Q    How many shots in all do you think you heard

17   that night?

18        A    I don't know.

19        Q    How many shots had you heard before you saw

20   Brooks running into the truck?

21        A    I guess one.

22        Q    Did you hear any more shots as you saw Brooks

23   running to the truck?

24        A    Yes.

25        Q    Do you remember how many?

Jason Wood - Direct                                    342

1        A    No.

2        Q    You've already testified after Brooks got in

3    the truck, you heard more shots as you saw him running

4    there.  Who was driving?

5        A    Patrick.

6        Q    Okay.  And where did y'all end up going?

7        A    We went and dropped B.D. off, then I went

8    home.

9        Q    Now, you just heard shots, right?  You heard

10    that one shot and see the defendant running to the

11    truck with a gun, and then you hear more shots.  Did

12    you ask Mr. Brooks what was going on?

13        A    No.

14        Q    You didn't have any interest whatsoever in

15    finding out what happened?

16        A    I didn't want to know.

17        Q    And where did you go first?

18        A    We went and dropped B.D. off, and then

19    Patrick dropped me off.

20        Q    Okay.  Dropping B.D. is Ryan Brooks.  You

21    dropped him off first?  Where were you sitting in the

22    Rodeo?

23        A    In the passenger seat.

24        Q    Do you recall anybody calling Mr. Patrick's

25    cell phone that night as y'all were leaving the scene?

Jason Wood - Direct                                    343

1       A    I don't remember.

2       Q    And it's your testimony you never asked

3  Brooks what happened that night as you were leaving the

4  scene?

5       A    Not that I remember.

6       Q    Now, let me ask you this.  Don't tell us how

7  or what was said, but when did you first learn that

8  Price and Brooks may have been involved in a shooting?

9       A    I don't know the exact day.

10      Q    Do you remember giving a statement to the

11  police on December 17th?

12      A    I guess it was the 17th.

13      Q    Do you remember telling them that you learned

14  the next day that Price and Brooks may have been    .

15  involved?

16      A    I don't remember that.  But, you know, if I

17  said that, I said it.  I don't remember that.  But if I

18  did, you know, maybe I did.

19      Q    You told the police on December 17th that you

20  learned by Sunday, December the 8th, that the

21  defendants may have been involved in a shooting, right?

22  That's what you told the police?

23      A    I don't know.  That's what you said.

24      Q    I want to show it to you, then.  You'd admit

25  that you were anything but forthright with the police

Jason Wood - Direct

344

1    -- you weren't honest with the police when they came

2    and interviewed you, correct?

3        A    No, I wouldn't say that.  I was honest.

4        Q    You did everything you could to protect your

5    friends, isn't that true?

6        A    No, not really.

7        Q    Page two of your statement, you can read it

8    yourself to refresh your memory.  This is a statement

9    you gave on December the 17th.  When did you tell the

10   police that you had learned about the shooting?

11       A    This says, "I spoke to B.D. the next day."

12       Q    You don't have to read the statement, unless

13   you want to.

14       A    Okay.

15       Q    When did you say you learned?

16       A    The next day.

17       Q    The next day.  Now, since it was early in the

18   morning Saturday at 2:00, did you learn about it on

19   Saturday or Sunday, the next day?

20       A    I don't know.

21       Q    Okay.  I'll give you the benefit of the doubt

22   and say Sunday, the 8th, how's that?  Now, when you

23   gave your statement to the police on December the 17th,

24   did you tell them that Mr. Brooks had driven back in

25   the vehicle with you after the shooting?

Jason Wood - Direct                           345

1        A    No, I didn't.

2        Q    Why not?

3        A    Because I didn't want to have any links to

4    anything.  You know, I didn't know.  I figured maybe I

5    could get in trouble if, you know, the police knew that

6    I was in the same car with him.

7        Q    And you told them on the 17th -- the police

8    -- that Brooks did not leave with you, isn't that true?

9    You didn't tell the police that Brooks left with you

10   that night of the shooting, correct?

11       A    Correct.

12       Q    Even though you knew the day after the

13   shooting that he and Price may have been involved in a

14   shooting, you didn't tell the police that?

15       A    I guess so.  He told me -- he just told me

16   what happened the next day.

17       Q    Now, also in your statement on December the

18   17th, did you tell them that Mr. Brooks had a chrome

19   .380-caliber pistol?

20       A    No.

21       Q    Sir, on page two of your statement -- do you

22   want to look at it to refresh your memory -- do you

23   remember being asked if you saw any gang activity that

24   night?

25       A    I don't see it.

Jason Wood - Direct

1    Q    On page two of your first statement on

2    December the 17th, "Did you see the victim arguing with

3    J.P. and B.D.?"  And then they asked, "Did you see any

4    gang activity?"  What was your response to the police?

5    A    I seen some hand movements, but I didn't know

6    what they were.

7    Q    You also mentioned that you saw blue rags,

8    isn't that the truth, sir?

9    A    Yes, I said that.

10    Q    How come you didn't mention anything in here

11    about Bloods or anybody wearing red that night?

12    A    I mean, what do you mean?  That's what I saw.

13    I told you what I saw.

14    Q    Is it true that you didn't want to mention

15    anything about Bloods because you are a Blood?

16    A    That's not true.

17    Q    Now, you failed to tell the police something

18    else in your first statement on December the 17th,

19    also, didn't you?

20    A    What?

21    Q    Tell this jury who you bought a cell phone

22    for and put in your name on Tuesday, December the 10th,

23    three days after this murder.

24    A    I bought a cell phone for Jeroid Price.

25    Q    And you didn't tell the police that?

Jason Wood - Direct                                    347

1        A    No.

2        Q    Whose name did you put the cell phone in?

3        A    Mine.

4        Q    And Jeroid Price had been wanted since at

5    least the 13th of December, and you knew that when you

6    gave your statement on the 17th, correct?

7        A    No, I did not know that.

8        Q    And you bought him a cell phone on the 10th,

9    that's your testimony.  But you didn't think that that

10   was important to tell the police on the 17th?

11       A    No.

12       Q    Tell this jury why you felt the need to buy

13   Mr. Price a cell phone on Tuesday, the 10th, after this

14   murder and put it in your name.  Tell the jury.

15       A    I didn't feel the need to do nothing.  I

16   didn't volunteer like, "Okay, let me go buy you a cell

17   phone."

18       Q    Tell the jury why you put the cell phone in

19   your name for Mr. Price.

20       A    Because he asked me to.

21       Q    Now, the police came back and reinterviewed

22   you on January the 15th, didn't they?

23       A    I guess so.

24       Q    And that was the second statement that you

25   gave, correct?

354

Jason Wood - Direct                                          348

1       A    Yes.

2       Q    And you just told the jury that Mr. Price had

3   asked you to put that cell phone in your name, correct?

4   But didn't you try to make up another reason as to why

5   you got that cell phone when you talked to the police?

6       A    No.

7       Q    Do you remember telling them it was so that

8   you could build some good credit?

9       A    I'm saying that's the same deal.  He asked me

10  to.  My motivation is to get the good credit.

11      Q    So let me make sure we've got this straight.

12  The murder happens on Saturday, December the 7th.  On

13  Tuesday, the 10th, you get a cell phone because Mr.

14  Price asked you to put it in your name, and you give it

15  to Mr. Price three days after the shooting, correct?

16  And you're also telling this jury that the other reason

17  you went ahead and did it was because you wanted to

18  build your credit?

19      A    Yes.

20      Q    Well, you had to be a little concerned when

21  Mr. Price went on the run after the 13th that he wasn't

22  going to pay your bill, isn't that true?

23      A    I guess -- well, I cut the line after I found

24  out that he was on the run, because I didn't want it to

25  seem like I was trying to do nothing to aid him.

Jason Wood - Direct                                    349

1        Q    And you didn't come forward and tell the

2   police that you had gotten Mr. Price a phone.   They

3   found that out and asked you about it, isn't that true?

4        A    Correct.

5        Q    Okay.  And, finally, from the time you talked

6   to the police on December the 17th until January the

7   15th, did you have any other conversations with the

8   defendant, Jeroid Price, while he was on the run from

9   the police?

10       A    Maybe one.

11       Q    Okay.  And did you tell the police about that

12  in your second statement on January the 15th, after

13  they informed you that they knew you had gotten him a

14  phone?

15       A    I don't remember that.

16       Q    Do you remember them asking you, "Did Jeroid

17  talk to you about this case?"  And what was your

18  response?

19       A    Yes, he wanted to know what was going on.

20       Q    And when the police asked you, "Did Jeroid

21  tell you anything specific about what happened at the

22  club?" what was your response?

23       A    I don't remember making that statement.

24       Q    You don't remember telling the police that he

25  said that the guy was trying to take his gun from him

Jason Wood - Direct                                    350

1    and B.D., B.D. shot him in the side -- "I remember him

2    saying that he ended up shooting the guy, too.  I don't

3    remember exactly what he said about how it exactly went

4    down"?

5         A    No.

6         Q    You don't remember Jeroid Price telling you

7    that he ended up shooting Carl Smalls?

8         A    No.

9         Q    Please take a look at that.

10        A    I see it.

11        Q    Whose statement is that?

12        A    I didn't write this statement.

13        Q    It's typed, isn't it?

14        A    Yes.

15        Q    How many pages is it -- three pages, correct?

16        A    Uh-huh.

17        Q    Who signed page one?

18        A    I did.

19        Q    Swearing that this was the truth, the whole

20   truth, and nothing but the truth.  Who signed page two,

21   where you said that Jeroid Price told you he shot the

22   victim?

23        A    But I never read the whole statement.  Me and

24   him, when the investigator interrogated me, I talked,

25   he typed.  When we was finished, he gave it to me to

Jason Wood - Direct                              351

1   sign.  He said, "Okay, I'm going to make you a copy."

2   He never came back with no copy.  I never seen this

3   until they sent me the subpoena to my house.  This was

4   a week ago.

5       Q    Mr. Woods, who signed page two?

6       A    Yes, I signed it.

7       Q    And who signed page three?

8       A    Me, I signed it.  I signed all of it.

9       Q    This is your statement.  At this time, Your

10  Honor, I'm going to ask that his statement be admitted

11  into evidence.

12              THE COURT:  Any objection?

13              MR. PASCOE:  I'll get the original and

14  put that in.

15              MR. LITTLEJOHN:  If you'd indulge me

16  just a moment, Your Honor.

17              THE COURT:  Yes, sir.

18              MR. LITTLEJOHN:  Your Honor, I don't

19  object to that particular statement if he wants to put

20  both of them in.

21              THE COURT:  Okay.

22              MR. PASCOE:  That's fine.

23              MR. LITTLEJOHN:  I don't have any

24  problem with both of them.

25              THE COURT:  We'll mark them both.

Jason Wood - Direct                                    352

1              MR. PASCOE:  I need those back.

2              THE COURT:  Thank you, sir.

3              MR. PASCOE:  We'll put both of them in?

4              THE COURT:  No objection to both of

5    them.

6              MR. PASCOE:  We'll mark the December

7    statement, Your Honor, State's Exhibit 68, and the

8    January statement, I assume, will be 69.

9                   (State's Exhibits 68 and 69

10   were received in evidence.)

11        Q    And just to make sure the record's clear on

12   State's Exhibit 68, that, too, is your first statement?

13        A    Yes, I guess so.

14        Q    Okay.  That's your signature under page one

15   and your signature under pages two and three, correct?

16        A    Uh-huh.

17        Q    Isn't it true, sir, that you were assisting

18   Jeroid Price in trying to elude the police as early as

19   Tuesday, December the 10th, when you got him that cell

20   phone?

21        A    No.

22        Q    Thank you, Mr. Woods.  Answer any questions

23   that defense counsel has for you.

24              THE COURT:  Thank you, Mr. Pascoe.

25              THE COURT:  Mr. Littlejohn.

Jason Wood - Direct                           353

1              MR. LITTLEJOHN:  Thank you, Your Honor.
2                        CROSS-EXAMINATION
3    BY MR. LITTLEJOHN:
4         Q    Mr. Woods, my name is Cam Littlejohn.  I
5    represent Jeroid Price.
6         A    Uh-huh.
7         Q    Mr. Woods, how old are you?
8         A    I'm 22.
9         Q    Do you live in Columbia?
10        A    Yes, I do.
11        Q    Have you lived in Columbia all your life?
12   Are you in school?
13        A    No.
14        Q    Are you working?
15        A    Yes.
16        Q    What do you do?
17        A    I'm a mentor.
18        Q    You're a mentor?
19        A    Yes.
20        Q    What do you do as a mentor?  Who do you work
21   for?
22        A    It's called the Mentor Network.  It's like
23   group homes for the mentally disabled.
24        Q    Okay.  So you're employed by the State?
25        A    No, it's a privately owned company.

# 360

Jason Wood - Cross                                      354

1       Q    A privately owned company, okay.  Mr. Woods,

2    let me back up a second to December of last year.  You

3    indicated that you went to the Voodoo Club with Bryan

4    Brooks --

5       A    Uh-huh.

6       Q    -- and Sherman Patrick -- Anthony Sherman

7    Patrick, just the three of y'all?

8       A    Yes.

9       Q    You need to answer up so the Court Reporter

10   can take down your answer.

11      A    Yes.

12      Q    Okay.  And you said y'all got there about

13   12:30 a.m.?

14      A    Yes.

15      Q    Now, when you went into the Voodoo Club, did

16   you see Carl Smalls?

17      A    Yes.

18      Q    Did you know Carl Smalls or know who he was?

19      A    No.

20      Q    How do you know who I'm talking about?

21      A    Because he's the victim.

22      Q    Okay.  Big guy?

23      A    Yes, a big guy.

24      Q    Real big guy, okay.  And did you observe Carl

25   Smalls during the course of the evening while you were

Jason Wood - Cross                              355

1   in there?

2       A    Yes, I did.

3       Q    And did you see him in any kind of arguments

4   or confrontations?

5       A    Yes, I did.

6       Q    Okay.  How many times did that occur that you

7   saw?

8       A    Over and over, consistently throughout the

9   night.

10      Q    Consistently through the night, okay.

11      A    He might be arguing with one guy.  They might

12  break it up.  Later on, he'd be arguing with somebody

13  else, you know.  No fights broke out, but he was

14  constantly into some kind of altercation with somebody.

15      Q    Okay.  From what you could see, who was

16  starting these altercations?

17      A    Smalls was.

18      Q    And this was a continuous thing that you saw?

19      A    From the time that I was there till the time

20  that I left, he was in something.

21      Q    Did he get into something with Jeroid Price?

22      A    I can't say directly, but, you know, it was

23  like a crowd of guys.  He was standing inside of the

24  crowd, and Smalls was talking to all of them, I guess.

25  You know, I couldn't make out what they was saying,

Jason Wood - Cross                                    356

1    because I wasn't standing close enough to hear over the

2    music.  But I could see them, you know, that he was

3    talking to them.

4         Q    Okay.  And you say this went on most of the

5    night, okay.  Now, Mr. Woods, did you leave the party

6    when it was more or less declared over with?

7         A    Yes, I did.

8         Q    That's when the music stopped and the lights

9    came on?

10        A    Yes, the lights came on.  It was over.

11        Q    Okay.  And I believe you said you went

12   outside, and you and Anthony Patrick were talking to

13   some girls or trying to talk to some girls, is that

14   right?

15        A    Yes.

16        Q    Okay.  Then you indicated that you heard a

17   shot?

18        A    Yes, I did.

19        Q    Okay.  And Ryan Brooks came and got in the

20   vehicle with you, is that right?

21        A    Yes.

22        Q    And you didn't have any conversation with him

23   about what might have occurred at that time, isn't that

24   right?

25        A    No.

Jason Wood - Cross                                    357

1      Q     Now, between December 7, 2002, and December
2    10, 2002, had you given any kind of statement to the
3    Sheriff's Department?
4      A     No, I don't think so.
5      Q     Had any sheriff or deputy sheriff come and
6    interviewed you, any investigator?
7      A     No.
8      Q     So you didn't know what was going on?
9      A     No, I didn't.
10     Q     Okay.  Now, you indicated that you had gotten
11   a telephone, you said for Jeroid Price?
12     A     Yes.
13     Q     And you did that because Jeroid owed them
14   some money, didn't he?
15     A     Yes, he did.
16     Q     He got disconnected?
17     A     He owed money to the Sprint Company where I
18   bought the phone from.
19     Q     Okay.
20     A     I had never had an account there, so it would
21   be easier, you know, to get it in my name without
22   having to pay back all the money that he already owed.
23     Q     Okay.  So you were doing that as a favor to
24   Jeroid?
25     A     As a favor.

364

Jason Wood - Cross                                    358

1        Q     Did you think you were doing anything wrong?

2        A     No, I didn't.

3        Q     You were trying to help him?

4        A     Yes.

5        Q     And, Mr. Woods, later on, when you were
6    interviewed the second time, you told the investigators
7    about that phone, didn't you?

8        A     Yes, I did.

9        Q     Now, let me back up a second.  When Mr.
10   Pascoe asked you about your two statements that you
11   made, the day after you were at the Voodoo Lounge, did
12   you have a conversation with Ryan Brooks about what may
13   have happened?

14       A     I think so, either that day or the day after.

15       Q     Okay.

16       A     Sometime on that weekend.

17       Q     All right.  And at that time, Ryan Brooks
18   made a statement to you, didn't he?

19       A     Yes, he did.

20       Q     And he told you what happened?

21       A     Yes, he told me what happened.

22       Q     Okay.  And you told the investigators about
23   that conversation, didn't you?

24       A     Yes, I told them what he told me.

25       Q     Okay.  And you gave that statement to the

Jason Wood - Cross                                    359

1    investigators the first time you were interviewed on

2    December 17th, is that right?

3        A    Yes.

4        Q    Okay.  And I believe you told them -- and I'm

5    reading from State's Exhibit 68 -- that "Yes, I spoke

6    to B.D."

7        A    That's his name, his street name.

8        Q    Okay, that's Brooks -- "the next day, and he

9    told me that J.P. and the victim were having words at

10   the front door and the victim saw that J.P. had a gun

11   in his waist.  B.D. said that the guy rushed J.P. and

12   was trying to take his gun away from him."

13       A    Correct.

14       Q    Did you tell them that?

15       A    Correct.

16       Q    Okay.  "And B.D." -- that's Brooks -- "said

17   that he then pulled his gun and shot the victim in his

18   hip."

19       A    Correct.

20       Q    And that's what he told you.  "B.D. then said

21   that after he shot, he then turned and went out the

22   door."

23       A    Right.

24       Q    Okay.  And you told the agents that on

25   December 17th, is that right?

**366**

Jason Wood - Cross                                              360

1      A     Yes, I did.

2      Q     Okay.  And that's what Brooks told you the

3   day after you were at the Voodoo Club?

4      A     Either that Saturday or Sunday, one of the

5   two.

6      Q     Okay.  And on that day that you were

7   interviewed, December 17th, why didn't you tell the

8   officers about Brooks having a gun and Brooks riding

9   home with you?

10     A     Because I didn't want to be involved.  I

11  didn't know if I was going to get in trouble for being

12  in the car with him after he had done shot somebody.

13     Q     Okay.  So you were scared of that?

14     A     Yes.

15     Q     And that's why you didn't mention it?

16     A     Yes.

17     Q     And, Mr. Woods, you didn't see anybody shoot

18  anybody that night?

19     A     I did not see anybody.

20     Q     You just heard shots, you didn't see

21  anything?

22     A     All I heard was the shots, and I saw Brooks

23  run and get in the car.  That's it.

24         MR. LITTLEJOHN:  If you'd give me just a

25  moment, Your Honor.

Jason Wood - Cross                              361

```
1                    THE COURT:  Yes, sir.
2          Q     Mr. Woods, one final thing.  Did you ever
3      know Jeroid Price by his initials?  Did you ever call
4      him J.P.?
5          A     No, I didn't.
6          Q     Have you ever heard him called J.P.?
7          A     I don't know.
8          Q     You don't know -- all right.  That's all I
9      have, Your Honor.
10                   THE COURT:  Thank you, sir.
11                   THE COURT:  Mr. Pascoe.
12                   RE-DIRECT EXAMINATION
13         Q     Just now on cross-examination, you were
14     referring to him as J.P., before Mr. Littlejohn asked
15     you that question, weren't you?
16         A     I didn't say J.P.
17         Q     He asked you if you told the police that,
18     referring to him as J.P., and you said yes, in your
19     statement.  Isn't that true?
20         A     I don't know what you're talking about.
21         Q     And let me ask you this.  How many times did
22     you see the victim getting in a confrontation that
23     night?
24         A     I don't know.  I wasn't counting how many
25     times he was getting in a confrontation with somebody.
```

**368**

Jason Wood - Redirect                                    362

1    Q    Isn't it true you didn't even get there until
2    like at least after 12:30 that evening?
3    A    How do you know that?
4    Q    Oh, I know because of the phone records.  You
5    want to take a look at them?
6    A    Phone records -- well.
7         THE COURT:  Before you even get to that
8    part, Mr. Pascoe, let's help Mr. Wood understand
9    something.  Sir, you are a witness.  You've been
10   brought here to testify.  The lawyers ask the
11   questions, and you answer the questions, sir, okay?
12   You don't ask them questions.  Are we clear?
13        MR. WOOD:  Yes, Your Honor.
14        THE COURT:  Thank you, sir.
15        MR. PASCOE:  Thank you, Your Honor.
16   Q    You and your friends, Mr. Brooks and Mr.
17   Patrick -- isn't it true that after midnight, at 12:34,
18   12:35, 12:38 -- were attempting to call Jeroid Price to
19   tell him you were on the way?
20   A    Who was -- I was?  I don't have a phone.  I
21   wasn't calling nobody.  And I told you I didn't know
22   exactly what time we got there.
23   Q    That's my point.  Would you agree now that it
24   was sometime after 12:30?
25   A    I guess so.

Jason Wood - Redirect                              363

1      Q    And it's amazing -- isn't it true in your

2    statement you could talk about people wearing blue and

3    blue rags, but you didn't see anybody wearing red get

4    into any confrontations?

5      A    I seen them with blue rags.  I did not see no

6    red rags.

7      Q    Did you see anybody you thought might be a

8    Blood?

9      A    I don't -- no, no.

10     Q    No -- and Jeroid Price isn't a Blood,

11   correct?

12     A    Not that I know of.

13     Q    And let me ask you this.  Did you ever see

14   Jeroid Price tell someone he was going to fall like

15   "The Matrix"?

16     A    No.  I could not hear what he was saying or

17   Smalls was saying.  I could just see what was going on.

18   I don't know what they said.

19     Q    Was Jeroid Price ever in Carl Smalls' face,

20   squaring off with one another?

21     A    I mean, if Smalls walks into his face, is he

22   in Smalls' face?

23     Q    Were they face-to-face that evening on the

24   dance floor?

25     A    Maybe so.  I can't say.  They was arguing.

Jason Wood - Redirect                                      364

1    It was a group.  Maybe he was in his face and everybody

2    else's face who was with him.

3         Q    And, finally, Mr. Littlejohn asked you, "You

4    didn't think you were doing anything wrong?" when you

5    knew that the defendants may have been involved in a

6    shooting on the 8th and on the 10th you put a telephone

7    in your name because Jeroid Price asked you to?

8         A    No, I did not.

9         Q    And did you see Jeroid Price again on the

10   11th?

11        A    I did not see Jeroid after that, period.

12        Q    The 12th, the 13th, anytime -- did you ever

13   see him again?

14        A    No.

15        Q    Anytime in the month of December or January?

16        A    No.

17        Q    But you did talk to him by telephone?

18        A    Yes.

19        Q    Before you gave your second statement to

20   Investigator Smith, to the Sheriff's Department?

21        A    In between the two statements, you're saying

22   I talked to him, right?

23        Q    Right.

24        A    Okay.

25        Q    And, finally, Mr. Littlejohn asked you, "You

Jason Wood - Redirect                               365

1    did tell the police in your second statement that you

2    got Jeroid Price a phone?"

3         A    Yes.

4         Q    But that was only because the police found

5    out about it before you even told them, as you said in

6    direct, isn't that true?

7         A  .  Yes, they asked me about it, and I told them

8    about it.

9         Q    You never would have told them about it if

10   they hadn't asked you about it, isn't that true?

11        A    Maybe so.

12        Q    Because you were protecting your friend,

13   Jeroid Price.  That's all I have.

14             THE COURT:  Thank you.

15             MR. LITTLEJOHN:  One final question,

16   Your Honor.

17             THE COURT:  Yes, sir.

18                  **RE-CROSS EXAMINATION**

19   BY MR. LITTLEJOHN:

20        Q    The first time you were interviewed, did they

21   ask you about the telephone?

22        A    No, they did not.

23        Q    That's all I have, Your Honor.

24             THE COURT:  Thank you.

25             THE COURT:  Mr. Wood, you can step off

Jason Wood - Recross                                          366

1      the stand, sir.

2                    THE COURT:  The State may call their

3      next witness.

4                    MR. SORENSON:  Thank you, Honor.  The

5      State calls Investigator Anna Elsey Clemmons.

6                         (The witness was sworn.)

7                    CLERK OF COURT:  Please have a seat and

8      state your full name for the record.

9                    MS. CLEMMONS:  Anna Elsey Clemmons.

10                   ANNA ELSEY CLEMMONS, having

11     first been duly sworn, testified as follows:

12                    **DIRECT EXAMINATION**

13     BY MR. SORENSON:

14          Q    Good afternoon.

15          A    Good afternoon.

16          Q    If you would, please tell the jury where

17     you're employed.

18          A    The Richland County Sheriff's Department.

19          Q    And what do you do with the Sheriff's

20     Department?

21          A    I am currently assigned to the Forensic Unit

22     investigative unit.

23          Q    Okay.  And how long have you been employed in

24     that capacity?

25          A    Since October of '98.

Anna Clemmons - Direct                                      367

1          Q     And were you with the Sheriff's Department
2     before that, also?
3          A     I was.  I was hired July of '96.
4          Q     And were you a road deputy prior?
5          A     I worked uniform patrol for a little over two
6     years.
7          Q     So from '98 until the present, you've been in
8     the Forensic Unit?
9          A     That's correct.
10         Q     If you would, just tell the jury a little bit
11    about what at the Forensic Unit at the Sheriff's
12    Department your day-to-day activities are.
13         A     Our main duties comprise working all crime
14    scenes, whether that be a burglary, rape, assault,
15    homicide.  And in working those scenes, that involves
16    photography, sketches, blood pattern analysis,
17    fingerprints, and collecting any type of physical
18    evidence that may be needed to solve the crime or to
19    relate either a victim to the crime or a suspect to the
20    crime.
21         Q     And, specifically, Investigator Clemmons,
22    when you respond to a crime scene -- specifically in
23    this case, a homicide -- if you would, tell the jury
24    what steps you go about when you arrive at that crime
25    scene as far as making sure it's secure and then going

**374**

Anna Clemmons - Direct                                    368

1    about doing your job.

2        A    When I first arrive on the scene, I try to

3    make contact with the officers or the investigators

4    that arrived there before I did, to determine what

5    happened and what we need to do.  I'll do an initial

6    walk-through with them, and then I will start

7    photographing and marking, collecting evidence that we

8    think we may need.

9        Q    Now, if I could, I'd like to turn your

10   attention, Investigator, back to the early morning

11   hours of Saturday, December the 7th, of last year.  Did

12   you have the opportunity to respond out to Club

13   Voodoo's at 7351 Garners Ferry Road here in Richland

14   County?

15       A    I did.  I was notified at 2:40 in the morning

16   and arrived there at 3:00.

17       Q    Okay.  And, if you would, tell the jury, when

18   you arrived out there, was the scene secured at that

19   point in time?

20       A    When I arrived, I observed crime scene tape

21   across the front of the building and officers outside

22   of the entrances.

23       Q    Okay.  And did they inform you at that point

24   in time that they had secured the area inside the club

25   where the shooting had occurred?

Anna Clemmons - Direct                          369

1        A    They did.

2        Q    What did you then do at that point in time?

3        A    I would have then made contact with the

4   deputies to find out what occurred prior to my arrival

5   as far as any individuals in the scene, any EMS

6   personnel that had been inside the scene.  I would have

7   then walked through the scene and began photographing,

8   taking general photographs initially.

9        Q    And, as you came inside, would you describe

10  for the jury the scene that you encountered?

11       A    There was one individual on the floor right

12  at the entrance, and then the club was in kind of

13  disarray, a lot of cups, trash on the floor, but it was

14  empty.

15       Q    And you indicated that you photographed the

16  scene at that point?

17       A    That's correct.

18            MR. SORENSON:  Beg the Court's

19  indulgence.

20            THE COURT:  Yes, sir.

21            MR. LITTLEJOHN:  We have no objection.

22            THE COURT:  Without objection -- what

23  numbers are those, Mr. Sorenson?

24            MR. SORENSON:  Your Honor, I just need

25  for you to you bear with me one second.

**376**

Anna Clemmons - Direct                                    370

1            THE COURT:  Yes, sir.

2            MR. SORENSON:  This is going to be

3    State's Exhibits 8, 9, 11 through 16, and then 18

4    through 37.

5            THE COURT:  Thank you, sir.

6        Q    Ma'am, if I could, I'll show you these and

7    let you kind of go through them initially.  Do those

8    all accurately depict the scene that you came upon in

9    those early morning hours?

10       A    Yes, sir.

11       Q    And also let me show you State's Exhibit #17,

12   which is already into evidence.  Is that another

13   photograph that was taken out there, also?

14       A    Yes, sir.

15       Q    Okay.  Now, if you would, describe for the

16   jury -- you indicated that you would have initially

17   photographed the scene and then gone about attempting

18   to find any evidence around the body, is that correct?

19       A    Yes.  I would have located the evidence right

20   around the body where there may be some movement in

21   removing the body.  I would have photographed that

22   evidence, marked it, and photographed again, and then

23   collected that evidence.

24       Q    Okay.  And if you would, tell the jury what

25   items were out there that you collected, specifically

Anna Clemmons - Direct                            371

1    within the close vicinity of the victim, Mr. Smalls?

2         A    I collected three shell casings, several

3    fragments, and another large fragment, and a

4    projectile.

5         Q    And by "fragments," fragments of what?

6         A    Of a bullet.

7         Q    And then actually a projectile, so a bullet?

8         A    Yes.

9         Q    And then I believe you indicated three shell

10   casings?

11        A    Correct.

12        Q    Okay.  And those items were photographed

13   before they were collected?

14        A    Yes.

15        Q    Also, were there any other items that were by

16   the victim?

17        A    There was a cell phone.

18        Q    Okay.  And, Your Honor, if I could get her to

19   step down, with the Court's permission?

20             THE COURT:  Certainly, yes, sir.

21        Q    You had indicated, Investigator Elsey, that

22   when you first got there, the sides of the victim being

23   right inside kind of a hallway, is that correct?

24        A    Yes.

25        Q    And the rest of the club was kind of in

Anna Clemmons - Direct                                    372

1     disarray?

2         A     Yes.

3         Q     Okay.  I'm showing you State's Exhibits 8, 9,

4     11, 12, 13, and 14.  Just kind of go through them for

5     the jury to show them what you mean by that.

6         A     This is when you walk -- this is kind of

7     through the entrance, looking out.  There's a bar area

8     here, here, and I believe what is a stage area,

9     straight back here.  And that's just another closer

10    look, kind of on the left side of the room, looking

11    straight back into the club.

12              This is looking from that stage area back

13    towards the entrance, back over here.  Again, that's

14    the bar area -- or one of them.  And then that's the

15    bar area on the right.  And, again, this is the

16    entrance here when you first walk in the club.

17        Q     I'm showing you State's Exhibit #15.

18        A     I just thought I'd show them this one.  This

19    is that crime scene tape.  This is on the other side of

20    the tape, back here at the entrance.

21        Q     And that's, I guess, an exit, right?

22        A     Well, that's where we entered, these two.

23    But it's also an exit.

24        Q     Okay.  And that would be Mr. Smalls laying on

25    the floor there, is that correct?

Anna Clemmons - Direct                           373

1        A    Yes, sir.

2        Q    And, now, I believe you had indicated before

3    you had said that you found out there several bullet

4    fragments, a projectile, three shell casings, and a

5    cell phone?

6        A    Yes.

7        Q    Did you mark them in some way before you

8    collected them?

9        A    I did, with one of our yellow evidence

10   markers.

11       Q    Okay.  I'm showing you -- looking at State's

12   Exhibits #16 and #17, do those depict those evidence

13   markers on the floor in those two photographs?

14       A    Yes, they do.  They're here and there.

15       Q    And I guess one up here by Mr. Smalls, and

16   two and three against the wall; four, five, and six, I

17   believe, are depicted in those photographs?

18       A    Correct.

19       Q    Okay.  Now, if I could, I'd like you to go

20   through them and show number one, which is up here by

21   Mr. Smalls, kind of right beside his waist area, is

22   that correct?

23       A    Correct.

24       Q    I'm showing you State's Exhibit #18.  What

25   does that depict?

Anna Clemmons - Direct                                      374

1          A     That's a closer shot of number one.  That's

2     the large fragment I was speaking of, the bullet

3     fragment.

4          Q     Okay.  And I'm showing you State's Exhibit

5     #48.  And is that the actual fragment that you

6     collected?

7          A     Yes.

8          Q     Your Honor, at this time, we'd offer State's

9     Exhibit #48 into evidence.

10               THE COURT:  Any objection, Mr.

11    Littlejohn?

12               MR. LITTLEJOHN:  No objection.

13               THE COURT:  Without objection.

14                    (State's Exhibit 48 was

15    received in evidence.)

16         Q     Again, that is a bullet fragment, and I guess

17    it's flattened out after it hits the floor or something

18    of that nature?

19         A     Correct.

20         Q     Okay.  State's Exhibit #19, what's being

21    depicted in that photograph?

22         A     That's the cell phone, number two, that was

23    also beside Mr. Smalls.

24         Q     And that would be kind of right where you can

25    see the very top of the evidence marker, is that

Anna Clemmons - Direct                                    375

1    correct?

2        A    Correct.

3        Q    And number three?

4        A    Number three is a shell casing from a .380, I

5    believe.

6        Q    I'm showing you State's Exhibit #42.  What

7    does that appear to be?

8        A    Casings.

9        Q    Your Honor, the State would offer State's #42

10   into evidence.

11                   MR. LITTLEJOHN:  No objection.

12                   THE COURT:  Without objection.

13                          (State's Exhibit 42 was

14   received in evidence.)

15       Q    You had indicated that was a .380 shell

16   casing, is that correct, with the caliber on the end of

17   it?

18       A    Correct.  It's a .380.

19       Q    Once again, for those of us who aren't as

20   familiar with firearms, what is a shell casing?

21       A    This is actually -- prior to being fired, you

22   have this part and then the actual bullet that comes

23   out.  But the shell casing is released from the gun,

24   and the bullet is ejected out.

25       Q    And if I fire a semi-automatic handgun, what

382

Anna Clemmons - Direct                                    376

1    happens with the shell casing after the bullet is fired
2    out --
3         A    It's ejected --
4         Q    -- out of the shell casing?
5         A    -- ejected from the gun.
6         Q    So it would be found possibly on the floor
7    like this was found?
8         A    Correct.
9         Q    What's the difference between a semi-
10   automatic pistol and a revolver?  What happens with the
11   shell casing in a revolver?
12        A    A revolver has an actual cylinder, and it
13   keeps the shell casing.  It does not release it like
14   the semi-automatic does.
15        Q    Now I'm showing you State's Exhibit #21.
16   What's depicted in that photograph?
17        A    That's another shell casing, and it's a .40-
18   caliber.
19        Q    That was marked as four, is that correct?
20        A    Correct.
21        Q    And now I'm showing you State's Exhibit #43.
22   Is that a shell casing?
23        A    Correct.
24        Q    Your Honor, at this time we'd offer State's
25   43 into evidence.

Anna Clemmons - Direct                                    377

1           MR. LITTLEJOHN:  No objection.  If I
2    might ask, what caliber is it?
3           MR. SORENSON:  It's a .40-caliber.
4           THE COURT:  Without objection.
5                      (State's Exhibit 43 was
6    received in evidence.)
7       Q    And I'll let you hold that.  A .40-caliber,
8    is that a larger handgun than a .380-caliber handgun?
9       A    That would be smaller than the .380.
10      Q    Once again, that was found, I guess, kind of
11   right at Mr. Smalls' foot, marker number four?
12      A    Correct.
13      Q    How about marker number five?
14      A    Again, that's another shell casing, which is
15   also .40.
16      Q    And that's found almost right next to number
17   four, right?
18      A    Right, just in front of it here.
19      Q    I'm showing you State's Exhibit #44.  That's
20   another .40-caliber shell casing?
21      A    Yes.
22      Q    Your Honor, at this time we'd offer State's
23   44 into evidence.
24          MR. LITTLEJOHN:  No objection.
25          THE COURT:  Without objection, it's

Anna Clemmons - Direct                                    378

1    admitted.

2                              (State's Exhibit 44 was

3    received in evidence.)

4        Q    Now I'm showing you State's Exhibit #23.

5    It's marker number six?

6        A    Yes.  Again, that's one of the fragments that

7    would have come off of the actual bullet when the gun

8    was fired.

9        Q    And that's, I guess, a little farther down

10   the hallway kind of back in --

11       A    Yes.

12       Q    -- towards the club a little way?

13       A    Right.

14       Q    And that's in State's Exhibit #47?

15       A    Yes, six.

16       Q    Your Honor, at this time we'd offer State's

17   47 into evidence.

18              MR. LITTLEJOHN:  That corresponds with

19   marker number six?

20              MR. SORENSON:  That is marker number

21   six, yes, sir.

22              MR. LITTLEJOHN:  No objection, Your

23   Honor.

24              THE COURT:  Without objection.  Thank

25   you.

Anna Clemmons - Direct                              379

1                      (State's Exhibit 47 was

2      received in evidence.)

3          Q    Now, looking at these photographs, I don't

4      see a marker number seven.  Did there come a time when

5      y'all were able to locate --

6          A    Yes, once he was moved and we moved the cups.

7          Q    Is that where Mr. Smalls was kind of tucked

8      up in the corner at that time when you got there?

9          A    Yes, sir.

10         Q    Now, could you tell if he had been moved at

11     all by the time you got to him, or do you have any

12     idea?

13         A    I was advised that he was, but that was based

14     on --

15             MR. LITTLEJOHN:  Your Honor, I'm going

16     to object that it would be hearsay, unless she knows of

17     her own knowledge.

18             THE COURT:  Okay.  Certainly, it's

19     sustained.

20         A    That's how he was found when I got there.

21         Q    Okay.  When you got there, that's where he

22     was, in that position?

23         A    Correct.

24         Q    Okay.  And this is kind of a close-up of his

25     head.  Did he appear to have had his head resting on

# 386

Anna Clemmons - Direct                                          380

1    any items?

2         A    Yes.   There's a sign right there in the

3    corner, an exit sign.

4         Q    An exit sign.   And there are also some

5    plastic cups up there, I guess?

6         A    Yes.

7         Q    Upon Mr. Smalls being moved, was there

8    anything located --

9         A    Later, once I moved the cups here, I located

10   another projectile.

11        Q    And is that actually depicted in State's

12   Exhibit 27?

13        A    Yes, it's right here in front of the plastic

14   cups.

15        Q    Okay.   And what was it that you found there

16   on that?

17        A    It was a bullet.

18        Q    I'm showing you State's Exhibit #45.   Is that

19   the bullet that you found?

20        A    Yes.

21        Q    Okay.   And that bullet would then have come

22   out of a shell casing?

23        A    Correct.

24        Q    One of those would have come out of?

25        A    Yes.

Anna Clemmons - Direct                          381

1        Q    At this time, Your Honor, we'd offer State's

2   45 into evidence.

3                   MR. LITTLEJOHN:  No objection.

4                   THE COURT:  Without objection.  Thank

5   you.

6                        (State's Exhibit 45 was

7   received in evidence.)

8        Q    And I see in this picture a marker -- this is

9   State's 28 -- a marker number eight on the floor?

10       A    Yes.

11       Q    What did you ultimately find there that you

12  marked as number eight?

13       A    This corresponds with a hole in the carpet

14  that was also located.

15       Q    In State's 29, is that shown up close?

16       A    It was actually near where marker one was

17  located.  This is marker one.  I located this here,

18  again, cutting the carpet to see if anything was

19  possibly under the carpet itself.

20       Q    State's Exhibit 30, I guess that's to show

21  where the red carpet has been pulled back?

22       A    Right.

23       Q    Number 31, is that the hole that was cut out

24  of the carpet?

25       A    Yes, that was from the carpet being cut out.

**388**

Anna Clemmons - Direct                                      382

1        Q     When you cut that carpet away, did there
2   appear to be anything underneath it?
3        A     I did locate several very small fragments and
4   what appeared to be an indentation into the floor
5   itself.
6        Q     As to the small fragments, I'm showing you
7   State's Exhibit #46.  Is that those fragments?
8        A     Appears to be, yes.
9        Q     And, Your Honor, at this time we'd offer
10  State's 46 into evidence.
11                    THE COURT:  Mr. Littlejohn.
12                    MR. LITTLEJOHN:  That corresponds to
13  what, please?
14                    INVESTIGATOR CLEMMONS:  It's 2AC.
15                    MR. LITTLEJOHN:  2AC?
16                    MR. SORENSON:  2AC, and it's marker
17  number eight.
18                    MR. LITTLEJOHN:  No objection.
19                    THE COURT:  Okay.  Thank you, sir.
20                         (State's Exhibit 46 was
21  received in evidence.)
22        Q     Now, you had indicated that there was an
23  indention --
24                    BAILIFF:  Excuse me, Your Honor.  We
25  have a juror that's sick all of a sudden.  I'm sorry.

Anna Clemmons - Direct                              383

1           THE COURT:  Okay, ladies and gentlemen,
2    we'll let you all take a break and take care of this.
3    Just don't discuss the testimony or evidence you've
4    seen or heard thus far.  Thank you.
5                     (Jury out at 3:30 p.m.)
6           THE COURT:  Okay.  Thank you, sir.
7    We'll stand down for a few minutes while we check on
8    our juror.  Investigator, you may step down.  I just
9    remind you you're still on the stand and still under
10   oath.  We'll be in recess for a few minutes.
11          THE COURT:  Counsel, I understand we're
12   ready to continue.
13          THE COURT:  Investigator, if you'll just
14   retake the stand.  Thank you, ma'am.
15          THE COURT:  We're ready for the jury.
16                     (The jury returned to the
17   courtroom at 3:47 p.m., after which the following
18   proceedings were had:)
19          BAILIFF:  The jury is all present, Your
20   Honor.
21          THE COURT:  Thank you, sir.
22          THE COURT:  Thank you, ladies and
23   gentleman.  Do you all feel all right?  Okay.  If you
24   need anything, just let us know, and we'll stop and
25   accommodate you, ma'am.  We're ready to continue.

Anna Clemmons - Direct                                384

1              THE COURT:  Mr. Sorenson, you can
2    continue, sir.
3              MR. SORENSON:  Thank you.  Can she step
4    back down?
5              THE COURT:  Yes, sir.
6        Q    I believe where we had left, Investigator
7    Clemmons, was you indicated that you had dug some small
8    fragments out of that kind of carpeting?
9        A    This is the general area where they were
10   collected.
11       Q    You indicated, I believe, earlier that there
12   was almost like a little indention in the floor.  I'm
13   showing you State's Exhibit #32.  Does that show that
14   indention?
15       A    Yes, it does.
16       Q    What did that appear to be consistent with?
17       A    It appears to be consistent with a force
18   going straight down to cause that indention.
19       Q    Such as a bullet?
20             COURT REPORTER:  I can't hear her.
21       A    Yes, that's possible.
22             THE COURT:  You may need to speak up a
23   little bit so the Court Reporter can hear.
24       Q    You said it was consistent with a force going
25   straight down, I believe?